**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| KEYSIGHT TECHNOLOGIES, INC. & SUBSIDIARIES | ) ) ) | |
| *Plaintiff,* | ) ) | No. 25-137 |
| v. | ) ) | |
| THE UNITED STATES, | ) ) | The Honorable David A. Tapp |
| *Defendant.* | ) ) ) ) ) ) | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to RCFC 56(a) and this Court's scheduling order, *see* ECF No. 15, Plaintiff Keysight Technologies, Inc. & Subsidiaries (Keysight) hereby moves for summary judgment on the validity of Treasury Regulation § 1.951A-2(c)(5), 26 C.F.R. § 1.951A-2(c)(5). For the reasons set forth below, Keysight respectfully requests that the Court enter judgment as a matter of law that Treasury Regulation § 1.951A-2(c)(5) is invalid. Plaintiff requests oral argument on this motion.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

QUESTION PRESENTED ............................................................................................ 2

STATEMENT OF THE CASE....................................................................................... 3

    A.  Legal Background ............................................................................................. 3

        1.  The TCJA's New Rule For Taxation Of Foreign Subsidiaries.................................... 3

        2.  The Rules For Calculating GILTI .................................................................. 3

        3.  The Statute's Rule For Determining Which Deductions Are Allowed ......................... 5

        4.  The Treasury Department's Proposed Rule Sought To Disallow Deductions That Meet The Established Test ................................................. 6

        5.  The Treasury Department's Final Rule Likewise Disallows Deductions Authorized By Statute................................................... 8

    B.  Factual Background ........................................................................................ 10

    C.  Procedural History ......................................................................................... 11

ARGUMENT................................................................................................................ 11

TREASURY REGULATION § 1.951A-2(c)(5) IS INVALID AS A MATTER OF LAW ........... 11

    *Legal Standard* ............................................................................................... 12

    A.  The Regulation Is Contrary To The Statute ...................................................... 13

        1.  The Statute Authorizes Taxpayers To Reduce Their GILTI By Claiming Deductions That Are Factually Related To Their Income ............................. 13

        2.  The Regulation Contradicts The Statute And Thus Is Invalid ................................ 16

        3.  The Treasury Department Has No Valid Defense Of The Regulation........................ 19

            a.  The Treasury Department ignores the full statutory text .................................... 20

            b.  The Treasury Department ignores the settled meaning of "properly allocable" ................................................... 21

            c.  The Treasury Department's approach impermissibly interprets the same term in two different ways ................................. 23

        4.  The Treasury Department's Policy Preferences Do Not Justify Its Disregard Of The Statute ........................................... 25

            a.  There is no indication that Congress viewed the gap period as problematic........ 25

            b.  The agency may not substitute its policy preferences for the statutory text ........ 29

i

B.  The Regulation Exceeds The Treasury Department's Authority ...................................... 31

    1.  Section 951A(d)(4) Does Not Authorize The Regulation .......................................... 31

    2.  Section 7805(a) Also Does Not Authorize The Regulation ....................................... 33

C.  The Regulation Is Not A Logical Outgrowth Of The Proposed Rule .............................. 36

    1.  The Regulation Operates Fundamentally Differently Than The Proposed Rule ........ 37

    2.  The Regulation Has A Different Effect Than The Proposed Rule ............................. 39

CONCLUSION ...................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*3M Co. v. Comm'r*,
   154 F.4th 574 (8th Cir. 2025) ...............................................................................................19

*Arzio v. Shinseki*,
   602 F.3d 1343 (Fed. Cir. 2010).............................................................................................34

*BASR P'ship v. United States*,
   795 F.3d 1338 (Fed. Cir. 2015).............................................................................................13

*BFP v. Resol. Tr. Corp.*,
   511 U.S. 531 (1994)..............................................................................................................26

*Cammarano v. United States*,
   358 U.S. 498 (1959)..............................................................................................................22

*Chevron Corp. v. Comm'r*,
   104 T.C. 719 (1995)..............................................................................................................15

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)..........................................................................................12, 20, 22, 23

*Clark v. Martinez*,
   543 U.S. 371 (2005)........................................................................................................24, 25

*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009).......................................................................................38, 40

*Dominion Res., Inc. v. United States*,
   681 F.3d 1313 (Fed. Cir. 2012).......................................................................................18, 19

*Env't Integrity Project v. EPA*,
   425 F.3d 992 (D.C. Cir. 2005)..............................................................................................36

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019)..............................................................................................................29

*George v. McDonough*,
   596 U.S. 740 (2022)..............................................................................................................22

*GHS Health Maintenance Org., Inc v. United States*,
   536 F.3d 1293 (Fed. Cir. 2008).......................................................................................12, 18

*Gitlitz v. Comm'r*,
   531 U.S. 206 (2001)........................................................................................................29, 30

*Int'l Paper Co. v. United States*,
   33 Fed. Cl. 384 (1995) ......................................................................................15, 16, 22

*ITServe All., Inc. v. United States*,
   161 Fed. Cl. 276 (2022) ......................................................................................13

*Jam v. Int'l Fin. Corp.*,
   586 U.S. 199 (2019)..............................................................................................14, 15, 20

*Lomax v. Ortiz-Marquez*,
   140 S. Ct. 1721 (2020).........................................................................................17

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)..............................................................................................12, 20, 23

*Lorillard v. Pons*,
   434 U.S. 575 (1978)..............................................................................................22

*Mid Continent Nail Corp. v. United States*,
   846 F.3d 1364 (Fed. Cir. 2017)..........................................................................36, 38, 40

*Miller v. United States*,
   65 F.3d 687 (8th Cir. 1995) ................................................................................22, 23

*Murfam Farms, LLC v. United States*,
   88 Fed. Cl. 516 (2009) ........................................................................................12

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
   551 U.S. 224 (2007)..............................................................................................24

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (1997)................................................................................................12

*Redlark v. Comm'r*,
   141 F.3d 936 (9th Cir. 1998) ..............................................................................22, 23

*Roberts v. Sea-Land Servs., Inc.*,
   566 U.S. 93 (2012)................................................................................................33

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997)..............................................................................................13

*Russello v. United States*,
   464 U.S. 16 (1983)................................................................................................27, 28, 35

*Salinas v. U.S. R.R. Ret. Bd.*,
   592 U.S. 188 (2021)..............................................................................................35

iv

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ..................................................................................39

*Trinova Corp. v. Comm'r*,
   T.C. Memo 1997-100 (1997) ..................................................................................15

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ...................................................................................................35

*United States v. Great N. Ry. Co.*,
   287 U.S. 144 (1932) .................................................................................................13

*United States ex rel. Schutte v. SuperValu, Inc.*,
   598 U.S. 739 (2023) .................................................................................................29

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) .................................................................................................25

*Varian Medical Sys., Inc. v. Comm'r*,
   163 T.C. 4 (2024) ..............................................................................................27, 30

*Veteran's Justice Grp., LLC v. Sec'y of Veterans Affairs*,
   818 F.3d 1336 (Fed. Cir. 2016) ...............................................................................36

*Wells Fargo & Co. v. United States*,
   641 F.3d 1319 (Fed. Cir. 2011) ...............................................................................31

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) .................................................................................................25

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ......................................12, 36, 39

   5 U.S.C. § 553(b)(3) ................................................................................................36

   5 U.S.C. § 706 ...................................................................................................12, 36

   5 U.S.C. § 706(2) ..............................................................................................12, 31

8 U.S.C. § 1231(a)(6) ....................................................................................................24

Internal Revenue Code of 1986, 26 U.S.C. § 1 *et seq.* ......................................... *passim*

   26 U.S.C. § 78 ..........................................................................................................30

   26 U.S.C. § 162 ..........................................................................................................6

   26 U.S.C. § 163(h)(2)(A) .........................................................................................23

26 U.S.C. § 167 (2017) ................................................................................8, 28

26 U.S.C. § 172(a) .............................................................................................27

26 U.S.C. § 172(b)(1)(A)(i) (2016) ...................................................................27

26 U.S.C. § 197 ..............................................................................................8, 11

26 U.S.C. § 197 (2017) .....................................................................................28

26 U.S.C. § 199 (2017) .....................................................................................22

26 U.S.C. § 199(c)(1) (2017) ............................................................................21

26 U.S.C. § 245A ........................................................................................30, 35

26 U.S.C. § 245A(a) ..........................................................................................35

26 U.S.C. § 245A(g) ..........................................................................................35

26 U.S.C. § 250 ..................................................................................................23

26 U.S.C. § 250(a) .............................................................................................23

26 U.S.C. § 250(a)(1)(A) ...................................................................................23

26 U.S.C. § 250(b)(3)(A)(ii) ..............................................................................23

26 U.S.C. § 861 ............................................................................................ passim

26 U.S.C. § 861(b) (2017) .............................................................................5, 15

26 U.S.C. § 864 .........................................................................................5, 14, 15

26 U.S.C. § 864(e)(3) ..........................................................................................5

26 U.S.C. § 904 (2017) .....................................................................................22

26 U.S.C. § 904(b)(4)(B) (2017) .......................................................................21

26 U.S.C. § 904(d) ....................................................................................5, 14, 15

26 U.S.C. § 904(d)(2) ..........................................................................................6

26 U.S.C. § 951A ........................................................................................ passim

26 U.S.C. § 951A(a) .............................................................................................3

26 U.S.C. § 951A(b) ......................................................................................3, 13

26 U.S.C. § 951A(b)(2)(A) ...............................................................................................4

26 U.S.C. § 951A(c) ..................................................................................................13, 32

26 U.S.C. § 951A(c)(2) ............................................................................................ *passim*

26 U.S.C. § 951A(c)(2)(A)(i) ......................................................................................4, 14

26 U.S.C. § 951A(c)(2)(A)(ii) .................................................................................. *passim*

26 U.S.C. § 951A(d) ................................................................................................31, 32

26 U.S.C. § 951A(d)(4) ............................................................................................ *passim*

26 U.S.C. § 952 .......................................................................................................3, 5, 14

26 U.S.C. § 954 .....................................................................................................5, 14, 21

26 U.S.C. § 954(b)(5) .............................................................................................. *passim*

26 U.S.C. § 954(b)(5) (2017) .......................................................................................14

26 U.S.C. § 965 ................................................................................................5, 7, 14, 26

26 U.S.C. § 965(a) ...........................................................................................................3

26 U.S.C. § 970 .............................................................................................................22

26 U.S.C. § 970(a)(1)(A) (2017) ..................................................................................21

26 U.S.C. § 1001(a) .........................................................................................................8

26 U.S.C. § 1012 .............................................................................................................8

26 U.S.C. § 7805(a) ................................................................................................ *passim*

One Big Beautiful Bill Act, Pub. L. No. 119-21, § 70323(a),
    139 Stat. 72, 205 (2025) ...................................................................................4, 22, 23

Revenue Act of 1962, Pub. L. No. 87-834, § 12(a), 76 Stat. 960, 1006 .......................14

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054 ................... *passim*

    § 11001(c), 131 Stat. 2059 ........................................................................................27

    § 11002(c), 131 Stat. 2063 ........................................................................................27

    § 11011(e), 131 Stat. 2071 ........................................................................................27

    § 11021(b), 131 Stat. 2073 ........................................................................................27

§ 11022(b), 131 Stat. 2074................................................................27

§ 11023(b), 131 Stat. 2075................................................................27

§ 11043(b), 131 Stat. 2087................................................................27

§ 11044(b), 131 Stat. 2087................................................................27

§ 11048(b), 131 Stat. 2088................................................................27

§ 11049(b), 131 Stat. 2089................................................................27

§ 13302(e)(2), 131 Stat. 2123 ...........................................................27

§ 14201, 131 Stat. 2208 .....................................................................3

§ 14201(d), 131 Stat. 2208...........................................................7, 26

**Regulations**

26 C.F.R. § 1.199-4(d) (2017) ..........................................................22

26 C.F.R. § 1.250(b)-1(d)(2)..............................................................23

26 C.F.R. § 1.263A-11(e)(1)..............................................................19

26 C.F.R. § 1.861-8.......................................................................6, 16

26 C.F.R. § 1.861-8(a)(2)...........................................................6, 15, 22

26 C.F.R. § 1.861-8(a)(2) (2017) ......................................................15

26 C.F.R. § 1.861-8(b)(1) .................................................................18

26 C.F.R. § 1.861-8(b)(2) .............................................................6, 15

26 C.F.R. § 1.861-8(f) (2017)............................................................22

26 C.F.R. § 1.861-8(g).....................................................................15

26 C.F.R. § 1.861-14T .....................................................................22

26 C.F.R. § 1.904-6(a) (2017)...........................................................22

26 C.F.R. § 1.951A-2(c)(3)...........................................................21, 24

26 C.F.R. § 1.951A-2(c)(5)........................................................ *passim*

26 C.F.R. § 1.951A-2(c)(5)(i)........................................................9, 37

26 C.F.R. § 1.951A-3(h)(2)(ii)(C)(1)..................................................................................16

26 C.F.R. § 1.951A-3(h)(2)(ii)(C)(2)..................................................................................16

26 C.F.R. § 1.954-1(c) .......................................................................................................21

26 C.F.R. § 1.954-1(c)(1)(i) (2017) ...............................................................5, 6, 15, 22

26 C.F.R. § 1.954-1(c)(1)(i)(B) ....................................................................................6, 15

26 C.F.R. § 1.954-1(c)(iv) (2020)......................................................................................15

26 C.F.R. § 1.954-2(e)(3)(iv) (2017) .................................................................................28

26 C.F.R. § 1.970-1(b)(3) (2017).......................................................................................22

26 C.F.R. § 1.951A-3(h)(2)(ii)(C) .................................................................................9, 18

## Other Authorities

42 Fed. Reg. 1195 (1977) ..................................................................................................15

Build Back Better Act, H.R. 5376, 117th Cong. (2021)..............................................32, 34

Deduction for Foreign-Derived Intangible Income,
    84 Fed. Reg. 8188-01 (Mar. 6, 2019) .........................................................................23

Guidance Related to Section 951A, 83 Fed. Reg. 51072-01 (Oct. 10, 2018)........................ *passim*

Guidance Related to Section 951A, 84 Fed. Reg. 29288-01 (June 21, 2019) ....................... *passim*

H.R. Rep. No. 115-409 (2017)..............................................................................................3

H.R. Rep. No. 115-466 (2017)............................................................................................29

*Sutherland Statutory Construction* (7th ed. 2025).........................................................14

**INTRODUCTION**

The question in this case is whether the Treasury Department can, by regulation, prevent a taxpayer from taking a deduction that Congress expressly authorized by statute, thereby increasing the taxpayer's tax liability. The answer is no. An administrative agency is not allowed to override Congress's judgment simply because it thinks it knows better than Congress.

This case involves taxation of foreign subsidiaries of U.S. companies. Historically, U.S. companies generally did not pay tax on the earnings of their foreign subsidiaries until those earnings were returned to the United States. Congress fundamentally changed that approach in the Tax Cuts and Jobs Act of 2017 (TCJA). Among its sweeping reforms, the TCJA created a new category of taxable income – called global intangible low-taxed income (GILTI) – that is taxed in the year it is earned, even if the income is not repatriated to the United States.

In Section 951A of the Internal Revenue Code, Congress set out comprehensive rules for how to calculate GILTI. Those include rules for which deductions taxpayers can take to reduce GILTI. The statute leaves no room for interpretation: It requires that taxpayers be allowed to subtract deductions "properly allocable" to their subsidiaries' income, using the same standard that has governed allocation of deductions to income for decades.

The Treasury Department rejected that command. It singled out one group of taxpayers – companies with foreign subsidiaries that file their taxes on a fiscal-year basis – for a different rule. The agency believed that those taxpayers would receive an unwarranted benefit from the effective date Congress chose for GILTI, so it decided to deny some of their deductions. Congress applied GILTI to taxable years beginning on or after January 1, 2018. Because some subsidiaries use fiscal years, rather than calendar years, for tax reporting, they had a short gap period in 2018 during which their income was not taxed as part of GILTI. In Treasury Regulation § 1.951A-2(c)(5), the agency decided to deny certain deductions arising out of gap-period transactions – even though

1

those deductions are "properly allocable" to income under Section 951A. That is, the regulation denies deductions that are allowed by the statute's plain text. It is invalid for that reason alone.

Beyond the threshold problem of prioritizing policy over text, the regulation also is built on a mistaken premise – that Congress's choice of effective dates caused a problem the agency needed to fix. The TCJA is filled with provisions whose effective dates may confer advantages on one group of taxpayers over another. That is the inevitable result of enacting sweeping changes to a complex tax system with taxpayers that use different fiscal years. Sometimes the timing works to the advantage of fiscal-year taxpayers, sometimes to the advantage of calendar-year taxpayers. Congress made those tradeoffs consciously, balancing policy goals against the complexity of bespoke rules. It is not the Treasury Department's role to change the consequences it dislikes.

The regulation is invalid for two additional, independent reasons. The Treasury Department lacked statutory authority to issue it, as Congress provided only limited, specific grants of rulemaking power in this area, and the agency's reliance on its general rulemaking authority would erase those limits. The rule also violates the Administrative Procedure Act's notice-and-comment requirements because it is so different from the proposed rule that it is not a logical outgrowth of the proposed rule. For all of these reasons, the Court should hold that Treasury Regulation § 1.951A-2(c)(5) is invalid.

## QUESTION PRESENTED

Whether Treasury Regulation § 1.951A-2(c)(5) (2022) is invalid because:

(a) it is contrary to the governing statute, 26 U.S.C. § 951A(c)(2)(A)(ii) (2022), by disallowing deductions that the statute affirmatively allows;

(b) the Treasury Department lacked the statutory authority to promulgate the regulation; and/or

(c) the final regulation is not a logical outgrowth of the proposed rule.

2

## STATEMENT OF THE CASE

### A.    Legal Background

#### 1.    The TCJA's New Rule For Taxation Of Foreign Subsidiaries

This case involves the taxation of foreign subsidiaries of U.S. companies.  Before 2017, the earnings of foreign subsidiaries generally were not taxed until those earnings were brought back to the United States – a process known as repatriation.  H.R. Rep. No. 115-409, at 361 (2017).  There were a few limited exceptions to this rule, *see, e.g.*, 26 U.S.C. § 952 *et seq.*, but otherwise earnings of foreign subsidiaries were not taxed until they were repatriated.[1]

Congress substantially revised that framework in the TCJA.  *See* Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 14201, 131 Stat. 2054, 2208.  Now, much of the income of foreign subsidiaries is taxed in the year it is earned, even if it is not brought back to the United States.

Congress made this change in two steps:  by imposing a transition tax and then by applying a new rule going forward.  First, for income earned through December 31, 2017, that had not been repatriated, Congress imposed a one-time transition tax.  26 U.S.C. § 965(a).  Second, for income earned in fiscal years beginning on or after January 1, 2018, Congress created a new category of foreign income – GILTI – that is taxed immediately even if not repatriated.  *Id.* § 951A.  These provisions apply to foreign subsidiaries that are more than 50 percent owned by U.S. taxpayers; these subsidiaries are called controlled foreign corporations, or CFCs.  *Id.* §§ 951A(a), 957(a).

#### 2.    The Rules For Calculating GILTI

Congress provided detailed rules for calculating GILTI in Section 951A of the Internal Revenue Code.  *See* 26 U.S.C. § 951A(b).  As its name implies, GILTI is about ensuring taxation of the income foreign subsidiaries earn from intangible assets, such as patents and other intellectual

---

[1]    Because this case involves Keysight's tax liability for 2020-2022, all statutory and regulatory references are to the versions in effect in 2022, unless otherwise noted.

property.  Thus, GILTI generally is defined as the net income from intangible assets, excluding an amount attributable to tangible assets.

In particular, a taxpayer's GILTI is its foreign subsidiaries' net income (which the statute calls "net CFC tested income"), minus a fixed return on their tangible assets.  26 U.S.C. § 951A. The statute calls those tangible assets "qualified business asset investment[s]," or QBAI.  *Id.* § 951A(b)(2)(A).  The fixed return is set at 10 percent of the value of the tangible assets, adjusted for interest expenses related to those assets.  *Id.* § 951A(b)(2)(A)-(B).[2]

The dispute in this case is about the taxpayer's net CFC tested income.  This is a critical element, because the higher the net CFC tested income, the higher the taxpayer's GILTI, and the more tax it must pay.  Net CFC tested income is an aggregated amount across all of the taxpayer's foreign subsidiaries.  26 U.S.C. § 951A(c)(2).  Each subsidiary calculates whether it has "tested income" or a "tested loss," and then the taxpayer combines those results to arrive at its net CFC tested income.  *See id.*

To calculate a subsidiary's "tested income," the statute provides a specific formula:  The subsidiary's tested income is its "gross income . . . over . . . the deductions (including taxes) properly allocable to such gross income under rules similar to the rules of section 954(b)(5)."  26 U.S.C. § 951A(c)(2)(A)(i)-(ii).  That is, Congress expressly authorized taxpayers to take deductions to reduce their tested income, which in turn reduces their net CFC tested income and GILTI. And a deduction is allowed if it is "properly allocable" to the subsidiaries' gross income using the rules of Section 954(b)(5).  Thus:

---

[2]    After the time period at issue, Congress eliminated the second part of the formula – the QBAI reduction for income from tangible assets – and renamed GILTI to "net CFC tested income."  *See* One Big Beautiful Bill Act, Pub. L. No. 119-21, § 70323(a), 139 Stat. 72, 205 (2025) (new rule applicable to tax years after December 31, 2025).



### 3.    The Statute's Rule For Determining Which Deductions Are Allowed

At the time Congress enacted Section 951A, the rule for when a deduction is allowed under Section 954(b)(5) was well settled:  A deduction is "properly allocable" to an amount of income if it bears a "factual relationship" to that income, meaning that the deduction is incurred as a result of, or incident to, the activity that produces that income.

As noted, Section 951A invokes the "rules of section 954(b)(5)" to determine when a deduction is "properly allocable" to gross income.  26 U.S.C. § 951A(c)(2)(A)(ii).  Section 954 is part of a set of provisions (called Subpart F) that, like GILTI, impose tax on certain income of foreign subsidiaries even if the income is not repatriated.  *See id*. §§ 952-65.  In Section 954(b)(5), Congress provided that a taxpayer could reduce its Subpart F income by the "deductions (including taxes) properly allocable to such income."  *Id.* § 954(b)(5).  Congress did not further define "properly allocable" in Section 954.

A Treasury Department regulation implementing Section 954(b)(5) defines "properly allocable."  It states that whether a deduction is "properly allocable" to income should be determined "under the principles of sections 861, 864 and 904(d)" of the Internal Revenue Code.  26 C.F.R. § 1.954-1(c)(1)(i) (2017).  Section 861 is the key provision; it states that taxpayers may take deductions to reduce income when the deductions are "properly apportioned or allocated" to that income.  26 U.S.C. § 861(b).  (Sections 864 and 904(d) are not relevant here; they provide special rules for tax-exempt assets and passive income, neither of which is at issue.  *See id.* § 864(e)(3)

5

(tax-exempt assets); *id.* § 904(d)(2) (passive income).)

A longstanding tax regulation explains how to allocate deductions to income under Section 861. *See* 26 C.F.R. § 1.861-8 (first promulgated in 1977). The regulation states that a deduction is allocable to income when it has a "factual relationship" to that income. *Id.* § 1.861-8(a)(2). Under the "factual relationship" test, a deduction is allocable to a category of income "if it is incurred as a result of, or incident to, an activity" that produces that income. *Id.* § 1.861-8(b)(2).

An example illustrates how the factual relationship test works. Take a taxpayer that manufactures and sells pianos, and also separately provides plumbing services. That taxpayer has two categories of income – piano income and plumbing income. Under the Internal Revenue Code, the taxpayer can claim a deduction for the costs of manufacturing the pianos. *See* 26 U.S.C. § 162. But under the factual relationship test, the taxpayer can allocate the deduction only to its piano income, and not the plumbing income, because the taxpayer only incurred those costs in order to produce the piano income. The factual relationship test reflects the common-sense proposition that deductions should be allocated to the income that was created by the deductions.

To summarize, a taxpayer can reduce its GILTI by subtracting from its foreign subsidiaries' income any deductions allocable to that income under the rules of Section 954(b)(5). 26 U.S.C. § 951A(c)(2). And the rules of Section 954(b)(5) allow a deduction if it is "factually related" to the income at issue, such as a deduction for an expense incurred to produce the income. *See id.* § 954(b)(5); 26 C.F.R. §§ 1.861-8(a)(2), 1.954-1(c)(1)(i)(B).

### 4. The Treasury Department's Proposed Rule Sought To Disallow Deductions That Meet The Established Test

Despite the statute's clear command, the Treasury Department proposed a regulation that would prevent taxpayers from taking some deductions that satisfy the factual relationship test. *See* Guidance Related to Section 951A, 83 Fed. Reg. 51072-01, 51077 (Oct. 10, 2018). In the proposed

regulation, the Treasury Department set out rules for calculating GILTI. For nearly all deductions, the agency proposed using the factual relationship test. *Id.* at 51074-75. But for one particular category of deductions, the agency decided to disallow the deductions even when they meet the factual relationship test. *Id.* at 51077.

Specifically, the Treasury Department decided to carve out deductions arising out of transactions that occurred during a gap period before the new GILTI regime became effective. 83 Fed. Reg. at 51077. The gap period arose for fiscal-year taxpayers because of the dates Congress chose for the transition tax and for the effective date of GILTI. The transition tax applied to the income that the foreign subsidiary earned through December 31, 2017, and had not repatriated, *see* 26 U.S.C. § 965, and GILTI applies to the subsidiary's income earned in the tax years starting on or after January 1, 2018, Pub. L. No. 115-97, § 14201(d), 131 Stat. 2054, 2208.

Those timing provisions meant that calendar-year taxpayers (*i.e.*, those with tax years that run from January 1 to December 31) were continuously subject to tax: Income earned through December 31, 2017, and not yet repatriated was subject to the transition tax, and income earned starting on January 1, 2018, was included in GILTI. But for fiscal-year taxpayers (*i.e.*, those with tax years that begin on a date other than January 1), there was a gap period: Unrepatriated income earned through December 31, 2017, was subject to the transition tax, but income earned after that date but before the start of their next fiscal year was not included in GILTI.

The Treasury Department was concerned that there could be transactions during the gap period that were not taxed but could create tax benefits in later years. The agency focused on transactions in which a foreign subsidiary sold assets to a related foreign subsidiary. If the transaction occurred during the gap period, the seller's gain would not be taxed, but the buyer would have an increased tax basis in the assets that it potentially could use to support deductions in future

tax years. "Basis" is the taxpayer's investment in an asset for tax purposes, usually the price the taxpayer paid to acquire it. 26 U.S.C. § 1012. When a taxpayer purchases intellectual property, it generally can amortize its basis in that property over time, taking a deduction each year to reduce its taxable income. *See id.* §§ 167, 197.

For example, suppose Subsidiary A, a fiscal year taxpayer, owned intellectual property with a tax basis of $1 million and a market value of $15 million. During the gap period, Subsidiary A sold that asset to Subsidiary B for $15 million. As a result, Subsidiary A realized a gain of $14 million, *see* 26 U.S.C. § 1001(a), and Subsidiary B now owned an asset with a basis of $15 million, *id.* § 1012. Subsidiary B then could take up to $15 million in amortization deductions against the asset in future tax years, even though Subsidiary A's gain had not been taxed. *See id.* §§ 167, 197.

In the proposed rule, the Treasury Department decided to disallow any deductions by the buyer above the seller's basis. 83 Fed. Reg. at 51077. In the example above, that means Subsidiary B could claim only $1 million in deductions. As authority for the proposed rule, the agency cited Section 951A(d)(4), which authorizes the Secretary of the Treasury to promulgate anti-abuse rules for QBAI, *see id.*– even though the proposed rule had nothing to do with QBAI, but related only to deductions when calculating tested income.

### 5.    The Treasury Department's Final Rule Likewise Disallows Deductions Authorized By Statute

The Treasury Department received many comments on its proposed rule. Among other things, taxpayers explained that the proposed rule was contrary to the statute, because it disallowed deductions that the statute affirmatively authorizes, and that the agency lacked the statutory authority to promulgate the rule, because the cited authority was about QBAI, not deductions attributable to intangible assets. *See* Guidance Related to Section 951A, 84 Fed. Reg. 29288-01, 29300 (June 21, 2019). In response, the Treasury Department changed the rule to use a different

8

mechanism for disallowing the deductions, and cited a different source of statutory authority for the rule. *See id.* But the bottom line was the same: The agency cast aside the factual relationship test and stopped taxpayers from taking deductions that the statute affirmatively authorizes.

In the final rule, rather than disallow these deductions outright, the Treasury Department came up with a clever way to effectively disallow them. The agency created a new category of income (one with no basis in the statute), stated that the deductions must be allocated to that new category of income, and then never used that new category for anything.

Specifically, the final rule labels any gap-period transaction in which one foreign subsidiary sold assets to another subsidiary as a "disqualified transfer," and any resulting basis increase as "disqualified basis." 26 C.F.R. § 1.951A-3(h)(2)(ii)(C). For deductions attributable to so-called "disqualified basis," the regulation abandons the factual relationship test and instead requires the taxpayer to allocate the deductions to a newly invented category of income called "residual CFC gross income." *Id.* § 1.951A-2(c)(5)(i).

"Residual CFC gross income" is a completely made-up term. It does not appear anywhere in the Internal Revenue Code, and it is not used to calculate GILTI. As the Treasury Department admits, this means the deductions are never taken into account and cannot be used to reduce GILTI. *See* 84 Fed. Reg. at 29300 (acknowledging that, under the regulation, "the deduction . . . is not permitted to reduce tested income"). The Treasury Department essentially created a black hole and sent the deductions there to disappear.

Thus, the final rule (like the proposed rule) prevents a taxpayer from taking deductions authorized by the statute and thus overrides Congress's formula for calculating GILTI. In fact, the new rule goes even further than the proposed rule, because the proposed rule only disallowed the deductions for purposes of GILTI, but the new rule ensures that the deductions are not used to

9

reduce *any* category of taxable foreign subsidiary income. *See* 84 Fed. Reg. at 29300 (admitting that the agency "broaden[ed]" the final rule so that it applies to more than just GILTI).

The Treasury Department also changed its claimed authority for the rule. Instead of relying on Section 951A(d)(4), which by its plain terms only allows the agency to adopt rules regarding QBAI, the agency invoked its general rulemaking authority under Section 7805(a). *See* 84 Fed. Reg. at 29298-99. The agency invoked this general authority even though Congress already spoke specifically on this issue in Section 951A(d)(4), when it set out the limited circumstances in which the agency could adopt an anti-abuse rule related to GILTI.

### B.      Factual Background

This motion does not depend on any facts, and the Court may decide it as a matter of law. Keysight provides the following summary of the complaint's allegations solely to provide context for the issue presented.

Keysight is a multinational technology company that provides electronic design and testing solutions. ECF No. 2 (Compl.) ¶ 24. Its products and services help clients develop and maintain complex electronic systems used in communications, networking, and other high-tech industries. *Id.* Keysight operates globally through a network of foreign subsidiaries, including several in Singapore. *Id.* ¶¶ 6-7. Keysight, along with all of its Singapore subsidiaries, is a fiscal-year taxpayer with a fiscal year beginning on November 1. *See* ECF No. 2-1, at 2.

In 2017, the Singaporean government decided to overhaul its tax treatment of intellectual property income, altering how Singapore taxed that income and conditioning certain benefits on the taxpayer's Singapore entities having a certain structure and operation. Compl. ¶ 29. On October 1, 2018, in anticipation of these changes, Keysight restructured its Singapore operations by transferring intellectual property assets and business functions from two Singaporean subsidiaries to a third subsidiary, Keysight Technologies Singapore (Sales) Pte. Ltd. (KTSS). *Id.* ¶ 33.

10

This case concerns Keysight's GILTI for the 2020, 2021, and 2022 tax years. In each of those years, KTSS earned income from assets that it received in the 2018 consolidation. Accordingly, for each of those years, KTSS claimed an amortization deduction for its intellectual property, *see* 26 U.S.C. § 197, and sought to allocate those deductions to its income under Section 951A(c)(2) to reduce Keysight's GILTI, Compl. ¶¶ 42-53.

### C. Procedural History

Keysight filed this action to seek its claimed deductions for the 2020, 2021, and 2022 tax years. Compl. ¶ 1. In particular, Keysight challenges the effective disallowance of the claimed deductions for all three tax years based on Treasury Regulation § 1.951A-2(c)(5), which Keysight alleges is invalid. *Id.* ¶¶ 64-81. This Court issued a scheduling order, under which the parties are to first address the threshold legal question of the regulation's validity. ECF No. 15.

### ARGUMENT

### TREASURY REGULATION § 1.951A-2(c)(5) IS INVALID AS A MATTER OF LAW

Treasury Regulation § 1.951A-2(c)(5) is invalid for three reasons. Most fundamentally, the regulation is contrary to the statute. Section 951A(c)(2) plainly authorizes a taxpayer to reduce its GILTI tax liability by taking a deduction permitted under the rules of Section 954(b)(5). The deductions at issue are permitted under the rules of Section 954(b)(5), yet the Treasury Department disallowed them by regulation. An administrative agency is not allowed to nullify a choice made by Congress, as the Treasury Department has attempted to do here.

Separately, the regulation is invalid because the Treasury Department lacked the authority to issue it. In both intent and effect, the regulation is an anti-abuse rule. But Congress did not authorize the Treasury Department to issue an anti-abuse rule on this subject – only on QBAI. Finally, the regulation is procedurally invalid, because the final rule is so different from the proposed regulation that it is not a logical outgrowth of the proposed rulemaking.

11

*Legal Standard*

This Court should grant summary judgment if "there is no genuine [issue of] material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The validity of an administrative agency regulation is a purely legal issue that does not depend on any disputed facts, and thus is appropriate for resolution on summary judgment. *See*, *e.g.*, *Murfam Farms, LLC v. United States*, 88 Fed. Cl. 516, 520 (2009).

Under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, a court should "hold unlawful and set aside" an agency's regulation if the court determines that the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; is "in excess of statutory jurisdiction, authority, or limitations"; or was enacted "without observance of procedure required by law." 5 U.S.C. § 706(2). A regulation is arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority – and therefore invalid – if it is "contrary to the statute." *GHS Health Maintenance Org., Inc v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (1997)).

In reviewing an agency's regulation, a "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court explained that this directive means that courts (not agencies) have the final word on the meaning of statutes, and that agency interpretations of statutes "are not entitled to deference." *Id.* at 391-92. In *Loper Bright*, the Supreme Court overruled *Chevron*, under which courts had deferred to an agency's reasonable reading of ambiguous statutory language. *Id.* at 396-97 (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Now, courts are to independently determine the best meaning of the statute by using "the traditional tools of statutory construction, not individual policy preferences." *Id.* at 374.

"Statutory interpretation begins with the words of the statute." *ITServe All., Inc. v. United States*, 161 Fed. Cl. 276, 283 (2022) (quoting *BASR P'ship v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015)). The court should "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If the statutory text is unambiguous, "the inquiry ends," and "the Court must not go 'beyond the borders of the statute.'" *ITServe All.*, 161 Fed. Cl. at 284 (quoting *United States v. Great N. Ry. Co.*, 287 U.S. 144, 154 (1932)).

### A.    The Regulation Is Contrary To The Statute

Section 951A(c)(2) unambiguously authorizes a taxpayer to reduce its GILTI by subtracting from its subsidiaries' gross income the deductions that are "properly allocable" to that income under the "rules of section 954(b)(5)," which means deductions that are "factually related" to that income. The regulation at issue, Treasury Regulation § 1.951A-2(c)(5), disallows deductions that meet that test. The regulation is directly contrary to the statute and therefore is invalid.

### 1.    The Statute Authorizes Taxpayers To Reduce Their GILTI By Claiming Deductions That Are Factually Related To Their Income

The question in this case is what deductions a taxpayer may take to reduce its taxable GILTI. Section 951A(c)(2) answers that question: It authorizes taxpayers to reduce their foreign subsidiaries' gross income by any deductions that are factually related to that income. The analysis involves several steps, but the rule Congress chose is clear and unambiguous.

Section 951A sets out the formula for calculating GILTI. It defines a taxpayer's GILTI as its pro rata share of the "net CFC tested income" of its foreign subsidiaries, minus an amount attributable to the subsidiaries' QBAI. 26 U.S.C. § 951A(b)-(c). "Net CFC tested income" depends on each subsidiary's "tested income," which is gross income minus deductions. *Id.* § 951A(c)(2). A taxpayer can take the "deductions (including taxes) properly allocable to such

gross income under rules similar to the rules of section 954(b)(5)." *Id.* § 951A(c)(2)(A)(i)-(ii). Thus, whether a deduction is allowed depends on "the rules of section 954(b)(5)."

The Supreme Court has explained that when a statute "refers to another statute by specific title or section number," the statute "in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209-10 (2019). That is, Congress's specific references to other statutory provisions "incorporate[] [the] provisions as they exist at the time of adoption, without subsequent amendments." 2B *Sutherland Statutory Construction* § 51:8 (7th ed. 2025). By referring to "the rules of Section 954(b)(5)," the statute refers to the rules that applied to Section 954(b)(5) in 2017, when Congress enacted Section 951A.

Section 954(b)(5) and its implementing regulations set out the "rules of Section 954(b)(5)" in 2017. Section 954 is part of the "Subpart F" provisions; they, like GILTI, address the taxation of foreign subsidiaries of U.S. companies. *See* 26 U.S.C. §§ 952-65. The Subpart F provisions, which predate GILTI, were an exception to the former general rule that the income of foreign subsidiaries was not taxed until it was repatriated. *See* Revenue Act of 1962, Pub. L. No. 87-834, § 12(a), 76 Stat. 960, 1006. They state that certain income is taxable in the year it is earned, even if the income is not repatriated. 26 U.S.C. §§ 952-65. In calculating that income, Congress allowed taxpayers to reduce their Subpart F income by the deductions "properly allocable" to that income. *Id.* § 954(b)(5). So when Congress enacted a similar approach for GILTI, it borrowed the deduction rules that already existed in Section 954(b)(5).

Section 954(b)(5) itself does not define what constitutes a "properly allocable" deduction. *See* 26 U.S.C. § 954(b)(5) (2017). But the Treasury Department regulation implementing this provision does define it. The regulation explains that a deduction is "properly allocable" to an amount of income under Section 954(b)(5) if it is allocable to that income "under the principles of sections

14

861, 864, and 904(d)."  26 C.F.R. § 1.954-1(c)(1)(i)(B) (2017).[3]  Thus, "the rules of Section 954(b)(5)" borrow the rules for allocating deductions that applied to Sections 861, 864, and 904(d).

Section 861, in turn, provides that a taxpayer could take deductions to reduce income for various tax purposes when the deductions were "properly apportioned or allocated" to that income. 26 U.S.C. § 861(b) (2017).[4]  A longstanding regulation – Treasury Regulation § 1.861-8(a)(2) – specifies that the "factual relationship" test is the test for allocating deductions to income under Section 861.  *See* 26 C.F.R. § 1.861-8(a)(2) (2017).  The regulation was promulgated in 1977, and it has not changed since then.  *See* 42 Fed. Reg. 1195, 1196 (1977).

In particular, the regulation states that "allocations and apportionments are made on the basis of the factual relationship of deductions to gross income."  26 C.F.R. § 1.861-8(a)(2).  The regulation also explains what "factually related" means:  A deduction is "factually related" to a class of income "if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived."  *Id.* § 1.861-8(b)(2).  Thus, expenses incurred for manufacturing pianos can be used to reduce piano income, but not plumbing income. *See* p. 6, *supra*; *see also* 26 C.F.R. § 1.861-8(g) (providing additional examples).

The "factual relationship" test is clear and well settled.  As this Court and others have recognized, Treasury Regulation § 1.861-8(a)(2) "clearly direct[s] that the apportionment and al-location of deductions are based on their 'factual relationship' to the gross income."  *Int'l Paper Co. v. United States*, 33 Fed. Cl. 384, 401 (1995); *see Trinova Corp. v. Comm'r*, T.C. Memo 1997-100, at *4 (1997); *Chevron Corp. v. Comm'r*, 104 T.C. 719, 726 (1995).  For example, in

---

[3]    In 2020, the Treasury Department changed the regulations implementing Section 954(b)(5), for tax years beginning on or after July 23, 2020.  *See* 26 C.F.R. § 1.954-1(c)(iv) (2020).  That change is irrelevant because Congress's reference to the "rules of Section 954(b)(5)" refers to the rules as they existed in 2017.  *See Jam*, 586 U.S. at 209-10.

[4]    Sections 864 and 904(d) provide special allocation rules not relevant here.  *See* pp. 5-6, *supra.*

*International Paper*, this Court considered whether a taxpayer's forest management expenses were properly allocable to income from the taxpayer's timber operations under the factual relationship test. *See* 33 Fed Cl. at 400-01. The Court held that because the expenses were "incurred as a result of, or incident to, an activity or in connection with property" that generated income from timber sales, they were "definitely related" to that category of gross income under Treasury Regulation § 1.861-8. *Id.* As a result, the Court concluded those deductions were "properly allocable" to the income from the timber operations. *Id.*

Thus, in Section 951A, Congress directed that deductions are allowed against foreign subsidiary income if they are factually related to that income, using the longstanding test developed for foreign subsidiary income in tax law.

### 2.    The Regulation Contradicts The Statute And Thus Is Invalid

The regulation at issue is contrary to Section 951A because it disallows a category of deductions that meets the factual relationship test. For that category, the Treasury Department cast aside the factual relationship test and made up an entirely new test with no basis in the statute.

The regulation targets deductions that arise out of certain gap-period transactions for fiscal-year taxpayers. 26 C.F.R. § 1.951A-3(h)(2)(ii)(C)(2). The targeted transactions are those in which one foreign subsidiary sold assets to another subsidiary during the period between January 1, 2018, and the beginning of the first tax year that the selling subsidiary was subject to the GILTI provisions. *Id.* § 1.951A-3(h)(2)(ii)(C)(1). As a reminder, the regulation calls these transactions "disqualified transfer[s]," and any resulting increase in basis "disqualified basis." *Id.* § 1.951A-3(h)(2)(ii)(C)(2). Then for deductions attributable to "disqualified basis," the regulation invents a new category of income ("residual CFC gross income") and mandates that the deductions be allocated "solely" to that new category of income. *Id.* § 1.951A-2(c)(5).

"Residual CFC gross income" is a made-up category. It appears nowhere in the statute,

16

and it is not used anywhere in the statutory formula for determining GILTI. *See* 26 U.S.C. § 951A. It is a black hole where deductions go to disappear. Deductions allocated to "residual CFC gross income" cannot reduce the taxpayer's GILTI, even if the deductions otherwise would satisfy the factual relationship test. That is by design: According to the Treasury Department, the whole point of the regulation is that these deductions are "not permitted to reduce tested income." 84 Fed. Reg. at 29300. That is, the point of the regulation is to make sure that the taxpayer cannot actually take deductions that were specifically authorized by Congress.

The conflict with the statute is clear. Section 951A states that a taxpayer can reduce a foreign subsidiary's gross income by "the deductions . . . properly allocable to such gross income under rules similar to the rules of section 954(b)(5)," 26 U.S.C. § 951A(c)(2) – which means the factual relationship test. The statute does not say that the allocation rules of Section 954(b)(5) apply to only *some* deductions, and it does not give the agency any authority to carve out categories of deductions it dislikes. An agency "may not narrow a provision's reach by inserting words" that do not appear in the statute. *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020). But that is exactly what the Treasury Department is doing here: It is narrowing Section 951A by disallowing some deductions that meet the factual relationship test, by allocating those deductions to a black-hole category called "residual CFC gross income." 26 C.F.R. § 1.951A-2(c)(5).

To illustrate the point: Consider the previous example where a U.S. company has two foreign subsidiaries. During the gap period, Subsidiary B buys intellectual property from Subsidiary A, paying $15 million for an asset in which Subsidiary A had a tax basis of $1 million. Subsidiary B now owns the asset with a $15 million basis and uses it to earn licensing revenue. Under the factual relationship test, amortization deductions attributable to that $15 million basis are "properly allocable" to the licensing income because the expense arises from owning and using

17

the asset to generate that income.  26 C.F.R. § 1.861-8(b)(1).  Under the statute, those $15 million in deductions can be used to reduce Subsidiary B's tested income and thus reduce the U.S. parent company's GILTI.  *See* 26 U.S.C. § 951A(c)(2)(A)(ii).

The regulation changes that result.  Because the purchase occurred in the gap period Congress created, it is labeled a "disqualified transfer," and the $14 million basis increase is considered a "disqualified basis."  26 C.F.R. § 1.951A-3(h)(2)(ii)(C).  Any deduction attributable to that disqualified basis is allocated solely to "residual CFC gross income," not to tested income, and "residual CFC gross income" is never used for anything.  *Id.* § 1.951A-2(c)(5).  As a result, $14 million of the deductions cannot be used to reduce tested income.  Even though that $14 million in deductions is factually related to the asset's income, it is completely disregarded, and the U.S. parent's GILTI is higher than it should be under the statute.

Thus, there is an irreconcilable conflict between the regulation and the statute.  According to the Treasury Department, deductions that meet the statute's factual relationship test are disallowed when they arise from a "disqualified transfer."  But Section 951A affirmatively allows those deductions and contains no exceptions.  The regulation thus contradicts the plain language of Section 951A and should be set aside.  *See GHS*, 536 F.3d at 1297 ("When a regulation directly contradicts a statute, the regulation must yield.").

This case is just like *Dominion Resources, Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012), where the Federal Circuit invalidated a regulation that "directly contradict[ed] the . . . rule that Congress intended the statute to implement."  The question in that case was how much interest on debt payments the taxpayer was required to capitalize, rather than deduct in the tax year at issue.  *Id.* at 1314.  Interest payments on debt usually are deductible in the year incurred, except if the taxpayer also spends money on construction to improve a capital asset in the same year; in

18

that situation, a statute requires the taxpayer to capitalize some of its interest payments for the year. *Id.* at 1315 (citing 26 U.S.C. § 263A(f)(2)). Specifically, the statute requires the taxpayer to capitalize interest payments to the extent that the taxpayer could have avoided those payments by paying down the debt instead of spending money on the construction. *Id.* The challenged regulation requires the taxpayer to determine how much interest to capitalize based on the entire value of the asset being improved, instead of the amount the taxpayer spent on construction. *Id.* at 1316-17 (citing 26 C.F.R. § 1.263A-11(e)(1)).

The Federal Circuit held that the regulation is invalid because it is contrary to the statute. Under the statute, the court explained, how much interest to capitalize depends on the amount the taxpayer spent on the construction, because that is the amount that the taxpayer instead could have used to pay down the debt. *Dominion Res.*, 681 F.3d at 1317. The regulation, in contrast, bases the determination on the value of the asset improved by the construction – even though the taxpayer did not spend that amount. *Id.* at 1318. In the face of that conflict, the Federal Circuit explained, the regulation must yield. *Id.* at 1318-19; *see 3M Co. v. Comm'r*, 154 F.4th 574, 581-82 (8th Cir. 2025) (declining to follow a tax regulation that is contrary to the governing statute).

The Court should take the same approach here. Congress specified a test for deductions in Section 951A, and the Treasury Department decided to disallow deductions that meet that test. The regulation "directly contradicts" the statute, *Dominion Res.*, 681 F.3d at 1317, and is invalid.

### 3. The Treasury Department Has No Valid Defense Of The Regulation

The Treasury Department has argued that the term "properly allocable" in Section 951A(c)(2) is ambiguous, so it has discretion to decide "whether it is 'proper' for a certain item of expense to be allocated to, and therefore reduce, a particular item of gross income." 84 Fed. Reg. at 29299. That is wrong.

As an initial matter, the agency's defense of the regulation rests on the mistaken premise

that its interpretation of the statute receives deference. In *Loper Bright*, the Supreme Court expressly overruled *Chevron* and held that courts should independently determine the best meaning of statutory terms, and may not defer to an agency's view. 603 U.S. at 391-92. The statute here is not ambiguous; as explained, Section 951A's reference to the "rules of Section 954(b)(5)" is clear. But if the Court believes the statute to be ambiguous, it should not defer to the Treasury Department's view but instead should determine the best reading of the statute using the ordinary tools of statutory interpretation. *Id.* at 396-97. Using those tools of interpretation, the regulation is not even a plausible reading of the statute, let alone the best reading.

### a. The Treasury Department ignores the full statutory text

To start, the Treasury Department's interpretation ignores the full statutory text. Section 951A(c)(2) does not use the phrase "properly allocable" in isolation. Instead, it states that taxpayers can reduce their foreign subsidiaries' gross income by subtracting the deductions that are "properly allocable to such gross income *under rules similar to the rules of section 954(b)(5)*." 26 U.S.C. § 951A(c)(2)(A)(ii) (emphasis added). The emphasized statutory text makes clear that Congress wanted the Treasury Department to use the settled test under Section 954(b)(5) – not to make up its own view of "properly allocable" that is different from the rules of Section 954(b)(5).

That is, Congress specified that the Treasury Department and taxpayers must follow the allocation rules that applied to Section 954(b)(5) at the time Congress enacted Section 951A – which means the factual relationship test. *See Jam*, 586 U.S. at 209-10 (when a statute cross-references another statute, it "cuts and pastes the referenced statute as it existed when the referring statute was enacted"). The Treasury Department's argument is wrong because it fails to give effect to the statutory phrase "under rules similar to the rules of section 954(b)(5)."

Indeed, in promulgating the regulation at issue, the Treasury Department recognized that Section 951A requires use of the longstanding factual relationship test. It used Section 954(b)(5)'s

20

factual relationship test for every category of deductions under Section 951A except the category at issue here.  26 C.F.R. § 1.951A-2(c)(3) (directing taxpayers to use the "principles of section 954(b)(5) and § 1.954-1(c)" to determine how to allocate most deductions for purposes of GILTI).  The agency even explained that it made sense to borrow the factual relationship test from Section 954(b)(5) for most categories of deductions because of "the similarities between gross tested income [under Section 951A] and subpart F income [under Section 954]."  83 Fed. Reg. at 51075.  That is, it made sense for Congress to have used the deduction rules under Subpart F because those were part of a preexisting regime for taxing foreign income.

Thus, the Treasury Department recognized that both GILTI and Subpart F involve matching deductions to foreign subsidiaries' income for purposes of the taxing that income, and that Congress wanted taxpayers to use the factual relationship test for both situations.  Yet the agency deliberately chose not to use that test for the transactions at issue here.

> **b.**     **_The Treasury Department ignores the settled meaning of "properly allocable"_**

The "properly allocable" language is not unique to Section 954(b)(5); this language is used elsewhere in the Internal Revenue Code for matching deductions to income.  In those instances, Congress consistently used the phrase "properly allocable" to incorporate the factual relationship test.  Thus, even if it were correct to look at the phrase "properly allocable" by itself, without the express cross-reference to Section 954(b)(5), Section 951A would have the same meaning.

At the time Congress enacted Section 951A, the Internal Revenue Code used "properly allocable" in other places to explain how to allocate deductions to income.[5]  The Treasury

---

[5]     *See* 26 U.S.C. § 199(c)(1) (2017) (qualified production activities income is gross receipts less the "deductions . . . which are properly allocable to such receipts"); *id.* § 904(b)(4)(B) (2017) (foreign taxable income is determined without regard to "any deductions properly allocable . . . to . . . income"); *id.* § 970(a)(1)(A) (2017) (Subpart F income is reduced by the amount of the taxpayer's

Department enacted regulations implementing those provisions, and all of those regulations used the factual relationship test.[6]  The Treasury Department also used the factual relationship test for other statutes that required matching deductions to income, even if the statute did not specifically use the term "properly allocable."  *See* 26 C.F.R. § 1.861-8(f) (2017) (listing fifteen statutes to which the factual relationship test applied).

Thus, when Congress enacted Section 951A, "properly allocable" was a term of art with a settled meaning about how to match deductions to income.  When Congress uses a term of art, Congress is presumed to adopt that term's settled meaning.  *See, e.g.*, *George v. McDonough*, 596 U.S. 740, 753 (2022).  Further, this is a term of art that had been given meaning through a longstanding regulation that had been consistently interpreted by courts.  *See, e.g.*, *Int'l Paper*, 33 Fed. Cl. at 401.  Congress's re-enactment of a term of art in the Internal Revenue Code "indicate[s] satisfaction with the interpretation consistently given the statute by the Regulations."  *Cammarano v. United States*, 358 U.S. 498, 510 (1959); *see Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute").  Thus, Section 951A's reference to deductions "properly allocable" under "the rules of Section 954(b)(5)" is well understood to mean the factual relationship test.[7]

---

export trade income, capped at 1.5 times "the export promotion expenses" that are "properly allocable to the export trade income").

[6]  *See* 26 C.F.R. § 1.199-4(d) (2017) (requiring deductions to be allocated using "the section 861 method" for purposes of Section 199 (2017)); *id.* § 1.904-6(a) (2017) (requiring deductions to be allocated using "the principles of [26 C.F.R. §§ ] 1.861-8 through 1.861-14T and section 954(b)(5)" for purposes of Section 904 (2017)); *id.* § 1.970-1(b)(3) (2017) (requiring deductions to be allocated to the income "directly related" to the deductions for purposes of Section 970, which is synonymous with the factual relationship test, *see id.* § 1.861-8(a)(2)).

[7]  In the rulemaking, the Treasury Department cited two *Chevron*-era decisions to argue that "properly allocable" is ambiguous.  *See* 84 Fed. Reg. at 29299 (citing *Redlark v. Comm'r*, 141 F.3d 936 (9th Cir. 1998), and *Miller v. United States*, 65 F.3d 687 (8th Cir. 1995)).  *Redlark* and *Miller*

Notably, the Treasury Department itself has recognized that the term "properly allocable" by itself means the factual relationship test. At the same time Congress enacted Section 951A, the statute at issue here, it also enacted Section 250. Section 250 allows U.S. taxpayers to offset their GILTI tax liability by allowing them to claim deductions for foreign income derived from intangible assets. *See* 26 U.S.C. § 250(a). The amount of the deduction depends on the taxpayer's "foreign-derived intangible income," *id.* § 250(a)(1)(A), and that amount in turn depends on the taxpayer's gross income minus the "expenses and deductions (including taxes), . . . properly allocable to such gross income," *id.* § 250(b)(3)(A)(ii). Thus (like Section 951A), Section 250 allows a taxpayer to reduce gross income by the deductions "properly allocable" to that income, although (unlike Section 951A) it does not expressly say to use the rules of Section 954(b)(5).

Yet the Treasury Department had no difficulty recognizing that "properly allocable" meant the factual relationship test. It promulgated a regulation instructing taxpayers to use "the rules of [Treasury Regulation §] 1.861-8" for that purpose. 26 C.F.R. § 1.250(b)-1(d)(2). The agency explained that it made sense to use those rules because those rules "apply for purposes of several other provisions in the Code which require the determination of taxable income from specific sources or activities." Deduction for Foreign-Derived Intangible Income, 84 Fed. Reg. 8188-01, 8191 (Mar. 6, 2019). This example confirms that, when allocating deductions to income, "properly allocable" means the factual relationship test.

> ### c. *The Treasury Department's approach impermissibly interprets the same term in two different ways*

Another problem with the regulation is that the Treasury Department interprets the key

---

both relied on *Chevron* and thus have been abrogated by *Loper Bright*. And neither construed "properly allocable" in the context here (allocating deductions to income); they addressed allocating debt to the source of the debt, *see* 26 U.S.C. § 163(h)(2)(A). *See Redlark*, 141 F.3d at 938; *Miller*, 65 F.3d at 689. As just explained, in the context of allocating deductions to income, "properly allocable" has a settled meaning and is not ambiguous.

23

statutory phrase "properly allocable under . . . the rules of Section 954(b)(5)" two different ways within the same regulation, which is not allowed.

Section 951A only sets out one rule for allocating deductions to income:  Deductions are allowed if they are "properly allocable" to income under "the rules of Section 954(b)(5)."  Yet the regulation interprets that language to mean two different things – the factual relationship test for most deductions by foreign subsidiaries, and the new made-up test for certain deductions related to transactions during the gap period.  That is, for purposes of all deductions other than deductions attributable to the transactions at issue, the regulation uses the factual relationship test under Sections 861 and 954(b)(5).  26 C.F.R. § 1.951A-2(c)(3).  But solely for the deductions at issue, the regulation uses a different allocation method, deeming them "disqualified transfers" creating "disqualified basis" and requiring the deductions to be allocated to "residual CFC gross income," a category with no purpose other than to disallow the deductions.  *Id.* § 1.951A-2(c)(5).  Thus, according to the Treasury Department, the same statutory language ("properly allocable under rules similar to the rules of Section 954(b)(5)") has two different meanings within the same regulation.

That is not allowed.  Congress is presumed to use words consistently.  *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).  Thus, when a statute sets out a rule, the rule applies consistently to all situations that come within its terms, unless the statute indicates that some situations should be treated differently.  The Supreme Court illustrated this principle in *Clark v. Martinez*, 543 U.S. 371 (2005).  That case involved a provision of the Immigration and Nationality Act that states that a person who has been ordered removed "may be detained beyond the removal period."  *Id.* at 377 (quoting 8 U.S.C. § 1231(a)(6)).  By its terms, the provision applies to three categories of people.  *Id.*  In a prior case involving people in the second category, the Supreme Court held that the statute permitted the government to detain them "only as long as

'reasonably necessary' to remove them from the country." *Id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)). In *Clark*, the Court applied the same rule to people in the other categories, explaining that the operative language ("may be detained beyond the removal period") "applies without differentiation to all three categories." *Id.* at 378. Because "the statutory text provides for no distinction between" the categories, it applies consistently to all three categories. *Id.* at 379.

Here, there is no statutory basis for interpreting "properly allocable under . . . the rules of section 954(b)(5)" one way for most deductions but another way for certain deductions related to transactions involving fiscal-year taxpayers. Section 951A(c)(2) states that a taxpayer can reduce its foreign subsidiaries' gross income by "the deductions" that are properly allocable to that income, without distinguishing between types of deductions. 26 U.S.C. § 951A(c)(2). And it gives only one rule for "the deductions" – the test under Section 954(b)(5). *Id.* The Treasury Department has not identified anything in the statute that justifies different allocation rules for different types of deductions. *See* 84 Fed. Reg. 29298-300. For this reason also, the regulation is invalid.

### 4. The Treasury Department's Policy Preferences Do Not Justify Its Disregard Of The Statute

The Treasury Department principally defends the regulation as necessary to address what it considers to be "inappropriate" deductions stemming from what it sees as a timing mismatch in the statute. 83 Fed. Reg. at 51077; *see* 84 Fed. Reg. at 29298-300. But there is no indication Congress shared the agency's concerns. Anyway, it is black-letter law that an agency "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

#### a. There is no indication that Congress viewed the gap period as problematic

The Treasury Department contends that the regulation is necessary to address what it sees as potential problems caused by the gap period for fiscal-year taxpayers. *See* 84 Fed. Reg. at

25

29299-300.  Congress had to choose effective dates for the one-time transition tax for earnings already accumulated but not yet repatriated, 26 U.S.C. § 965, and for GILTI, which would apply to earnings going forward, *id.* § 951A.  Congress chose consistent dates for all taxpayers:  The transition tax applied to all unrepatriated earnings accumulated through December 31, 2017, *id.* § 965; and GILTI applies "to taxable years of foreign corporations beginning after December 31, 2017," Pub. L. No. 115-97, § 14201(d), 131 Stat. 2054, 2213.  That meant a short gap in taxation of income for fiscal-year taxpayers.

The Treasury Department takes the view that this gap period is unintentional, and so it should not apply the usual rule for deductions related to transactions during the gap period.  *See* 84 Fed. Reg. at 29299-300.  Instead, the Treasury Department adopted a different rule to address this supposed problem and "create[] symmetry" between the income earned during the gap period and deductions claimed after the gap period.  *Id.*

But Congress deliberately chose these effective dates.  It decided to have one set of effective dates for all taxpayers rather than different rules for calendar-year and fiscal-year filers.  The TCJA is a complicated piece of legislation that made many changes to the Internal Revenue Code.  *See* Pub. L. No. 115-97, 131 Stat. 2054.  It has hundreds of operative provisions and over 120 effective-date provisions.  *See id.*  Congress thus faced a tradeoff.  It could draft simple, uniform effective dates that might lead to gaps for particular transactions.  Or it could create detailed transition rules for each provision and type of transaction that would eliminate all potential discrepancies, at the cost of extraordinary complexity.

Congress chose simple rules for effective dates.  *See, e.g.*, 26 U.S.C. § 965.  That choice is "presumed" to be "intentional[]."  *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537 (1994).  That presumption applies with special force to "complex legislation" like the TCJA, where Congress had

26

to decide the effective dates for hundreds of interrelated provisions. *Russello v. United States,* 464 U.S. 16, 23 (1983). Notably, in the TCJA, Congress used the same effective date for GILTI (the first taxable year beginning after December 31, 2017) as the effective date for many other provisions. *See*, *e.g.*, Pub. L. No. 115-97, §§ 11001(c), 11002(c), 11011(e), 11021(b), 11022(b), 11023(b), 11043(b), 11044(b), 11048(b), 11049(b), 131 Stat. 2059, 2063, 2071, 2073-75, 2087-89. That confirms that Congress intentionally chose those dates to be simple and consistent.

There is no reason to believe that Congress was concerned about treating fiscal-year taxpayers differently from calendar-year taxpayers. As the Tax Court has observed, "the Code is full of provisions that treat taxpayers differently." *Varian Medical Sys., Inc. v. Comm'r*, 163 T.C. 4, 101 (2024). Congress's decision to use simple rules for the effective dates of the various provisions necessarily creates some different consequences for different taxpayers. But it is not the Treasury Department's role to rewrite the statute to eliminate the consequences it dislikes.

Indeed, there are many other effective-date provisions in the TCJA that affected calendar-year taxpayers differently from fiscal-year taxpayers. Not all favored fiscal-year taxpayers. In particular, the timing provisions of the TCJA's amendments to the net operating loss rules benefited calendar-year taxpayers over fiscal-year taxpayers. A net operating loss occurs when a taxpayer's deductions exceed its taxable income. *See* 26 U.S.C. § 172(a). Before 2017, the Internal Revenue Code allowed the taxpayer to carry back the loss to offset taxable income for the previous two tax years. *See id.* § 172(b)(1)(A)(i) (2016). Congress generally eliminated the carryback provisions in the TCJA, and it applied the new, more restrictive rule to "losses arising in taxable years ending after December 31, 2017." Pub. L. No. 115-97, § 13302(e)(2), 131 Stat. 2123.

The effective date for the new carryback rules benefited calendar-year taxpayers over fiscal-year taxpayers, because it allowed calendar-year taxpayers to apply the old rules to more losses.

For calendar-year taxpayers, the first taxable year that ended after December 31, 2017, was the taxable year that ran from January 1, 2018, to December 31, 2018. Those taxpayers thus could apply the old rules to all losses incurred in 2017. But for fiscal-year taxpayers, the first taxable year subject to the new rules included part of 2017. For example, if a taxpayer had a fiscal year starting November 1, its first tax year affected by the new rules ran from November 1, 2017, to October 30, 2018. So that taxpayer (unlike a calendar-year taxpayer) could not apply the old, more permissive carryback rules to losses incurred between November 1 and December 31, 2017.

The point is that Congress had to make tradeoffs across the 120-plus effective date provisions in the TCJA. Some of its choices (as with the new carryback rules) benefited calendar-year taxpayers over fiscal-year taxpayers; other choices (as with the transition tax and GILTI) had the opposite effect. That differential treatment was inevitable given the scope of the changes in the legislation, and Congress is presumed to have intended that different treatment. *See Russello*, 464 U.S. at 23. It certainly is not a basis for the Treasury Department to reject Congress's choice and adopt a regulation that directly conflicts with the statutory text.

Anyway, there is no reason to think that Congress was particularly concerned about any asymmetry in the statute between the seller's tax and the buyer's deductions during the gap period. That asymmetry existed before the TCJA. Before 2017, the earnings of a taxpayer's foreign subsidiary from selling an asset to another subsidiary might not have been taxed in the year it was earned, depending on when (if ever) the earnings were repatriated to the United States. *See* 26 C.F.R. § 1.954-2(e)(3)(iv) (2017). Yet the Code allowed the buying subsidiary to take deductions for the asset even if those earnings were not taxed. *See* 26 U.S.C. §§ 167, 197 (2017). That is the same basic dynamic that the Treasury Department apparently finds problematic here. *See* 84 Fed. Reg. at 29299. But Congress never acted to restrict deductions to exclude those related to untaxed

28

earnings before it fundamentally changed the statutory scheme by creating GILTI. So there is no reason to believe that Congress was particularly troubled by the claimed deductions here.

In the final rule, the Treasury Department relies on a snippet of legislative history as support for the regulation. *See* 84 Fed. Reg. at 29299. Specifically, it cites a passage from the conference report, in which the conferees noted their "inten[t] that non-economic transactions intended to affect tax attributes of CFCs . . . to minimize tax under this provision be disregarded." H.R. Rep. No. 115-466, at 645 (2017) (Conf. Rep.). But legislative history may not be used "to muddy the meaning of clear statutory language." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Further, the most this language says is that Congress had some interest in curbing abusive transactions – and Congress gave effect to that interest by enacting an anti-abuse provision in Section 951A *only* with respect to QBAI. *See* 26 U.S.C. § 951A(d)(4). Thus, whatever concerns the conferees may have expressed in the report, in the actual statute, the drafters limited the agency's anti-abuse authority to QBAI.

### b.    The agency may not substitute its policy preferences for the statutory text

The Treasury Department's policy concerns "cannot supersede the clear statutory text." *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 758 (2023) (internal quotation marks omitted). The Supreme Court applied that principle in the tax context in *Gitlitz v. Commissioner*, 531 U.S. 206 (2001). In that case, the taxpayers sought to exclude discharged corporate debt from their income, while also claiming increased stock basis from the discharged debt to obtain deductions for certain losses. *Id.* at 210. The IRS viewed that as a "double windfall," *id.* at 219 (internal quotation marks omitted), and argued that the taxpayer should not be allowed to do both. But the Supreme Court rejected the government's arguments, because the statutes at issue expressly allowed the taxpayers to both exclude the discharged debts from income and to increase their stock

29

basis. *Id.* at 214, 216. The Court rejected any concern about the taxpayers obtaining windfalls, explaining that "[b]ecause the Code's plain text permits the taxpayers here to receive these benefits, [the Court] need not address this policy concern." *Id.* at 220. That is, the Court made clear that a statute's plain text controls, even if the agency dislikes the outcome.

The Tax Court took the same approach in *Varian*. That case, like this one, involved two timing provisions in the TCJA that the government viewed as mismatched and as creating an unwarranted benefit to the taxpayer. 163 T.C. at 78. Specifically, Section 245A allows taxpayers to deduct dividends received from foreign subsidiaries, *see* 26 U.S.C. § 245A, whereas Section 78 increases the taxpayer's income when it claims foreign tax credits related to those dividends, *see id.* § 78. Because the two provisions had different effective dates, there was a gap period during which some fiscal-year taxpayers were able to claim a Section 245A deduction without reporting an offsetting increase in income under Section 78. *Varian*, 163 T.C. at 100. The IRS argued that this "windfall" distorted the statutory scheme and thus sought to disallow the deductions. *Id.*

The Tax Court rejected the IRS's arguments. *Varian*, 163 T.C. at 102. It explained that "Congress spoke clearly" when it "selected the mismatched effective dates" for the two provisions, and so "[a]ppeals to policy and Congress's overarching purpose cannot overcome these choices, no matter how much the Commissioner may dislike them." *Id.*

*Gitlitz* and *Varian* foreclose the Treasury Department's approach here. Both decisions make clear that the agency cannot overrule a statute to enact its preferred policy outcome. *Varian* is particularly on point, because it also involved Congress's choice of effective dates in the TCJA, and the Tax Court made clear that the Treasury Department must respect that choice. The same is true here; the agency may not like that gap-period transactions can result in increased deductions, but it is plainly what the statute permits.

30

**B.      The Regulation Exceeds The Treasury Department's Authority**

Separately, the regulation is invalid because the Treasury Department lacked the authority to promulgate it.  *See* 5 U.S.C. § 706(2) (court should set aside a regulation that is in excess of the agency's authority).

The agency invoked two bases of statutory authority for the regulation:  In the proposed rule, the agency relied principally on its anti-abuse authority under Section 951A(d)(4), *see* 83 Fed. Reg. at 51077; and in the final rule, the agency rested entirely on its general rulemaking authority under Section 7805(a), *see* 84 Fed. Reg. at 29298-99.  Neither provision authorizes the Treasury Department to adopt a new definition of "properly allocable" to deny deductions in situations where it deems those deductions "inappropriate."  83 Fed. Reg. at 51077-78; 84 Fed. Reg. at 29298-300.

### 1.      Section 951A(d)(4) Does Not Authorize The Regulation

The Treasury Department initially invoked Section 951A(d)(4) as authority for the regulation.  That is the only part of Section 951A that grants the Treasury Department the authority to enact an anti-abuse rule, meaning a rule that prevents taxpayers from claiming a tax benefit under a statute that is contrary to the statute's purposes.  *See Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325 (Fed. Cir. 2011).

By its terms, Section 951A(d)(4) gives the Treasury Department only a carefully circumscribed grant of rulemaking authority limited to QBAI.  The provision authorizes the Secretary "to issue such regulations or other guidance as the Secretary determines appropriate to prevent the avoidance of the purposes of this subsection."  26 U.S.C. § 951A(d)(4).  That is, the agency can enact rules that prevent taxpayers from avoiding or subverting Congress's plan for taxation under that subsection.  The "subsection" referenced is subsection (d), which governs the calculation of a taxpayer's QBAI.  *See id.* § 951A(d) (title of subsection (d) is "Qualified business asset

31

investment," *i.e.*, QBAI). The agency's authority under Section 951A(d)(4) therefore is confined to preventing abuse in determining QBAI.

The regulation at issue, Treasury Regulation 1.951A-2(c)(5), has nothing to do with QBAI. The formula for calculating GILTI has two main components – the first part (net CFC tested income) is about determining each foreign subsidiary's tested income or loss, and the second part (the QBAI-related amount) is about subtracting an amount to represent a return on tangible assets. *See* p. 4, *supra*. Net CFC tested income and QBAI serve different functions in the GILTI calculation and are governed by separate statutory subsections with distinct rules. Net CFC tested income is addressed in Section 951A(c), and QBAI is addressed in Section 951A(d).

The challenged regulation is only about disallowing deductions that reduce the taxpayer's net CFC tested income under Section 951A(c). *See* 26 C.F.R. § 1.951A-2(c)(5). But the grant of rulemaking authority in Section 951A(d)(4) says nothing about Section 951A(c) or net CFC tested income. Instead, that grant of authority only authorizes the Treasury Department to promulgate rules related to "this subsection" – meaning Section 951A(d). The grant of authority thus is limited to anti-abuse rules related to QBAI. It does not provide any authority for regulations governing the allocation of deductions to tested income.

Subsequent legislative action confirms that Section 951A(d)(4) applies only narrowly to rules about QBAI. In 2021, the House of Representatives passed the Build Back Better Act, which would have expanded the Treasury Department's regulatory authority under Section 951A(d)(4) by changing "subsection" to "section." H.R. 5376, 117th Cong., § 138110 (2021). If enacted, that would have granted the Secretary much broader rulemaking authority, for all of Section 951A and thus for all components of GILTI. But that proposal never became law. And that proposed amendment would have been unnecessary if Section 951A(d)(4) already conferred anti-abuse authority

32

over all of Section 951A.

Notably, the Treasury Department itself has seemingly acknowledged the limits of its Section 951A(d)(4) authority.  Its notice of proposed rulemaking cited Section 951A(d)(4) as providing the principal authority for the proposed rule, with Section 7805(a) mentioned only in passing. 83 Fed. Reg. at 51077.  After comments pointed out that Section 951A(d)(4) is limited to QBAI, *see* 84 Fed. Reg. at 29298, the final rule abandoned any reliance on Section 951A(d)(4) and instead invoked only Section 7805(a), *see id.* at 29299.  The agency's strategic retreat from Section 951A(d)(4) acknowledges that the provision does not authorize the regulation.

### 2.    Section 7805(a) Also Does Not Authorize The Regulation

The Treasury Department's reliance on Section 7805(a) similarly is misplaced.  That provision grants the Secretary of the Treasury the authority to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code.  26 U.S.C. § 7805(a).

Although that language could be interpreted broadly to grant the agency the authority to issue any "needful" substantive regulation, the words must be "read in [their] context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (internal quotation marks omitted).  In particular, Section 7805(a) should be read together with Section 951A, which makes clear Congress's intent to grant the Secretary only a limited authority to enact anti-abuse rules related to GILTI.  Under the Treasury Department's interpretation of Section 7805(a), that limitation on the Secretary's authority becomes meaningless.

Treasury Regulation § 1.951A-2(c)(5) is an anti-abuse rule, meaning a rule designed "to prevent [tax] avoidance."  26 U.S.C. § 951A(d)(4).  The Treasury Department specifically targeted deductions that it thought would be "inappropriate" for taxpayers to claim – deductions attributable to a gap-period transaction for which the gain was not taxed.  83 Fed. Reg. at 51077.  The agency said that allowing taxpayers to claim those deductions would be "improper[]" because they had

33

not paid tax on the gains, and it promulgated the regulation specifically to ensure that the deductions "[are] not permitted to reduce tested income." 84 Fed. Reg. at 29299-300. In short, the whole point of the challenged regulation is to disallow deductions that the agency views as abusive.

But Congress gave the agency only very limited authority to issue anti-abuse regulations in Section 951A. It limited that authority to "prevent[ing] the avoidance of the purposes of this subsection," meaning the provisions about QBAI. 26 U.S.C. § 951A(d)(4). That targeted grant of authority underscores that Congress chose not to confer similar anti-abuse authority with respect to other parts of Section 951A, including with respect to deductions. Further, Congress considered but rejected a proposal to give the agency rulemaking authority with respect to all of Section 951A. *See* H.R. 5376, 117th Cong., § 138110 (2021).

Yet that is precisely the authority the Treasury Department now claims. That is, the agency claims that Section 7805(a) gives the agency the authority that Congress specifically withheld when Congress enacted the GILTI provisions as part of the TCJA and when Congress later considered amending those provisions.

Although Section 7805(a) gives the agency broad rulemaking authority, it should not be interpreted to override the specific limitations on the agency's authority with respect to GILTI in Section 951A. Courts presume that "a specific statute takes precedence over a more general one." *Arzio v. Shinseki*, 602 F.3d 1343, 1347 (Fed. Cir. 2010). In this case, that means that the specific authority to enact anti-abuse rules with respect to Section 951A under Section 951A(d)(4) limits the general authority the Treasury Department may possess with respect to the Internal Revenue Code as a whole under Section 7805(a). The agency's interpretation of Section 7805(a) would completely swallow up the limitations on its rulemaking authority in Section 951A(d)(4).

Indeed, the Treasury Department's view of Section 7805(a) would render Section

34

951A(d)(4) meaningless. There would not be any need for Section 951A(d)(4)'s grant of authority to enact anti-abuse rules for QBAI, because the agency could enact those same rules using its authority under Section 7805(a). That would violate the "cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted).

Notably, in other provisions of the TCJA, Congress granted the Treasury Department broader anti-abuse authority than in Section 951A(d)(4). For example, the TCJA also included Section 245A, which permits taxpayers to claim deductions for certain dividends paid by certain foreign subsidiaries. *See* 26 U.S.C. § 245A(a). In Section 245A(g), Congress authorized the agency to "prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this *section*." *Id.* § 245A(g) (emphasis added). Thus, that provision gives the Treasury Department the authority to enact anti-abuse rules with respect to the whole of Section 245A, and not just one part of that section.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act," courts "presume[]" the difference is "intentional[] and purpose[ful]." *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 196 (2021) (quoting *Russello*, 464 U.S. at 23). This Court should presume that Congress's decision not to use the broader language in Section 951A(d)(4) was intentional, and accordingly that Congress specifically chose to withhold from the Treasury Department the authority to enact anti-abuse rules with respect to any aspect of GILTI other than QBAI.

Section 7805(a) should be interpreted so that it operates alongside Section 951A(d)(4)'s specific delegation of rulemaking authority, instead of supplanting it. Section 7805(a) could have

35

conferred substantive rulemaking authority if Section 951A did not address rulemaking, and the statute's text and context suggested that Congress intended for the Treasury Department to issue particular rules with respect to the statute. But that is not what Congress did; it expressly addressed and limited the scope of the Treasury Department's rulemaking authority with respect to Section 951A. Section 7805(a) should not be interpreted to give the agency the broader authority to adopt an anti-abuse rule related to deductions – and particularly not a rule that is contrary to the statute.

### C.  The Regulation Is Not A Logical Outgrowth Of The Proposed Rule

The regulation also is procedurally invalid because the agency made significant changes between the proposed rule and the final rule, without giving taxpayers the chance to meaningfully comment on the final rule.

The APA requires a final rule to be a "logical outgrowth" of the proposed rule. *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017) (citing 5 U.S.C. § 553(b)(3)). This requirement ensures that an agency gives the public a fair chance to comment on the substance of the rule the agency ultimately adopts. *Id.* A rule satisfies the logical-outgrowth requirement "only if interested parties should have anticipated that the change was possible." *Id.* (quoting *Veteran's Justice Grp., LLC v. Sec'y of Veterans Affairs*, 818 F.3d 1336, 1344 (Fed. Cir. 2016)). In contrast, a final rule is not a logical outgrowth of a proposed rule if interested parties "would have had to divine the agency's unspoken thoughts." *Id.* at 1374 (quoting *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)). Where the agency's failure to provide notice of its change "could well have affected the result" the agency reached, the agency's error was not harmless and the final rule should be set aside. *Id.* at 1385; *see* 5 U.S.C. § 706 (reviewing court should take "due account" of "the rule of prejudicial error").

Here, Treasury Regulation § 1.951A-2(c)(5) is fundamentally different from the proposed rule in operation and effect. Taxpayers could not have anticipated the regulation based on the

36

proposed rule, and thus it is not a logical outgrowth of the proposed rule.

### 1. The Regulation Operates Fundamentally Differently Than The Proposed Rule

The Treasury Department completely changed the mechanics of the regulation between the proposed rule and the final rule. In the notice of proposed rulemaking, the Treasury Department proposed a categorical rule: The targeted deductions simply would be "disregarded" for GILTI purposes. 83 Fed. Reg. at 51077. But in the final rule, the Treasury Department abandoned that approach and instead came up with a new, much more convoluted approach. It created a new category of income called "residual CFC gross income" that appears nowhere in the statute, and then used that category to come up with rule that has the result of disallowing all deductions attributable to an increase in basis resulting from a gap-period transaction. It required taxpayers to allocate all such deductions to its new category of "residual CFC gross income," 26 C.F.R. § 1.951A-2(c)(5)(i), even though that category of income plays no role in GILTI. That concept and approach was nowhere in the proposed rule or in the statute.

Interested parties could not and did not anticipate these changes to the regulation. The discussion of the proposed rule in the notice of proposed rulemaking consisted of a single sentence: "[T]hese rules are also cross-referenced in proposed § 1.951A-2(c)(5) to disregard a stepped-up basis in any property that is depreciable or amortizable for purposes of calculating tested income and tested loss." 83 Fed. Reg. at 51077. The "rules" referenced are anti-abuse rules the agency also was proposing with respect to QBAI, that would "disallow" taxpayers from claiming certain benefits from gap-period transactions "for purposes of calculating . . . QBAI." *Id.*

Thus, the only thing the Treasury Department said was that it would flatly disallow deductions for any increased basis from gap-period transactions. And the only reason the agency provided for these proposed provisions was that it "ha[d] determined that it would be inappropriate

for a taxpayer to reduce its GILTI inclusion amount for any taxable year by reason of" a sale of property between related foreign subsidiaries during the gap period. 83 Fed. Reg. at 51077.

This brief discussion in the proposed rule "gave no indication" that, instead of disallowing the deductions, the agency "was considering a different approach," under which it would create an entirely new category of income and require taxpayers to allocate the deductions to that category. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). That is, the proposed rule said nothing about the new category of "residual CFC gross income" or requiring deductions to be allocated solely to that category. The proposed rule thus gave no notice that the agency "was contemplating [those] particular change[s]." *Id.*

The notice also gave no indication that Treasury Department was disallowing the deductions based on its interpretation of "properly allocable" in Section 951A(c)(2)(A)(ii). *See* 83 Fed. Reg. at 51075. Indeed, the only discussion of that term in the notice emphasized that "properly allocable" means the factual relationship test under Sections 861 and 954(b)(5). *See id.*

Accordingly, interested parties had no notice that the Treasury Department was contemplating that "properly allocable" might mean something other than the longstanding factual relationship test for purposes of deductions that would reduce GILTI. If they had, they would have told the agency that "properly allocable" has a settled meaning in the context of matching deductions to income, and that the agency's contemplated approach is flatly inconsistent with that settled meaning. *See* pp. 21-24, *supra*. "[T]he fact that comments responding to [the notice of proposed rulemaking] were entirely silent on the issue" whether the deductions could be allocated to a new category of "residual income" "supports the conclusion that [the] notice[] w[as] insufficient." *Mid Continent Nail*, 846 F.3d at 1379.

The bottom line is that the Treasury Department failed to comply with the APA's notice-

and-comment requirements with respect to how Treasury Regulation § 1.951A-2(c)(5) operates. Interested parties simply did not know what the agency was contemplating. That deprived the public of the opportunity to explain to the agency that its approach is contrary to the statute and inconsistent with longstanding allocation principles. Because those explanations could have affected the outcome, the agency's failure to comply with the APA was not harmless. *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) ("[A]n utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure."). For this reason also, the regulation should be set aside.

### 2. The Regulation Has A Different Effect Than The Proposed Rule

The Treasury Department also fundamentally changed the effect of the final rule compared to the proposed rule. The proposed rule simply would have prevented a taxpayer from using the deductions at issue to reduce its foreign subsidiaries' tested income for purposes of calculating its GILTI. *See* 83 Fed. Reg. at 51077. The final rule is much broader: It requires the taxpayer to allocate the deductions "solely" to residual CFC income. 26 C.F.R. § 1.951A-2(c)(5).

The effect of this is that the taxpayer not only cannot use the deductions to reduce its subsidiaries' tested income for purposes of calculating GILTI, but it also cannot use the deductions to reduce Subpart F income or other types of income. *See* 84 Fed. Reg. at 29300. Indeed, the Treasury Department admits that it "broaden[ed]" the proposed rule, so that the deductions would not count for GILTI purposes, and also would not be "taken into account for purposes of determining the CFC's subpart F income" or other types of taxable income. *Id.* By design, the final rule thus has a broader effect than the proposed rule.

Here again, interested parties could not anticipate this change. The notice of proposed rulemaking does not say anything about any other categories of taxable income. *See* 83 Fed. Reg. at 51077. Indeed, the proposed rule was paired with anti-abuse rules about QBAI – which only is

39

relevant for calculating GILTI. *See id.* There was no indication that the Treasury Department was targeting more than just deductions for purposes of GILTI.

If interested parties had known that the agency was considering effectively disallowing the deductions for all types of taxable income, they would have provided comments on that point, to explain how the new approach exceeds the statutory scheme, conflicts with established allocation rules, and disrupts unrelated provisions. *See Mid Continent Nail*, 846 F.3d at 1379. Thus, the Treasury Department's significant expansion of the final rule compared to the proposed rule was harmful and prejudicial. *See CSX Transp.*, 584 F.3d at 1083. For this reason also, the final rule was not a logical outgrowth of the proposed rule and should be set aside.

## CONCLUSION

The Court should grant partial summary judgment to Keysight on the ground that Treasury Regulation § 1.951A-2(c)(5) is invalid.


DATED:  November 25, 2025

Respectfully submitted,

/s/ Jenny A. Austin
JENNY A. AUSTIN
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 701-7140
jaustin@mayerbrown.com

*Of counsel:*
GARY B. WILCOX
NICOLE A. SAHARSKY
ANTHONY D. PASTORE
MARIA C. CRITELLI
MINH NGUYEN-DANG
ZACHARY C. WEIT
MADISON T. ZEEMAN

*Attorneys for Plaintiff*


40