IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 25-137 T
(Judge David A. Tapp)

KEYSIGHT TECHNOLOGIES, INC. & SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

**UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT WITH
MEMORANDUM IN SUPPORT OF CROSS-MOTION AND IN RESPONSE TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

_____

In accordance with RCFC 5.4(a)(5) and 56(a) and this Court's Orders (Dkt. Nos. 15, 36), the United States opposes Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 34) and cross-moves for summary judgment on the validity of Treas. Reg. § 1.951A-2(c)(5) (the "Regulation"). Because the Regulation is a proper exercise of authority delegated by Congress, and because Keysight admits that the deduction at issue in its refund claim is barred by the Regulation, the United States is entitled to judgment as a matter of law on the entirety of the case. The United States requests oral argument on this motion.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iv

INTRODUCTION ............................................................................................................. 1

QUESTIONS PRESENTED .............................................................................................. 3

STATEMENT OF THE CASE ........................................................................................... 3

      A.  TCJA's changes to international taxation. .................................................. 3

      B.  The "gap period" and the potential for abuse. ............................................. 6

      C.  Congress's provisions for Treasury rulemaking. .......................................... 9

      D.  The proposed regulation. ........................................................................... 10

      E.  Development of the final regulation. .......................................................... 11

      F.  Keysight's request that the Regulation be set aside. .................................. 13

ARGUMENT ................................................................................................................... 14

   I.  Congress delegated authority to promulgate the Regulation. ......................... 14

      A.  Congress delegated authority, under Section 951A(c)(2)(A)(ii), to define
           what deductions are "properly allocable" to a CFC's gross income. .......................... 14

      B.  Congress delegated broad authority, under Section 7805(a), to prescribe all
           needful rules and regulations, particularly in response to alterations of law. ............ 18

      C.  One delegation of authority does not limit other delegations of authority. ............... 20

   II.  The Regulation is within the bounds of the Secretary's delegated authority. ................... 23

      A.  The Regulation's targeted focus falls within the boundaries of the Secretary's
           delegated authority under Section 951A(c)(2)(A)(ii). ................................................ 23

          1.  The plain language of Section 951A(c)(2)(A)(ii) does not require only a
              factual relationship test. ...................................................................................... 24

          2.  Congress has never understood "properly allocable" to mandate only a
              factual relationship test. ...................................................................................... 27

      B.  The Regulation also falls within the boundaries of the Secretary's delegated
           authority under Section 7805(a). .............................................................................. 30

C. The Court should take guidance from the Secretary's understanding of "properly allocable." ................................................................................ 32

D. There is no indication Congress intended a massive tax holiday during which only taxpayers with fiscal-year CFCs could engage in artificial, related-party transactions to generate massive tax deductions for years to come, without limit. .... 34

E. Congress subsequently amended Section 951A and did not overturn the Regulation. ........................................................................................................... 38

III. The Secretary engaged in reasoned decision-making. ....................................... 39

A. The rulemaking process was logical and rational. .......................................... 39

B. The Regulation is a logical outgrowth of the proposed regulations. ........................ 41

1. The Regulation's change in methodology to prevent deductions against gross tested income was a logical outgrowth. ........................................ 42

2. The Regulation's broadening to prevent deductions against other income was also a logical outgrowth. ................................................................ 44

CONCLUSION .............................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*ABA Retirement Funds v. United States*,
  No. 09 C 6993, 2013 WL 1788297 (N.D. Ill. 2013) ................................................. 16

*Allen v. United States*,
  173 F.3d 533 (4th Cir. 1999) .................................................................................. 24

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998) ................................................................................................ 39

*BASF Wyandotte Corp. v. Costle*,
  598 F.3d 637 (1st Cir. 1979) ............................................................................. 43, 44

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ................................................................................................ 19

*Cottage Sav. Ass'n v. Comm'r*,
  499 U.S. 554 (1991) .......................................................................................... 19, 38

*CSX Transp., Inc. v. Surface Transp. Bd.*,
  584 F.3d 1076 (D.C. Cir. 2009) .............................................................................. 42

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ................................................................................................ 45

*Dep't of Lab. v. Americare Healthcare Serv., LLC*,
  762 F. Supp. 3d 666 (S.D. Ohio 2025) ................................................................... 20

*First Fed. Sav. & Loan Ass'n of Boston v. State Tax Comm'n*,
  437 U.S. 255 (1978) ................................................................................................ 16

*Fischer v. United States*,
  603 U.S. 480 (2024) ................................................................................................ 16

*Gitlitz v. Comm'r*,
  531 U.S. 206 (2001) ................................................................................................ 37

*Hefti v. Comm'r*,
  983 F.2d 868 (8th Cir. 1993) .................................................................................. 38

*Ireland v. United States*,
  101 F.4th 1338 (Fed. Cir. 2024) ............................................................................. 15

*ITServe Alliance, Inc. v. United States*,
  122 F.4th 1364 (Fed. Cir. 2024) ............................................................................. 39

*Lesko v. United States*,
No. 2023-1823, 2025 WL 3562218 (Fed. Cir. Dec. 12, 2025) ............................ 17, 18, 19, 23

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) ............................................................................................................ 42

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ...................................................................................................... passim

*McNamee v. Dep't of Treasury*,
488 F.3d 100 (2d Cir. 2007) ............................................................................................... 19

*Metro. Area EMS Auth. v. Sec'y of Veterans Affs.*,
122 F.4th 1339 (Fed. Cir. 2024) .................................................................................... 14, 15

*Miller v. United States*,
65 F.3d 687 (8th Cir. 1995) ................................................................................................ 24

*Moore v. United States*,
602 U.S. 572 (2024) ......................................................................................................... 2, 5

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................................................. 39

*Mourning v. Fam. Publ'ns Serv., Inc.*,
411 U.S. 356 (1973) ...................................................................................................... 21, 31

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) ............................................................................................................ 21

*Redlark v. Comm'r*,
141 F.3d 936 (9th Cir. 1998) .............................................................................................. 24

*Rimini St., Inc. v. Oracle USA, Inc.*,
586 U.S. 334 (2019) ............................................................................................................ 22

*Robinson v. Comm'r*,
119 T.C. 44 (2002) .............................................................................................................. 24

*Schaffner v. Monsanto Corp.*,
113 F.4th 364 (3d Cir. 2024) .............................................................................................. 19

*Scripps-Howard Radio v. FCC*,
316 U.S. 4 (1942) ................................................................................................................ 21

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ............................................................................................................ 32

*Trans-Pac. Freight Conf. of Japan/Korea v. Fed. Mar. Comm'n*,
  650 F.2d 1235 (D.C. Cir. 1980)................................................................. 41

*Tualatin Valley Builders Supply, Inc. v. United States*,
  522 F.3d 937 (9th Cir. 2008) ............................................................. 19, 22

*United States v. Correll*,
  389 U.S. 299 (1967)........................................................................... 18, 19

*United States v. Werner*,
  620 F.2d 922 (2d Cir. 1980) ..................................................................... 16

*United Steelworkers of Am. AFL-CIO v. Marshall*,
  647 F.2d 1189 (D.C. Cir. 1980)................................................................ 43

*Varian Medical Systems, Inc. & Subsidiaries v. Commissioner*,
  163 T.C. 76 (2024) ........................................................................... 36, 37

*Veterans Just. Grp., LLC v. Sec'y of Veterans Affs.*,
  818 F.3d 1336 (Fed. Cir. 2016) ..................................................... 41, 42, 43

*Watt v. Alaska*,
  451 U.S. 259 (1981)................................................................................. 21

**Statutes**

5 U.S.C. § 553........................................................................................... 41

5 U.S.C. § 553(b)(3) ................................................................................. 41

I.R.C. § 1001(a) ......................................................................................... 8

I.R.C. § 1011(a)........................................................................................... 8

I.R.C. § 1012(a) ......................................................................................... 8

I.R.C. § 1015............................................................................................. 33

I.R.C. § 1016............................................................................................... 8

I.R.C. § 1017(a) ......................................................................................... 33

I.R.C. § 1367(a)(2)(A) .............................................................................. 33

I.R.C. § 167............................................................................................... 8

I.R.C. § 197............................................................................................... 8

I.R.C. § 245A(a)........................................................................................... 5

I.R.C. § 245A(c)(1)(A) ................................................................................................ 5

I.R.C. § 316(a) ......................................................................................................... 27

I.R.C. § 444 ............................................................................................................... 6

I.R.C. § 722 ............................................................................................................. 33

I.R.C. § 723 ............................................................................................................. 33

I.R.C. § 7805(a) ................................................................................................. passim

I.R.C. § 7805(b)(3) .................................................................................................... 9

I.R.C. § 864(e)(3) .................................................................................................... 29

I.R.C. § 898 ............................................................................................................... 6

I.R.C. § 951(b) .......................................................................................................... 4

I.R.C. § 951A(a) ....................................................................................................... 4

I.R.C. § 951A(b) ....................................................................................................... 4

I.R.C. § 951A(b)(1)(B) ............................................................................................11

I.R.C. § 951A(b)(2) ................................................................................................11

I.R.C. § 951A(c)(2)(A)(i) ......................................................................................... 4

I.R.C. § 951A(c)(2)(A)(ii) ................................................................................. passim

I.R.C. § 951A(d)(1) ................................................................................................11

I.R.C. § 952(c)(1)(A) .............................................................................................. 27

I.R.C. § 954(b)(5) .............................................................................................. 15, 28

I.R.C. § 957(a) .......................................................................................................... 4

I.R.C. § 959(a) .......................................................................................................... 5

I.R.C. § 961(a) ......................................................................................................... 33

I.R.C. § 965(a) .................................................................................................. 5, 6, 7

I.R.C. §§ 951 through 965 ("Subpart F") ................................................................. 4

## Other Authorities

FACT Coalition, *Proposed Regulations Under Section 951A (REG-104390-18)* (Nov. 26, 2018) ........................................................................................ 40

Guidance Related to Section 951A (Global Intangible Low-Tax Income), 83 Fed. Reg. 51072 (proposed Oct. 10, 2018) .......................................11, 40, 43, 44

Guidance Related to Section 951A (Global Intangible Low-Taxed Income) and Certain Guidance Related to Foreign Tax Credits, 84 Fed. Reg. 29288 (June 21, 2019)............. passim

H.R. Rep. No. 115-409 (2017) ............................................................................... 6

H.R. Rep. No. 115-466 (2017) (Conf. Rep.) .................................................... 10, 36

H.R. Rep. No. 99-426 (1985) ............................................................................... 30

H.R. Rep. No. 99-841 (1986) (Conf. Rep.) ..................................................... 28, 29

Jenny A. Austin, et al., *Hidden in Plain Sight: Antiabuse Rule Standards and Authority*, Tax Notes (Apr. 22, 2025) ............................................................................... 32

Proposed Regulation, Allocation and Apportionment of Deductions for Computation of Taxable Income from Sources Within the United States and Other Sources, 41 Fed. Reg. 49160 (Nov. 8, 1976) ................................................................. 31

Pub. L. 119-21, 139 Stat. 72 (July 4, 2025) ......................................................... 38

Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 .................................. 2, 3, 6

Webster's New Int'l Dictionary (2d ed.) ................................................................ 16

## Regulations

Treas. Reg. § 1.861-8(a)(2) ................................................................................... 26

Treas. Reg. § 1.861-8(a)(4) ................................................................................... 26

Treas. Reg. § 1.951A-2(c)(5)(i) .................................................................. 12, 13, 26

Treas. Reg. § 1.951A-2(c)(5)(ii) ............................................................................ 12

Treas. Reg. § 1.951A-2(c)(5)(iii)(A) ...................................................................... 13

Treas. Reg. § 1.951A-2(c)(5)(iii)(B) ...................................................................... 13

Treas. Reg. § 1.951A-2(c)(5)(v) ............................................................................ 24

Treas. Reg. § 1.951A-3(h)(2)(ii) ...................................................................... 13, 24

Treas. Reg. § 1.954-1(c)(1)(i) .................................................................................... 26, 29

Treas. Reg. § 1.954-1(c)(1)(iv) ......................................................................................... 26

Treas. Reg. § 1.954-1(c)(i)(C) ........................................................................................... 28

**INTRODUCTION**

Keysight was the U.S. corporate parent of three Singapore subsidiaries. In 2018, Keysight directed one subsidiary to transfer assets to another subsidiary. Ordinarily, this kind of intracompany transaction is ultimately a wash: Keysight would still own the assets. The purchasing subsidiary would acquire a cost basis in the assets equal to the amount it paid. That basis would provide a tax benefit in the form of depreciation or amortization deductions that reduce taxable income while it uses the asset. But the U.S. parent would ultimately be subject to tax on the gain the selling subsidiary recognized from the sale—the difference between the selling subsidiary's cost basis and the amount it received. This symmetry ensures that the income earned through a U.S. parent's subsidiaries neither evades tax nor is inappropriately over-taxed.

Keysight seeks to turn that symmetry on its head. It claims that when its subsidiaries exchanged assets for intercompany debt of $8.5 billion, the purchasing subsidiary acquired an $8.5 billion amortizable cost basis in those assets even though Keysight paid no tax on the corresponding gain. Keysight is wrong. Congress gave the Treasury Secretary the authority to fill gaps like the one Keysight is trying to exploit. The Secretary lawfully exercised that authority, and Keysight is not entitled to the deductions it seeks.

The taxation of U.S. multinational companies is a complex area that Congress has sought to improve several times over the years. But throughout those changes, Congress has consistently sought to prevent taxpayers from exploiting the use of foreign subsidiaries and related-party transactions to improperly avoid the taxation of income. Further, Congress has long granted the Treasury Secretary broad authority to promulgate regulations that would disallow tax benefits improperly derived from such efforts. And when Congress made significant changes to the international taxation regime in 2017, it provided the Treasury

Secretary ample flexibility to address the tax consequences of abusive transactions that it expected to come up as a result of those changes.

Before 2017, Congress generally did not tax U.S. shareholders on the earnings of foreign subsidiaries until those earnings were repatriated to the United States. In 2017, Congress passed the Tax Cuts and Jobs Act ("TCJA"), Pub. L. No. 115-97, 131 Stat. 2054 , which revamped the way the United States taxes the earnings of a controlled foreign corporation ("CFC"). As the Supreme Court recently explained, the TCJA made a "complicated transition to a more territorial system." *Moore v. United States*, 602 U.S. 572, 580 (2024). It did so with several new provisions, including a one-time "repatriation tax" on CFCs' previously untaxed earnings and a global intangible low tax income ("GILTI") regime that would subject a U.S. shareholder to tax on most categories of its CFCs' future earnings.

Congress recognized the complexity of its endeavor, as well as the possibility that taxpayers were planning transactions to intentionally exploit that complexity. To enforce the new regime it passed, Congress authorized the Secretary to draft rules "similar to" long-standing allocation rules addressing what deductions of a CFC were "properly allocable" to income subject to the GILTI regime. The question here is whether Treasury properly promulgated a regulation that, "similar to" longstanding allocation rules, prevents taxpayers from avoiding the taxation of CFC income by improperly allocating CFC deductions attributable to basis created from untaxed gain.

Keysight argues that the Regulation is invalid because the gap period was an intentional benefit granted by Congress that permits fiscal-year taxpayers to freely engage in transactions designed to evade tax. In reality, Congress specifically recognized that taxpayers might engage in gap period transactions like Keysight's to thwart its intent, and it expected the Treasury

2

Secretary to address this issue through regulation. Heeding Congress's call, the Secretary promulgated the Regulation, which prevents taxpayers from allocating expenses attributable to untaxed basis increases to improperly reduce taxable income. It does so by ensuring that the acquiring CFC's resulting basis amortization is properly allocated to income that is also not subject to tax.

Because the Regulation properly effectuates Congress's intent, is based on express delegations of authority, and is the product of reasoned decision-making, the Regulation is valid. And while there are other reasons to deny Keysight's refund, better addressed after the close of discovery, Keysight acknowledges that the Regulation bars its claim entirely. Thus, a finding that the Regulation is valid also entitles the United States to judgment as a matter of law on the entirety of the case.

## QUESTIONS PRESENTED

1) Whether Congress delegated authority to the Treasury Secretary to promulgate the Regulation.

2) Whether the Regulation is within the bounds of the Secretary's delegated authority.

3) Whether the Regulation was the product of reasoned decision-making.

## STATEMENT OF THE CASE

### A.  TCJA's changes to international taxation.

On December 22, 2017, the Tax Cuts and Jobs Act ("TCJA"), Pub. L. No. 115-97, 131 Stat. 2054, was enacted. Prior to the TCJA, the United States had a system of worldwide taxation under which the active income of a statutorily defined "controlled foreign corporation" ("CFC") was generally taxed only when the earnings were distributed to shareholders or otherwise effectively repatriated. This created a tax benefit for U.S. companies that owned subsidiaries in jurisdictions with a lower income tax rate than the United States: the subsidiaries

could keep the earnings offshore and reinvest them without having to pay U.S. income tax.

Subpart F of the Internal Revenue Code was an important exception to this benefit, requiring U.S. shareholders to include in income a pro rata share of their CFCs' statutorily-defined "Subpart F income." *See generally* I.R.C. §§ 951 through 965 (together, "Subpart F"); § 951(b) (defining "United States shareholder"); § 957(a) (defining "CFCs"). Since the 1960s, Subpart F has required U.S. shareholders of CFCs to include in current, gross income many categories of passive or movable foreign income, so that their pro rata share of that income would be taxed currently instead of upon repatriation. Despite these anti-deferral provisions, many CFCs kept substantial earnings offshore and untaxed.

The TCJA overhauled the United States' approach to taxing the income of CFCs owned by U.S. shareholders. It did so with three significant provisions relevant here.

First, Congress expanded what CFC income a U.S. shareholder had to include as part of its gross income on its return. In addition to Subpart F income, the U.S. shareholder must now include in current gross income their global intangible low taxed income ("GILTI"). *See* I.R.C. § 951A(a). The GILTI regime generally subjects U.S. shareholders of CFCs to current year taxation on their pro rata share of the CFCs' foreign income that is non-Subpart F income, reduced by a "net deemed tangible income return" on their CFCs' tangible property (the CFCs' "qualified business asset investment" or "QBAI"). *See* I.R.C. § 951A(b). Although GILTI refers to "intangible" income, its computation begins with the CFC's entire gross income with certain exceptions (the CFC gross income subject to GILTI, or "gross tested income"). *See* I.R.C. § 951A(c)(2)(A)(i). The CFC's gross tested income is then reduced by deductions "properly allocable" to such gross tested income "under rules similar to the rules of section 954(b)(5)."

I.R.C. § 951A(c)(2)(A)(ii).[1] Congress did not define what it meant for a deduction to be "properly allocable" to gross tested income, nor what "similar" rules might apply. It expected Treasury to do that by regulation.

Second, Section 245A[2] provides a deduction when a domestic corporation owning at least 10% of a specified foreign corporation (including a CFC) receives a dividend from the foreign corporation. The deduction is equal to the portion of the dividend attributable to previously "undistributed foreign earnings," provided certain holding period requirements are met. *See* I.R.C. §§ 245A(a), 245A(c)(1)(A). Compared to the previous laws, in which repatriation of untaxed earnings to the United States triggered a tax on the dividend, this encouraged repatriation by providing a deduction to offset the dividend income. For income earned after the TCJA's enactment and, critically here, subject to GILTI, the income need not face a repatriation tax because it would have been taxed in the year it was earned. *See* I.R.C. § 959(a) (which generally prevents income previously taxed under GILTI from being taxed upon repatriation).

Finally, the TCJA also enacted a new "transition tax" under Section 965, which has also been referred to as a "mandatory repatriation tax." *See Moore*, 602 U.S. at 578. Section 965 effectively imposed a one-time tax on the previously untaxed earnings of a U.S. shareholder's CFCs by requiring those earnings to be included in the "last taxable year . . . which begins before January 1, 2018." I.R.C. § 965(a). The transition tax was implemented "[t]o avoid a potential windfall" in the case of U.S.-owned foreign corporations that could otherwise

---

[1] Unless otherwise specified, all citations to the Internal Revenue Code are to the years at issue. For example, Section 951A was amended in 2025 and the language here now resides at Section 951A(b)(2)(A)(ii).

[2] Unless otherwise specified, "Section" refers to Title 26 of the U.S. Code ("I.R.C.").

repatriate their accumulated foreign earnings—which had never faced U.S. tax under the prior laws—without incurring any U.S. tax due to the new availability of the Section 245A deduction. H.R. Rep. No. 115-409, at 375 (2017). The transition tax thus prevented companies from avoiding taxation of past unrepatriated income altogether. Together, these three provisions generally ensured that earnings of U.S.-owned foreign corporations—past, present, and future—would be subject to the U.S. tax regime.

### B.  The "gap period" and the potential for abuse.

Sections 951A, 245A, and 965 were each enacted with their own applicability dates. The Section 951A GILTI regime applies to the taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of U.S. shareholders in which or with which the foreign corporations' taxable years end. Pub. L. No. 115-97, § 14201(d). The Section 245A deduction applies to distributions made after December 31, 2017. Pub. L. No. 115-97, § 14101(a). And the Section 965 transition tax applied to the last taxable year of a CFC that began before January 1, 2018, and generally measured the accumulated deferred foreign income (the amount subject to the transition tax) as of December 31, 2017. I.R.C. § 965(a).

These effective dates align smoothly for calendar-year taxpayers. The Section 965 transition tax applied to a CFC's 2017 tax year, which would be the year ending December 31, 2017, for a calendar-year taxpayer. I.R.C. § 965(a). And the GILTI regime applies for taxable years of foreign corporations beginning after December 31, 2017; for calendar-year taxpayers, that would be the tax year beginning January 1, 2018, and all years thereafter. In other words, GILTI picks up where the transition tax leaves off.

However, Congress permits some taxpayers to file tax returns on a fiscal-year basis. *See* I.R.C. §§ 444, 898. For taxpayers with fiscal-year CFCs, the TCJA created a gap period between the effective dates of Sections 965 and 951A. Keysight is one such taxpayer, with each

6

of its taxable years beginning November 1 and ending October 31 of the following year, and its CFCs following the same taxable year. (Dkt. No. 2 ¶ 28).

Under the Section 965 transition tax, the Subpart F income of each Keysight CFC for the year ending October 31, 2018, is increased by its accumulated deferred foreign income determined as of December 31, 2017. I.R.C. § 965(a). In other words, untaxed foreign earnings of Keysight CFCs accumulated as of December 31, 2017, were subject to the one-time transition tax imposed by Section 965. Further, tested income of any Keysight CFC earned in the taxable year beginning November 1, 2018 (and in all future taxable years) is subject to the Section 951A GILTI regime (the year beginning November 1, 2018 is Keysight's first taxable year beginning after December 31, 2017). However, between January 1, 2018 and October 31, 2018, any foreign earnings of a Keysight CFC are neither subject to the transition tax nor the GILTI regime. Moreover, subject to the application of other anti-abuse regulations not relevant here, when its CFCs distribute those untaxed earnings to Keysight, Keysight might claim the 100% deduction provided by Section 245A. Thus, non-Subpart F earnings of any Keysight CFCs that arose after December 31, 2017, but before its taxable year beginning November 1, 2018 (that is, in the gap period) may escape U.S. taxation entirely.

In its motion, Keysight offers a hypothetical example to explain how a U.S. shareholder with multiple CFCs could abuse the gap period. (Dkt. No. 34 at 18). But hypotheticals aren't necessary when Keysight's own actions provide sufficient context for the case. As alleged in the Complaint, Keysight is a publicly traded U.S. corporation that indirectly wholly owns three Singapore subsidiaries: Keysight Technologies Singapore (International) Pte. Ltd. ("KTSI"), Keysight Technologies Singapore (Holdings) Pte. Ltd. ("KTSH"), and Keysight Technologies Singapore (Sales) Pte. Ltd. ("KTSS"). As noted above, Keysight and its controlled entities have

tax and fiscal years ending October 31.

In 2018, KTSH held certain intangible property with an adjusted cost basis of $235,800,151. (Dkt. No. 2 ¶¶ 33, 35). Basis is an important tax accounting concept. When a taxpayer disposes of an asset, basis is the starting point from which gain or loss is measured. *See* I.R.C. §§ 1001(a), 1011(a). In general, a taxpayer's basis is equal to the cost of acquiring the asset. I.R.C. § 1012(a). This "cost basis" can be increased or decreased by various events, yielding the taxpayer's "adjusted basis." *See, e.g.*, I.R.C. § 1016. Adjusted basis is important to calculating the gain or loss on disposition of an asset. *See* I.R.C. § 1001(a). Taxpayers can also often claim deductions during the useful life of an asset: depreciation (wear and tear of tangible assets) or amortization (decrease in value of intangible assets over time). *See* I.R.C. §§ 167, 197. These deductions adjust the taxpayer's basis by decreasing it, and a taxpayer can generally claim the deductions only up to the amount of its adjusted basis in the asset.

Effective October 1, 2018, during the gap period, KTSH transferred its intangible property to KTSS in exchange for in exchange for purported intracompany debt in the total amount of $8,548,000,000 (Dkt. No. 2 ¶¶ 33–34), which represents a purchase price of 3,525.1% of KTSH's adjusted basis. Although this gain would have been subject to GILTI if it arose in the tax year beginning November 1, 2018, because the transfer was done in the gap period, Keysight did not include the $8,312,199,849 gain to KTSH into income subject to GILTI and did not pay any taxes on it. (Dkt. No. 2 ¶¶ 35–37). KTSS then claimed a cost basis of $8,548,000,000 in the intangible property, which Keysight now asserts is amortizable over 15 years under Section 197 and allocable against gross tested income that is subject to GILTI and therefore taxable to Keysight. (Dkt. No. 2 ¶ 38). Amortizing this cost basis and allocating it against KTSS's gross tested income would allow Keysight to claim billions of dollars in

8

deductions over the years that would reduce its GILTI, creating a tax imbalance between KTSH's untaxed gain and KTSS's ability to take deductions against taxable income based on the same, related-party transaction.

### C.  Congress's provisions for Treasury rulemaking.

In the absence of regulation, the ability of fiscal-year taxpayers to generate tax-free earnings during the gap period through non-economic related-party transactions presented significant opportunities to abuse the scheme set up by Sections 965, 245A, and 951A. But the Internal Revenue Code does not require Congress to anticipate and close every potentially abusive loophole in the tax laws; rather, Congress has given several delegations to the Treasury Secretary to make regulations necessary to enforce the tax laws and prevent abuse.

Broadly, Congress has provided that the Secretary "*shall* prescribe all needful rules and regulations" for the enforcement of the Internal Revenue Code. I.R.C. § 7805(a) (emphasis added). Congress went on to specify that this grant of authority includes the duty to prescribe "all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." *Id.* In the same statute, Congress provided the Secretary with even more latitude in issuing anti-abuse regulations, allowing for regulations to "take effect or apply *retroactively* to prevent abuse." I.R.C. § 7805(b)(3) (emphasis added). Section 7805 thus provides a broad delegation of rulemaking authority that is especially applicable when regulations are necessary because of changes in the Internal Revenue Code and to prevent abuse.

Further, when enacting the TCJA, Congress explicitly recognized the problem presented by the gap period and provided authority for the Treasury to address the problem. As explained in the Conference Report, Congress wanted to bolster the Secretary's general regulatory authority under Section 7805 of the Internal Revenue Code to address such abuse. It notes that:

9

"The conferees intend that non-economic transactions intended to affect tax attributes of CFCs and their U.S. shareholders (including amounts of tested income and tested loss, tested foreign income taxes, net deemed tangible income return, and QBAI) to minimize tax under this provision be disregarded." H.R. Rep. No. 115-466, at 645 (2017) (Conf. Rep.). As an example of a transaction that should be disregarded (which, while in the context of QBAI benefits, indicates the more general concern of Congress), the conferees noted that they "expect[ed] the Secretary to prescribe regulations to address transactions that occur after the measurement date of post-1986 earnings and profits under amended section 965, but before the first taxable year for which new section 951A applies." *Id.*

The final text of the TCJA includes a grant of rulemaking authority in Section 951A. It provides that, when determining the tested income (or loss) of a CFC in order to calculate tax owed under the GILTI regime, the gross income is reduced by the deductions "*properly allocable* to such gross income *under rules similar to the rules of section 954(b)(5).*" I.R.C. § 951A(c)(2)(A)(ii) (emphasis added).

Section 954(b)(5) itself generally does not include allocation rules. Instead, since inception, Section 954(b)(5) has provided the Secretary with, and the Secretary has exercised, regulatory authority to determine how deductions are properly allocated to Subpart F income. Thus, the text of Section 951A directed the Secretary to prescribe new rules addressing which deductions are "properly allocable" to tested income. And Congress provided general guidelines for the shape of those rules, in that they should be "similar to" the allocation rules of Section 954(b)(5). In doing so, Congress delegated authority for the Regulation at issue.

### D.  The proposed regulation.

In response to Congress's direct call to action, the Secretary promulgated proposed Treas. Reg. § 1.951A-2(c)(5) (the "Proposed Regulation"). *See* Guidance Related to Section

951A (Global Intangible Low-Tax Income), 83 Fed. Reg. 51072 (proposed Oct. 10, 2018). The

Proposed Regulation anticipated that some U.S. shareholders might try to game the new rules. It

targeted asset transfers from one related CFC to another during the "disqualified period"—that

is, the period during 2018 after Section 965 applies and when the Section 245A deduction was

available, but the GILTI provisions did not yet apply to a fiscal-year CFC. *See* 83 Fed. Reg. at

51096 (proposed Treas. Reg. §§ 1.951A-2(c)(5)); 83 Fed. Reg. at 51099 (proposed Treas. Reg.

§ 1.951A-3(h)(2)(ii)). The Proposed Regulation identified these transfers as "disqualified

transfers" that created "disqualified basis." *See id.* The Proposed Regulation disallowed

deductions or losses attributable to the disqualified basis that would otherwise reduce gross

tested income. The Proposed Regulation therefore deprived taxpayers of the ability to reduce

taxable income using benefits attributable to gap period transactions not otherwise subject to

tax, as Congress intended.

### E.  Development of the final regulation.

When Treasury issued the Proposed Regulation, it cited Section 951A(d)(4) as one of its

sources of Congressional authority. During the notice-and-comment period, the Secretary

received comments asserting Section 951A(d)(4) did not authorize the Secretary to promulgate

rules for any purpose other than determining QBAI under Section 951(d).[3] Other comments

suggested that Treasury lacked the authority to simply disregard deductions or losses

attributable to the disqualified basis.

In response to these comments, the Secretary revised the Proposed Regulation to better

---

[3] In Section 951A, QBAI is essentially a measure of a CFC's investment in tangible assets in another country. *See* I.R.C. § 951A(d)(1). Congress deemed some of a CFC's gross tested income to be attributable to those tangible assets and excluded that deemed portion from GILTI. *See* I.R.C. §§ 951A(b)(1)(B), (b)(2). This method is part of the shift to a territorial corporate income tax; it eliminated tax on income that Congress thought insufficiently connected to the United States.

reflect the source of its authority. *See* Guidance Related to Section 951A (Global Intangible Low-Taxed Income) and Certain Guidance Related to Foreign Tax Credits, 84 Fed. Reg. 29288, 29299 (June 21, 2019). The Secretary also made technical changes to the final Regulation, which now provides that deductions or loss attributable to disqualified basis are always "allocated and apportioned solely to residual CFC gross income." Treas. Reg. § 1.951A-2(c)(5)(i). In other words, the final Regulation ties disqualified basis deductions—i.e., those arising from non-taxable gap period transactions—to income that is *not* taxable under the Section 951A, Subpart F, or as effectively connected income. *See* Treas. Reg. § 1.951A-2(c)(5)(i), (ii). As a result, deductions or losses attributable to the disqualified basis are not "properly allocable" to income taxed under the GILTI regime and thus are not available to reduce income that is subject to U.S. tax. *See id.*; I.R.C. § 951A(c)(2)(A)(ii). The substantive impact for GILTI purposes, however, is the same as under the Proposed Regulation: deductions attributable to disqualified basis cannot be used to reduce gross tested income. As Congress intended, this prevents taxpayers from evading U.S. tax based on related-party transactions conducted as part of non-economic tax planning during the gap period.

The Secretary largely grounded its explanation of the Regulation by reference to the language in Section 951A(c)(2)(A)(ii), which provides that the gross tested income of a CFC will be reduced by the deductions "*properly allocable* to such gross income under rules similar to the rules of section 954(b)(5)." 84 Fed. Reg. at 29299 (citing I.R.C. § 951A(c)(2)(A)(ii) (emphasis added)). The Secretary noted that, while the rules allocating and apportioning expenses under Section 954(b)(5) "generally depend on the factual relationship between the item of expense and the associated gross income," the language in Section 951A(c)(2)(A)(ii) does not "constrain the Secretary from taking into account other considerations in determining

12

whether it is 'proper' for a certain item of expense to be allocated to, and therefore reduce, a particular item of gross income." *Id.* The Secretary went on to explain that the Regulation "is necessary to ensure that transactions during the disqualified period, the income or earnings from which are not subject to tax, are not permitted to *improperly* reduce or eliminate a taxpayer's income that would be subject to tax after the disqualified period." *Id.* (emphasis added).

The Secretary also explained that it had authority to promulgate the Regulation under Section 7805(a), which provides that "the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." *Id.* (citing I.R.C. § 7805(a)).

### F.  Keysight's request that the Regulation be set aside.

Under the Regulation, KTSH's purported sale of assets to KTSS on October 1, 2018, was a disqualified transfer, and KTSS acquired disqualified basis in those assets. *See* Treas. Reg. §§ 1.951A-2(c)(5)(iii)(A), 1.951A-3(h)(2)(ii). Thus, as Keysight acknowledges (Dkt. No. 2 ¶ 3), Keysight cannot use amortization deductions attributable to KTSS's disqualified basis to offset GILTI. *See* Treas. Reg. §§ 1.951A-2(c)(5)(i), (iii)(B). But Keysight now argues that it "would be entitled to a section 197 amortization deduction when computing its GILTI inclusion" for each of the tax years at issue in this case if the Regulation "had never been promulgated." (Dkt. No. 2 ¶ 2). Keysight asks the Court to set the Regulation aside, allowing Keysight to use a transaction between its own subsidiaries to create some $8 billion in tax deductions, without any corresponding tax cost, over the years at issue and future years to reduce gross tested income that would otherwise be taxable to Keysight under the GILTI regime. The Court should decline this invitation.

13

**ARGUMENT**

Section 951A(c)(2)(A)(ii)'s statutory language, the context of the U.S. system of international tax, and the "traditional tools of statutory construction, including the statute's structure, canons of statutory construction, and legislative history" all establish that the Secretary was authorized to promulgate the Regulation. *See Metro. Area EMS Auth. v. Sec'y of Veterans Affs.*, 122 F.4th 1339, 1343 (Fed. Cir. 2024) (internal quotations omitted). And because the Regulation is within the boundaries of that delegation and is the result of "reasoned decisionmaking," the Regulation is valid. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (internal quotations omitted).

**I.    Congress delegated authority to promulgate the Regulation.**

In 2024, the Supreme Court clarified when agencies could issue regulations that are binding law. *See Loper Bright*, 603 U.S. 369. It overruled the "*Chevron* doctrine," which sometimes required courts to defer to agency interpretations of ambiguous statutes the agency was charged with administering. 603 U.S. at 379–80, 412. But the Court explained that sometimes "the best reading of a statute is that it delegates discretionary authority to an agency." *Id*. at 395. To determine whether a statute does delegate such authority, a court must "every tool" at its disposal "to determine the best reading of the statute." *Id.* at 400. Here, the best reading of Section 951A is that it grants the Secretary authority to issue regulations that determine how to properly allocate deductions to a CFC's gross tested income—including by allocating deductions away from gross tested income to non-taxable income if they were generated through untaxed related-party transactions during the gap period.

**A.   Congress delegated authority, under Section 951A(c)(2)(A)(ii), to define what deductions are "properly allocable" to a CFC's gross income.**

The Court's first task is to determine whether Congress, through statute, has delegated

authority to issue the Regulation. *Loper Bright*, 603 U.S. at 395. Statutory construction begins "with the language of the statute." *Metro. Area EMS Auth.*, 122 F.4th at 1345 (internal quotation omitted). Yet in interpreting the language of the statute, the Court is "'not guided by a single sentence or member of a sentence, but look[s] to the provisions of the whole law, and to its object and policy.'" *Id.* (quoting *Ireland v. United States*, 101 F.4th 1338, 1343 (Fed. Cir. 2024)). "In addition to the statute's text," the Court also employs "the traditional tools of statutory construction, including 'the statute's structure, canons of statutory construction, and legislative history.'" *Id.*

As explained in *Loper Bright*, some statutes are best read to give discretionary authority to an agency. 603 U.S. at 394–95. Here, Congress did just that. When calculating GILTI tax, Congress provided that when determining the tested income (or loss) of a CFC, the gross income is reduced by the deductions "*properly allocable* to such gross income *under rules similar to the rules of section 954(b)(5)*." I.R.C. § 951A(c)(2)(A)(ii) (emphasis added). Keysight agrees "properly allocable" is not a statutorily defined term. (Dkt. No. 34 at 15) ("Congress did not further define 'properly allocable' in Section 954."); (Dkt. No. 34 at 24) ("Section 954(b)(5) itself does not define what constitutes a "properly allocable" deduction.").

Here, Congress delegated authority to define "properly allocable" in Section 951A(c)(2)(A)(ii). First, Congress allowed deductions "properly allocable" under "rules similar to the *rules of section 954(b)(5)*." I.R.C. § 951A(c)(2)(A)(ii) (emphasis added). And in Section 954(b)(5), Congress provided that certain Subpart F income should be reduced, "under regulations prescribed by the Secretary, so as to take into account deductions (including taxes) properly allocable to such income." I.R.C. § 954(b)(5). That language—which has existed since Section 954 was enacted in 1962—is itself a clear delegation for the Secretary to define what

15

deductions are "properly allocable" to certain income of a CFC. Moreover, the grant of authority in Section 954(b)(5) continues to operate post-TCJA in harmony with the grant provided by Section 951A(c)(2)(A)(ii), as any rule that would properly allocate a deduction to Subpart F income means that the deduction is not properly allocable to tested income (and vice versa). For this reason, the Regulation is partially issued under the authority of Section 954(b)(5), as it properly allocates disqualified basis deductions away from both Subpart F income and tested income.

Further, contrary to Keysight's arguments, Congress did not simply incorporate the "rules of section 954(b)(5)" as they existed at the time of the TCJA's enactment. Instead, Congress provided that, for purposes of calculating GILTI, gross income should be reduced by deductions properly allocable "under rules *similar to* the rules of section 954(b)(5)." I.R.C. § 951A(c)(2)(A)(ii) (emphasis added). Keysight omits the words "similar to," but the Court "must give effect, if possible, to every clause and word of the statute." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (citation modified). Similar means having characteristics in common, but not identical. *See United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (explaining that "similar" means "'resembling in many respects; somewhat alike; having a general likeness'") (quoting Webster's New Int'l Dictionary (2d ed.)); *ABA Retirement Funds v. United States*, No. 09 C 6993, 2013 WL 1788297 at *12 (N.D. Ill. 2013) ("'Similar to' does not mean 'the same as' and indeed suggests that there remains some difference between the similar, but non-identical, items.") (*citing First Fed. Sav. & Loan Ass'n of Boston v. State Tax Comm'n*, 437 U.S. 255, 264 (1978) (Blackmun, J., concurring) ("The statutory term 'similar' usually, and certainly here, does not mean 'identical.'")).

Accordingly, while Congress intended the rules under Section 951A(c)(2)(A)(ii) to bear

16

a strong resemblance to the then-existing rules under Section 954(b)(5), it did not intend for them to be identical. In the absence of specifying *how* the rules under Section 951A(c)(2)(A)(ii) would differ from the pre-existing rules under Section 954(b)(5), Congress provided the Secretary discretion to "fill up the details," within the guardrails of Section 954(b)(5), by providing those similar, but new, rules regarding what deductions are "properly allocable" in light of the new GILTI regime.

The recent decision in *Lesko v. United States*, No. 2023-1823, 2025 WL 3562218 (Fed. Cir. Dec. 12, 2025), is instructive. There, the Federal Circuit addressed the validity of a regulation requiring written authorization for overtime pay, and found that the regulation was a valid exercise of the Office of Personnel Management's ("OPM") congressionally delegated rulemaking authority. *Lesko*, 2025 WL 3562218, at *3. First, the court looked to the specific overtime statute and analyzed the plain text of the phrase "officially ordered or approved." *Id.* at *4.The court found that the plain language "presupposes a process for authorizing overtime with sufficient formalities but provides no guidance as to the mechanics of that process (i.e., who can authorize overtime and how they can do it (oral, written, or both))." *Id.* Accordingly, the court found that "the best interpretation of the overtime statute is that Congress mandated an authorization process for directing or ratifying overtime but did not determine the requisite formalities in the statutory text." *Id.* The court then looked to the broader Federal Employees Pay Act of 1945, which includes a broader express delegation to OPM to issue regulations as may be necessary for the administration of the Act. *Id.* at *5. Ultimately, the Court found, because the statute required overtime to be "officially ordered or approved," but was "silent regarding the formalities," coupled with Congress's delegation of broad authority to OPM, that the statute was best read as a "fill-up-the-details delegation" of authority. *Id.* at *5.

17

Here, Section 951A(c)(2)(A)(ii) similarly necessitates a determination as to what deductions are "properly allocable" to income but does not define what makes a deduction properly allocable. Additionally, Section 951A(c)(2)(A)(ii) provides that deductions are properly allocated under rules "similar to" the rules under Section 954(b)(5), but does not specify the ways in which the new rules will differ. Instead, the plain language, coupled with the broad delegation of authority to the Treasury Secretary (discussed further below), is best read as a delegation for the Secretary to fill up the details as to what deductions are properly allocable.

**B. Congress delegated broad authority, under Section 7805(a), to prescribe all needful rules and regulations, particularly in response to alterations of law.**

In *Loper Bright*, the Supreme Court explained that some statutes "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate" or 'reasonable.'" 603 U.S. at 395 (internal citations omitted). Congress did just that when it included Section 7805 in the Internal Revenue Code of 1954. Congress provided the Secretary broad authority to "prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." I.R.C. § 7805(a). Thus, Section 7805(a), in conjunction with Section 951A(c)(2)(A)(ii), gives the Secretary broad discretion to fill in gaps or make any necessary rules resulting from the TCJA's sweeping changes, which the Secretary properly did. *See Lesko*, 2025 WL 3562218, at *5, *7 n.11 (finding a delegation similar to Section 7805(a) to be both a "fill-up-the-details" delegation and a flexible delegation of authority, and specifically recognizing Section 7805(a) as a comparable delegation).

Courts have long recognized the Secretary's broad authority under Section 7805(a). *See,*

18

*e.g.*, *United States v. Correll*, 389 U.S. 299, 306–07 (1967) ("But we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code."); *Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 942 (9th Cir. 2008) ("Congress has given the IRS broad authority to issue rules implementing the tax laws."); *McNamee v. Dep't of Treasury*, 488 F.3d 100, 105 (2d Cir. 2007) ("Congress expressly delegated authority to the Secretary of the Treasury to adopt regulations to fill in gaps in the Code"). And the Secretary has long used that authority to fill up the details in the Internal Revenue Code. *See, e.g.*, *Correll*, 389 U.S. at 302–07 (upholding a rule defining "away from home"); *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 560–61 (1991) (upholding a rule defining "disposition of property" to include a "material difference" requirement).

Although the cases cited above were decided before *Loper Bright*, the breadth of the authority granted by Section 7805(a) remains undisturbed. *See* 603 U.S. at 395 (explaining that statutes may empower an agency to regulate with flexibility). The framework for analyzing whether a statute delegates authority to issue rules carrying the force of law predates *Chevron*. *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 301–03 (1979). Moreover, *Loper Bright* confirmed that prior cases upholding agency action were "still subject to statutory *stare decisis*." 603 U.S. at 412.

Following *Loper Bright*, courts continue to hold that statutes like Section 7805(a) are best read as broad delegations of authority that can allow an agency to issue regulations to ensure application of the law matches Congress's intent. *See Lesko*, 2025 WL 3562218, at *5, *7 n.11; *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 381 n.9 (3d Cir. 2024) (concluding that a

19

statute expressly authorizing the EPA Administrator "to prescribe regulations to carry out the provisions" of the statute was best read as authorizing the agency to exercise discretion and fill up the details); *Dep't of Lab. v. Americare Healthcare Serv., LLC*, 762 F. Supp. 3d 666, 683–85 (S.D. Ohio 2025) (upholding a rule based on the Department of Labor's broad authority "to prescribe the rules and regulations to shape the parameters of the exemptions to the FLSA").

Additionally, the Secretary's authority here soundly fits within Section 7805(a)'s direction to issue rules made necessary by changes in the law. Congress gave the Secretary broad authority to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code, and included delegated authority for "all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." I.R.C. § 7805(a). Keysight agrees that the "TCJA is a complicated piece of legislation that made many changes to the Internal Revenue Code," with "hundreds of operative provisions and over 120 effective-date provisions." (Dkt. No. 34 at 36). This makes regulations like the one at issue all the more necessary and all the more appropriate.

Thus, the best reading of Section 7805(a) in this context is that it delegates discretionary authority to the Secretary to fill in the details of Section 951A(c)(2)(A)(ii). Congress authorized deductions "properly allocable" to gross income under "rules similar to the rules of section 954(b)(5)." I.R.C. § 951A(c)(2)(A)(ii). That Congress did not fully supply those rules in Section 954(b)(5), but instructed the Secretary to do so, is itself an indication that Congress expected the Secretary to provide rules for Section 951A(c)(2)(A)(ii) as well. Section 7805(a), in connection with Section 951A(c)(2)(A)(ii), delegated authority to the Secretary to do so.

## C. One delegation of authority does not limit other delegations of authority.

In attempting to cabin the broad scope of Section 7805(a), Keysight argues that another

20

delegation, in Section 951A(d)(4), was an implicit attempt to limit the Secretary's rulemaking authority elsewhere. (Dkt. No. 34 at 43–46). But that argument is contrary to the plain text of the statute, precedent, and logic.

At the outset, Keysight's argument is misplaced because it focuses on Section 951A(d)(4) and ignores Section 951A(c)(2)(A)(ii). Keysight argues that because Congress provided a delegation in Section 951A(d)(4), the Court should presume that Congress's silence elsewhere means it meant to *withdraw* rulemaking authority from the rest of Section 951A (despite the overarching and broad delegation in Section 7805(a)). But Congress was not silent on the topic at hand. Instead, Congress spoke to its desire that the Secretary promulgate "rules similar to the rules of section 954(b)(5)" for the purpose of defining what deductions are "properly allocable" to gross tested income. I.R.C. § 951A(c)(2)(A)(ii). Even if Congress hadn't so spoken, Keysight's argument—that Congress intended to withdraw rulemaking authority through silence—assumes too much. "The silence of Congress" is "a treacherous guide to its intent." *Watt v. Alaska*, 451 U.S. 259, 271 n.13 (1981); *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 11 (1942) ("The search for significance in the silence of Congress is too often the pursuit of a mirage.").

Keysight's arguments are also unsupported by precedent. The Supreme Court has recognized broad delegations to carry out provisions of a statute even where other parts of the statute grant specific rulemaking authority. *See, e.g.*, *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 365 (1973) ("In addition to granting to the Board the authority normally given to administrative agencies to promulgate regulations designed to 'carry out the purposes' of the Act, Congress specifically provided, as noted earlier, that the regulations may define classifications and exceptions to insure compliance with the Act."); *Nat'l Broad. Co. v. United*

21

*States*, 319 U.S. 190, 214–17 (1943). And, when specifically addressing the Secretary's authority under Section 7805(a), the Ninth Circuit explained that this "broad authority *supplements* the specific grant of authority that Congress gave the IRS" elsewhere. *Tualatin Valley*, 522 F.3d at 942 (emphasis added). Even if Section 951A(c)(2)(A)(ii) did not provide its own grant, a specific grant of authority in Section 951A(d)(4) cannot override Section 7805(a)'s broad reach with respect to other parts of Section 951A, it merely supplements it.

What Keysight misses is that Congress sometimes includes specific delegations of authority not just to confer rulemaking authority, but also to direct the agency to promulgate more particular rules, or to draw agency attention to areas with a potential for abuse, or even to put taxpayers on notice of potential regulations. As Keysight points out, Sections 951A(d) and 245A(g) specifically direct the Secretary to issue regulations on particular topics. But Congress's direction to write specific rules for specific purposes cannot take away from its authorization in Section 951A(c)(2)(A)(ii) to write other, *discretionary* rules. At the same time, Section 7805(a) is a backstop authority for the Secretary to issue "needful" regulations. Thus, there is no superfluity in reading all of the statutes to confer regulatory authority on the Secretary. But even if there is some overlap, "[s]ometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). Congress's decision to direct the Secretary to address a certain issue through rulemaking does not dictate whether the Secretary has statutory authority under other provisions to issue other rules addressing other matters.

At bottom, Keysight's argument is that a delegation to issue an anti-abuse rule in one area (such as Section 951(d)(4)'s delegation to disallow the QBAI benefits of certain abusive transactions, including those that would exploit the gap period) is not only meant to highlight

22

and prevent one type of potentially abusive transaction, it is also an implicit blessing of similar abusive transactions that have parallel results (such as transactions that exploit the gap period to improperly reduce future tested income through a related-party transfer that artificially inflates basis without any tax cost). But that is not the law.

**II.     The Regulation is within the bounds of the Secretary's delegated authority.**

Once a delegation of authority is established, the Court's job is "to independently interpret the statute and effectuate the will of Congress." *Loper Bright*, 603 U.S. at 395.[4] It does this in part by "fixing the boundaries of the delegated authority." *Id.* (citation modified). In this case, the Regulation is within the boundaries of the Secretary's authority because it carries out Congress's intent to prevent the tax benefit of deductions claimed from untaxed, related-party transactions during the gap period. *See Lesko v. United States*, No. 2023-1823, 2025 WL 3562218, at *4–6 (Fed. Cir. Dec. 12, 2025) (affirming a regulation's validity where Congress expressly delegated rulemaking authority "necessary" for administering statutory provisions, the statute mandated a process but left the details of that process to the agency, and the rule was based on reasoned decision making and within the boundaries of delegated authority).

**A.   The Regulation's targeted focus falls within the boundaries of the Secretary's delegated authority under Section 951A(c)(2)(A)(ii).**

The Regulation is a focused rule with a narrow scope. Keysight argues that the Regulation broadly disallows deductions that are otherwise "factually related" to particular income, but that argument is overstated. As explained above, *see supra* Statement of Case, Part D., E., the Regulation only applies to deductions related to (1) property transfers, (2) made by CFCs with a fiscal taxable year, (3) to a related party, (4) during the transferor CFC's gap

---

[4] The Court must also ensure that any delegation is within "constitutional limits." *See id.* at 404. Keysight raises no constitutional challenge to the delegation.

23

period, (5) where the gain generated upon the transfer was not otherwise subject to U.S. tax. *See* Treas. Reg. §§ 1.951A-2(c)(5)(v), 1.951A-3(h)(2)(ii). That is a targeted regulation, which falls well within the Secretary's delegated authority.

### 1. The plain language of Section 951A(c)(2)(A)(ii) does not require only a factual relationship test.

As discussed above, *see supra* Argument Part I.A., Section 951A delegates authority for the Secretary to define what deductions are "properly allocable" to gross tested income under "rules similar to the rules of section 954(b)(5)." I.R.C. § 951A(c)(2)(A)(ii). Keysight argues that the plain language of that provision is meant to allocate a CFC's deductions to gross tested income solely, and in all instances, based on the deductions' "factual relationship" to the CFC's gross income (regardless of whether it would permit expenses traceable to untaxed income to improperly reduce taxable income). But that argument fails for several reasons.

First, Section 951A *does not* use the term "factually related." Undeterred by the fact that the "plain language" they cite is nowhere to be found in the statute, Keysight tries to import the words in other ways. One attempt is Keysight's argument that "properly allocable" has a settled meaning as "factually related." (Dkt. No. 34 at 31–33). Since the two terms have the same meaning, Keysight argues, the plain language of the statute might as well have said "factually related." But as Keysight acknowledges (Dkt. No. 34 at 32 n.7), multiple courts have found the term "properly allocable" to be ambiguous. *See, e.g.*, *Allen v. United States*, 173 F.3d 533, 535–36 (4th Cir. 1999); *Redlark v. Comm'r*, 141 F.3d 936, 939–40 (9th Cir. 1998); *Miller v. United States*, 65 F.3d 687, 690 (8th Cir. 1995); *Robinson v. Comm'r*, 119 T.C. 44, 49 (2002). True, those case were decided pre-*Loper Bright*, but they "are still subject to statutory *stare decisis*." *Loper Bright*, 603 U.S. at 412. And, in any event, they show that the meaning of "properly allocable" is far from settled.

24

The rest of Keysight's "plain language" argument rests on an increasingly convoluted series of references and inferences. It goes something like this:

1. I.R.C. § 951A doesn't define "properly allocable" and certainly doesn't state, in plain language, that it means "factually related," but it does reference "the rules of section 954(b)(5)."

2. While I.R.C. § 954(b)(5) doesn't state that "proper allocations" necessarily depend on a factual relationship, the rules under I.R.C. § 954(b)(5) are contained in Treas. Reg. § 1.954-1(c)(1)(i). That regulation also doesn't include the words "factually related" in providing guidance on the proper allocation of deductions. Rather, it generally says expenses "shall be allocated and apportioned under the principles of sections 861, 864, and 904(d)."

3. I.R.C. §§ 864 and 904(d) also do not contain the term "factually related."

4. I.R.C. § 861(b) says that income shall be reduced by deductions "properly apportioned or allocated." It does not define properly apportioned or allocated to mean "factually related" and does not contain that term at all.

5. Having thus far failed to locate anything to support its argument that "properly allocable" has a settled meaning of "factually related," Keysight turns to the rules issued under I.R.C. § 861. At last, Keysight is able to locate its "plain language": Treas. Reg. § 1.861-8(a)(2), promulgated in 1977, states that "allocations and apportionments are made on the basis of the factual relationship of deductions to gross income."

It's simply illogical to state that Section 951A(c)(2)(A)(ii)'s "plain language" requires deductions to always be allocated on the basis of a factual relationship to income based on the above chain of references, which end in a regulation that was promulgated in 1977, especially since multiple courts have found the phrase "properly allocable" to be ambiguous even after the enactment of that regulation.

But Keysight's chain of references fails for a more fundamental reason. It asks the Court to, once again, read language out of the statute. Throughout its motion, Keysight misleadingly claims that Section 951A provides for deductions "properly allocable" under the "rules of section 954(b)(5)," when in reality, it says "under *rules similar to* the rules of section

25

954(b)(5)."[5] But no matter how many times Keysight omits this key phrase from its quotation

of the statute, it cannot erase words that Congress included. Therefore, even if the Court accepts

Keysight's argument that when Congress wrote "rules of section 954(b)(5)," it was referring to

the regulations then existing under Section 954(b)(5) and therefore, by way of cross-references,

to the test under Treas. Reg. § 1.861-8(a)(2), the Court must still acknowledge that Congress

wrote more. It gave the Secretary discretionary authority to write rules *similar to*, but not

identical to, those pre-existing rules.[6]

Keysight similarly complains that "residual CFC gross income," *see* Treas. Reg.

§ 1.951A-2(c)(5)(i), is a "a completely made-up term" and that, by allocating disqualified basis

deductions to that income category, "the Treasury Department essentially created a black hole

and sent the deductions there to disappear." (Dkt. No. 34 at 19). These claims are misleading.

The expense allocation rules under Sections 954(b)(5) and 861 have *always* allocated certain

deductions to a "residual grouping of income." *See, e.g.*, Treas. Reg. § 1.861-8(a)(2) (providing

that operative sections of the Code apportion deductions between the "statutory grouping" and

the "residual grouping"); Treas. Reg. § 1.861-8(a)(4) (distinguishing the "statutory grouping,"

which means "gross income from a specific source or activity which must first be determined in

order to arrive at 'taxable income,'" from the "residual grouping," which is the gross income

"from other sources or activities."); Treas. Reg. § 1.954-1(c)(1)(i) (generally incorporating these

---

[5] In its motion, Keysight consistently leaves out the entire statutory language in this misleading manner, arguing that deductions are allocable under "rules of section 954(b)(5)" at least nineteen times. (Dkt. No. 34 at 14, 15, 16, 21, 23, 24, 25, 25 n.3, 27, 30, 32, 34, 35).

[6] Moreover, the Secretary updated the Section 954(b)(5) regulations at the time it promulgated the Regulation to provide for a parallel rule preventing deductions attributable to disqualified basis from being allocated and apportioned to Subpart F income. *See* Treas. Reg. § 1.954-1(c)(1)(iv). Therefore, the Regulation does not deviate from the "rules under section 954(b)(5)" as they currently exist.

principles for Section 954(b)(5) purposes). Accordingly, while Treas. Reg. § 1.951A-2(c)(5) gave a particular name to the relevant residual grouping for its purposes, it did so consistent with the pre-existing deduction allocation rules. Further, while allocating disqualified basis deductions to residual CFC gross income generally defeats the intended benefits of the tax planning efforts at issue, the deductions do not simply "disappear." These deductions still, for example, reduce the CFC's earnings and profits, which has an impact on various determinations under the Internal Revenue Code. *See, e.g.*, I.R.C. § 952(c)(1)(A) (limiting a CFC's Subpart F income to the amount of the CFC's earnings and profits for a taxable year), I.R.C. § 316(a) (defining a "dividend" as a distribution out of a corporation's earnings and profits).

The Secretary therefore acted appropriately in writing regulations that generally incorporate the pre-existing Section 954(b)(5) regulations for allocating deductions under Section 951A(c)(2)(A)(ii), while using its authority to create a new, narrow expense allocation rule. Namely, a rule that prevents taxpayers from improperly allocating specific deductions against gross tested income to exploit a planning opportunity that existed only as a result of the enactment of the TCJA and that, therefore, addressed a novel concern that the pre-existing regulations under Section 954(b)(5) could not have accounted for.

### 2. Congress has never understood "properly allocable" to mandate only a factual relationship test.

The crux of Keysight's argument is that "properly allocable" must mean "factually related," and nothing more. But that has never been the *only* way Congress and the Secretary have used the term "properly allocable," even in the case of allocating deductions.

Look no further than Section 954(b)(5), which Congress referenced when setting the bounds of the Secretary's authority here. Section 954(b)(5) provides that certain categories of Subpart F income shall be reduced, under regulations provided by the Secretary, to take into

27

account deductions properly allocated to them. But Congress amended this provision in 1986 to provide an additional rule (known as the "cream-skimming rule") that a CFC's deductions for interest expense paid to a United States shareholder of the CFC or a related CFC must be allocated first to a particular category of Subpart F income (namely, passive foreign personal holding company income ("FPHCI")), except as otherwise provided by the Secretary. *See* I.R.C. § 954(b)(5).

As made clear in the legislative history, Congress added this rule to combat U.S. shareholders abusing foreign tax credits through their CFCs to reduce or eliminate the taxation of the shareholder's interest income. *See* H.R. Rep. No. 99-841, pt. II, at 578–79 (1986) (Conf. Rep.). This planning was possible as a result of the then-existing regulations under Sections 954(b)(5) and 861, which would otherwise allocate the relevant interest expense across all of a CFC's various categories of income.

Importantly, the cream-skimming rule, subsequently incorporated into the regulations under Section 954(b)(5), requires relevant interest expense to first reduce (that is, be allocated to) passive FPHCI, *even if* the expense would be allocated differently under the principles of section 861 or would be "factually related" to other income. *See* Treas. Reg. § 1.954-1(c)(i)(C).

Further, the relevant legislative history confirms that Congress was directing *how* this particular type of deduction should be considered "properly allocated," rather than *overriding* the general rule that deductions are to be properly allocated. In describing how the rule would apply to a particular abusive fact pattern, the Conference Report states that the relevant interest expense is "*properly allocable* in full" to the CFC's passive FPHCI, and that this allocation ultimately prevents the abusive result they were concerned about. H.R. Rep. No. 99-841, pt. II, at 578–79 (Conf. Rep.) (emphasis added). Congress therefore views the interest expense as

"properly allocated" even though its allocation is based on the cream-skimming rule, and *not* on the basis of a factual relationship.

In the case of expenses other than interest (and therefore not covered by the cream-skimming rule itself), the report also states a Congressional intent "that the Secretary make any clarifications in the present regulations that might be necessary to ensure" the appropriate result "in such problem cases." *Id.*  Clearly, then, Congress viewed the Secretary as having ample authority even under the general, pre-existing regulatory grant in Section 954(b)(5) to deviate from the existing Section 861 regulations when determining the "proper allocation" of deductions, particularly as necessary to prevent improper, abusive outcomes. And that authority was incorporated into Section 951A when Congress allowed for deductions properly allocable "under rules similar to the rules of section 954(b)(5)." I.R.C. § 951A(c)(2)(A)(ii).

The cream-skimming rule is not the only instance where the "rules under section 954(b)(5)" have deviated from applying a factual relationship test when "properly allocating" deductions. In Section 864(e)(3), Congress directed certain deductions to be allocated in a manner contrary to what would result from applying a pure factual relationship test (the "tax exempt income rule"). Specifically, this rule requires deductions to be allocated *away* from tax-exempt assets and income, even where those deductions would be factually related to that income. *See* I.R.C. § 864(e)(3). And the regulations under Section 954(b)(5), by requiring deductions not subject to the cream-skimming rule to be allocated under the "principles of sections 861, 864, and 904(d)," incorporate this same rule. Treas. Reg. § 1.954-1(c)(1)(i).

The tax-exempt income rule is therefore another instance where Congress endorsed a deviation from a factual relationship standard for purposes of properly allocating deductions to income. Further, Section 864(e)(3) was enacted out of a concern that taxpayers were utilizing

29

certain income not subject to U.S. tax to improperly derive certain foreign tax credit benefits to offset income that was subject to U.S. tax:

> The committee believes that it is *inappropriate* to consider assets that generate tax-exempt income in allocating and apportioning expenses. It is immaterial whether exempt income is U.S. source or foreign source. The inclusion of exempt U.S. source income and assets in the expense allocation increases the amount of expense allocated to U.S. source income even though the income generated is not subject to U.S. tax.

H.R. Rep. No. 99-426, at 374 (1985) (emphasis added).

So the cream-skimming rule and the tax-exempt income rule refute Keysight's claim that "properly allocable" under the rules of Section 954(b)(5) exclusively meant "factually related." And they also show that Congress has historically considered allocations of deductions on the basis of a factual relationship to be *improper* allocations where the allocation would facilitate taxpayers' ability to improperly evade the taxation of their income.

In this sense, the Regulation is fundamentally "similar to" the rules that pre-existed under Section 954(b)(5). Like the cream-skimming rule, the Regulation defeats taxpayer efforts to manipulate their CFCs to evade the taxation of income. Like the tax-exempt income rule, the Regulation prevents taxpayers from using income that is not subject to tax to derive benefits with respect to income that is subject to tax. And all of these rules ensure the "proper allocation" of particular deductions by preventing an *improper* result. Therefore, while the Regulation addresses a concern that did not arise until the enactment of the TCJA, it is fully consistent with Congress's historical understanding that the proper allocation of a deduction may require a consideration of the allocation's tax consequences under the Internal Revenue Code, and not just the factual relationships between deductions and income.

**B. The Regulation also falls within the boundaries of the Secretary's delegated authority under Section 7805(a).**

As discussed above, *see supra* Argument Part I.B., Congress also provided the Secretary

30

broad authority to "prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." I.R.C. § 7805(a). When considering the bounds of a broad delegation of authority, such as Section 7805(a), an agency acts within the boundaries of its authority if the resulting regulation "is reasonably related to the purposes of the enabling legislation." *Mourning*, 411 U.S. at 369 (internal quotations omitted). The Regulation easily meets this standard.

The Regulation was reasonably necessary due to an "alteration of law in relation to internal revenue." I.R.C. § 7805(a). As Keysight acknowledges, the TCJA enacted sweeping changes to the U.S. international tax system, including the addition of GILTI. GILTI comprised an entirely new anti-deferral tax regime that would co-exist alongside the existing Subpart F regime, requiring taxpayers to work through several new components, subcomponents, and defined terms to compute their liability. As an entirely new statutory regime, Section 951A presented an especially compelling need for regulatory guidance, including, as relevant here, as to the proper allocation of expenses to determine tested income. Without regulations providing rules for the proper allocation of expenses to categories of income, taxpayers would be left with uncertainty, and the enforcement of the Code would suffer from inconsistent positions taken by taxpayers. Section 7805(a) provides a backstop authority for issuing those regulations—just as it did when the Secretary issued Treas. Reg.§ 1.861-8, which Keysight cites repeatedly. *See* Proposed Regulation, Allocation and Apportionment of Deductions for Computation of Taxable Income from Sources Within the United States and Other Sources, 41 Fed. Reg. 49160, 49160 (Nov. 8, 1976) (citing Section 7805(a) as authority). Moreover, the Regulation, in preventing an abusive result that can occur solely due to the enactment of the TCJA, is reasonably related to

31

the "enforcement" of the Code. *See* I.R.C. § 7805(a) .

Because the Regulation is directly tied to the statutory delegations under Section 951A(c)(2)(A)(ii) and Section 7805(a), and because, as discussed further below, clear legislative history establishes Congress's intent that the Secretary issue the Regulation, the Regulation is valid. *See* Jenny A. Austin, et al., *Hidden in Plain Sight: Antiabuse Rule Standards and Authority*, Tax Notes (Apr. 22, 2025), available at https://www.mayerbrown.com/-/media/files/public-relations/hidden_in_plain_sight_antiabuse_rule_standards_and_authority_20250422-113240.pdf%3Frev=214a709214c04187ad612e26aa5378c3 ("To the extent that an antiabuse rule is closely tethered to the statutory language or clearly expresses congressional intent reflected in the legislative history, it will likely be less vulnerable to validity challenges.").

### C. The Court should take guidance from the Secretary's understanding of "properly allocable."

In interpreting the meaning of a statute, the Court may "seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Loper Bright*, 603 U.S. at 394 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "And interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id.* Here, the Regulation reflects the Secretary's contemporaneous interpretation of its authority, based on the Treasury Department's extensive experience in enforcing the Internal Revenue Code.

In particular, the Regulation reflects the Secretary's consistent understanding of the types of deductions that are "properly allocable" to income, and the Secretary's determination

32

that deductions attributable to gratuitous basis generated in a tax-free gap period transaction between related parties are not "properly allocable" to gross tested income. As the Secretary explained, the Regulation "creates symmetry between the category of income generated by reason of a transfer during the disqualified period" (namely, income of the transferor that is not subject to U.S. tax) and "the category of income to which any deduction . . . attributable to the resulting basis is allocated" (namely, income of the transferee which is not subject to U.S. tax). 84 Fed. Reg. at 29299. It thereby prevents taxpayers from "improperly" reducing income that would otherwise be subject to tax after the disqualified period. *Id.*

The Secretary's explanation is also consistent with the longstanding tax principle that basis in an asset generally increases only in the case of taxation. *See, e.g.*, I.R.C. § 961(a) (limiting basis increase in stock to "the extent to which such amount was included in the gross income of such United States shareholder"). Basis, which may be thought of as reflecting gain or income that has already been subjected to tax, generally does not increase in tax-exempt transactions so as to preserve gain for future taxation. *See, e.g.*, I.R.C. § 1015 (donee takes basis in gift generally the same as in hands of donor, except increased by the amount of gift tax paid); I.R.C. § 1017(a) (where taxpayer excludes discharge of indebtedness income under § 108, it must reduce basis to preserve gain); I.R.C. § 722 (contributing partner takes carryover basis in partnership increased by gain recognized); I.R.C. § 723 (partnership takes carryover basis in contributed property increased by gain recognized); I.R.C. § 1367(a)(2)(A) (reducing shareholder's basis in S corporation stock for excluded income).

In light of this basic principle, the Secretary recognized that in the case of related-party transactions, a potential to generate basis without paying tax is especially prone to abuse. Where one member of a controlled group transfers property to another member of the group, the

33

group's overall economic position generally does not change, subject to potential tax or regulatory implications. But allowing a group member to transfer assets within the group during the gap period to generate tax basis without incurring tax on the gain realized from the same transaction, and then using that basis to reduce otherwise taxable income, is tax arbitrage, pure and simple. The Regulation, while permitting tax basis in a relevant asset to increase, prevents this arbitrage by allocating the resulting deductions to residual CFC gross income that is not subject to taxation.

Therefore, based on the Secretary's extensive understanding of what deductions "properly" reduce income, and Congress's delegations to write rules defining what deductions are "properly allocable," the Secretary properly limited deductions with respect to basis generated in an *untaxed* transaction being improperly used to reduce *taxable* gross tested income.

> **D. There is no indication Congress intended a massive tax holiday during which only taxpayers with fiscal-year CFCs could engage in artificial, related-party transactions to generate massive tax deductions for years to come, without limit.**

Keysight's argument is not just that the factual relationship test should apply when allocating deductions to income—the United States does not dispute that it is the generally applicable test—but that Congress intended to allow all deductions factually related to income regardless of any possible anti-abuse authority. As discussed above, this argument is contrary to the plain language of the statute. If Congress wanted the IRS to only use the factual relationship test, it could have simply written Section 951A to allow deductions "factually related to such gross income." But it didn't.

The import of Keysight's argument is that Congress intended to create a gap period in which fiscal-year taxpayers (but not calendar year taxpayers) could freely engage in related-

34

party transactions designed to inflate basis and create tax deductions without any limits or negative tax consequences. But Keysight's interpretation goes far beyond a one-time tax holiday enjoyed by fiscal-year taxpayers during a relatively brief gap period. Keysight claims *annual* deductions for *billions* of dollars going forward for over a decade, purely as the result of an artificial, related-party transaction. But there is no support for such a proposition.

Keysight is the party whose proposed interpretation would contravene congressional intent—not just by decoupling tax benefits and burdens, as explained above, but by creating an enormous disparity between taxpayers with fiscal-year CFCs as opposed to those with calendar-year CFCs. Consider a company called Keysight Prime, which is identical in every way to Keysight, and owns CFCs that engage in the same transaction as KTSS and KTSH on the same date—except that Keysight Prime and its CFCs have a tax year that ends December 31 instead of October 31. There is no question that Keysight Prime, the calendar-year taxpayer, could not generate tax-free basis through the non-economic related-party transaction. While the acquiring CFC would be able to amortize its cost basis in the transferred intangible property against gross tested income, this is appropriate because the gain on the transaction would be subject to taxation under the GILTI regime. The Regulation subjects Keysight, the fiscal-year taxpayer that is not subject to taxation on the gain, to a parallel outcome by allocating the resulting amortization deductions to residual CFC gross income. The Regulation thereby denies the benefit of a tax planning abuse that would otherwise only be available to taxpayers with fiscal year CFCs.

All indications from the TCJA, including its express language, context, and legislative history, indicate that this is the proper result. And this is abundantly clear in the legislative history. The Conference Report confirms that Congress intended "that non-economic

transactions intended to affect tax attributes of CFCs and their U.S. shareholders . . . to minimize tax under this provision be disregarded." H.R. Rep. No. 115-466, at 645 (2017) (Conf. Rep.). As an *example* of a transaction that should be disregarded, the conferees noted that, when determining QBAI, they "expect[ed] the Secretary to prescribe regulations to address transactions that occur after the measurement date of post-1986 earnings and profits under amended section 965, but before the first taxable year for which new section 951A applies." *Id.* While this example specifically highlighted QBAI abuses that might arise from the gap period, Congress's general concern about non-economic transactions affecting tax attributes of CFCs is equally applicable to gap period tax planning—which can only be pursued by taxpayers with fiscal year CFCs—like that at issue here.

Keysight observes that "legislative history may not be used to muddy the meaning of clear statutory language." (Dkt. No. 34 at 39) (internal quotation omitted). But the "clear statutory language" provides the Secretary's authority, under Section 951A(c)(2)(A)(ii) and Section 7805(a), to write rules defining what deductions are properly allocable. The legislative history confirms this and confirms the bounds of regulatory authority that Congress intended to delegate. Moreover, the Court should "use every tool" at its disposal "to determine the best reading of the statute." *Loper Bright*, 603 U.S. at 400. One tool is legislative history.

Keysight relies on *Varian Medical Systems, Inc. & Subsidiaries v. Commissioner*, 163 T.C. 76 (2024), to argue that Congress spoke clearly when it created "mismatched effective dates." (ECF No. 34 at 40). But Keysight reads too much into *Varian*, which addressed a different regulation and different statutes (Sections 78 and 245A). In *Varian*, the Tax Court addressed "whether Varian's section 78 dividend qualifies as a 'dividend [it] received' within the meaning of section 245A(a)." 163 T.C. at 88. That case has no bearing on whether

36

Keysight's deductions are "properly allocable" here, "under rules similar to the rules of section 954(b)(5)." I.R.C. § 951A(c)(2)(A)(ii).

In addition, the reasoning in *Varian* is completely inapplicable to this case. In *Varian*, the Tax Court determined that Treas. Reg. §§ 1.78-1(a) and (c), which together generally provided that a Section 78 dividend received after December 31, 2017 was not a dividend for purposes of Sections 245 or 245A, "essentially gives one of the TCJA's amendments to section 78 an earlier effective date than provided for in the TCJA." *Id*. at 104. Accordingly, the Tax Court concluded that the regulations did not prohibit relief to the taxpayer because they would contradict "the clear effective date provided for in the statutory text." *Id*. at 108.[7] However, the Regulation at issue here plainly does not alter the effective date of Section 951A. Instead, the Regulation necessarily only requires allocating deductions attributable to disqualified basis to residual CFC gross income in tax years during which Section 951A is effective. In fact, the Regulation is only necessary because it does *not* alter the statutory gap period and effective date of Section 951A. If Section 951A applied to gain on a disposition of assets during the gap period, the gain otherwise generating disqualified basis would instead be subject to GILTI and there would be no need to allocate deductions attributable to that basis to residual CFC gross income.

Keysight's reliance on *Gitlitz v. Commissioner*, 531 U.S. 206 (2001), is similarly unavailing. In that case, the Supreme Court held that a discharge of indebtedness was an "item of income" based on the plain language of the statute. *Id.* at 212–13. Like *Varian*, *Gitlitz* provides no guidance on the scope of the Secretary's delegation of authority under Sections

---

[7] The United States disagrees with *Varian*, including the Tax Court's conclusion that Treas. Reg. § 1.78-1 alters the effective date of Section 78. *Varian* is not yet final and thus not yet appealable.

951A(c)(2)(A)(ii) and 7805(a).

### E.  Congress subsequently amended Section 951A and did not overturn the Regulation.

In 2025, Congress substantially amended Section 951A in Sections 70323(a) and 70354(b) of Public Law 119-21, 139 Stat. 72 (July 4, 2025), commonly known as the One, Big, Beautiful Bill Act (the "OBBBA"). As part of these amendments, Congress removed the provisions providing a reduction for the net deemed tangible income return and altered the manner in which a U.S. shareholder's pro rata share of a CFC's tested income is determined. Congress did not, however, alter the provision in Section 951A(c)(2)(A)(ii)—now redesignated as Section 951A(b)(2)(A)(ii)—that gross tested income is reduced by deductions "properly allocable . . . under rules similar to the rules of section 954(b)(5)" or amend Section 954(b)(5) itself. Further, Congress did not override the rule provided by the Regulation.

Congress's failure to change a challenged regulation when amending the relevant statutory provision "is an indication that Congress did not perceive the regulation to be unreasonable or inconsistent with Congressional intent." *Hefti v. Comm'r,* 983 F.2d 868, 872 (8th Cir. 1993), *cert. denied,* 508 U.S. 913 (1993); *cf. Cottage Savings*, 499 U.S. at 561 ("Treasury regulations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law") (citation modified). That Congress made extensive revisions to Section 951A without undoing the result provided by the Regulation therefore indicates approval of the Secretary's exercise of authority under Section 951A(c)(2)(A)(ii). Further, the Regulation applies with respect to amortization deductions that in almost all cases will be taken over a 15-year period following the gap period: accordingly, the Regulation remained fully relevant at the time of the OBBBA. If Congress disagreed with the result under the Regulation, it could have

38

redrafted Section 951A(c)(2)(A)(ii) to exclusively allocate deductions on the basis of a factual relationship as part of its other extensive changes to the statute. Meaningfully, it chose not to do so. *See ITServe Alliance, Inc. v. United States*, 122 F.4th 1364, 1372 (Fed. Cir. 2024) ("If Congress disagreed with how the statute was being applied, it could have changed the language of the statute, and it did not.").

### III.    The Secretary engaged in reasoned decision-making.

The Court's last task, having determined that the statute delegates authority to the agency and that the agency acted within the bounds of that delegation, is to ensure that the Secretary engaged in "reasoned decisionmaking" within the bounds of its authority. *Loper Bright*, 603 U.S. at 395 (internal citations omitted). In doing so, the Court "may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

The ultimate question under the APA is whether the Secretary's actions were "arbitrary and capricious." *State Farm*, 463 U.S. at 42. The scope of review under this standard "is narrow and a court is not to substitute its judgment for that of the agency." *Id.* at 43. The Court must consider the agency's explanation for its actions and "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (internal quotations omitted).

### A.  The rulemaking process was logical and rational.

As discussed above, the Regulation is within the scope of authority delegated to the

39

Secretary. Additionally, the Secretary's actions were logical and rational. The Secretary took Congress's directions, in both the statutory language and the legislative history, and sought to address the problem that Congress identified. In doing so, the Secretary engaged in reasoned and thoughtful notice-and-comment rulemaking. The preambles to both the proposed and final regulations illustrate that the Secretary "considered all relevant factors," especially those considered by Congress, when promulgating the Regulation. The preambles also demonstrate that the Secretary followed a logical and rational process in doing so, one that carefully considered the comments submitted on the proposed regulations.

The Regulation was included in a notice of proposed rulemaking on October 10, 2018. 83 Fed. Reg. 51072. The preamble described the Proposed Regulation, labeled it an anti-abuse rule, and invited written comments and requests for a public hearing. *Id.* at 51072–77. The preamble specifically discussed the examples illustrated in the Congressional Conference Report, where a taxpayer engaged in a transaction after the measurement dates under Section 965, but before the effective date of GILTI. *Id.* at 51077. The preamble highlighted that such transactions described in the Conference Report might result not only in a step-up in the basis of property, but also, in the absence of regulation, reduce tested income due to increased amortization deductions during the period the GILTI rules apply. *Id.*

The final regulations were published in the Federal Register on June 21, 2019. 84 Fed. Reg. 29288. The preamble to the final regulations discussed various comments requesting revisions to the Proposed Regulation, as well as a comment opposed to any "weakening of the anti-abuse rules" in the proposed regulations. *Id.* at 29298; *see also* FACT Coalition, *Proposed Regulations Under Section 951A (REG-104390-18)*, at 2 (Nov. 26, 2018) ("We do, however, oppose any additional effort to carve out or weaken anti-abuse rules proposed by Treasury in

40

this regulation. As noted . . . the goal of the tax on GILTI is to prevent base erosion."), *available at* https://thefactcoalition.org/wp-content/uploads/2018/11/FACT-IRS-GILTI-1118.pdf. The preamble to the final regulations also described in detail the source of its authority for the Regulation, provided an extensive discussion of the legislative history, and described alternative approaches that could have been taken. *See* 84 Fed. Reg. at 29298–301.

As such, the Regulation is a rational resolution of the gap-period abuse concerns raised by Congress, and the preambles to the proposed and final regulations show that the Regulation was based on consideration of the relevant factors.

### B. The Regulation is a logical outgrowth of the proposed regulations.

When rulemaking, agencies are required to publish notice of a proposed rule in the Federal Register and allow interested parties an opportunity to comment on the proposed rule as part of the rulemaking process. *See* 5 U.S.C. § 553. "Although the APA does not explicitly address the relationship the notice of proposed rulemaking must have to the final rule, it provides some guidance when it states that agencies must publish in their notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Veterans Just. Grp., LLC v. Sec'y of Veterans Affs.*, 818 F.3d 1336, 1343–44 (Fed. Cir. 2016) (quoting 5 U.S.C. § 553(b)(3)). Notably, a final rule "need not be identical to the proposed rule. Indeed, '[t]he whole rationale of notice and comment rests on the expectation that the final rules will be somewhat different and improved from the rules originally proposed by the agency.'" *Id.* at 1344 (quoting *Trans-Pac. Freight Conf. of Japan/Korea v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1249 (D.C. Cir. 1980)).

Under this standard, a "modified rule may be promulgated as a final rule without additional notice and opportunity for comment, so long as the final rule is a 'logical outgrowth' of the proposed rule." *Id.*; *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174

41

(2007) ("The object, in short, is one of fair notice."). "By contrast, a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation modified).

Keysight argues that the Regulation is not a logical outgrowth of the proposed regulations. But its argument is puzzling considering Keysight's express acknowledgment that the Regulation leads to similar results as the proposed regulation. (Dkt. No. 34 at 19) ("But the bottom line was the same . . . the final rule (like the proposed rule) prevents a taxpayer from taking [certain] deductions."). In any event, all of the changes to the final regulation were logical outgrowths of the proposed regulation.

### 1. The Regulation's change in methodology to prevent deductions against gross tested income was a logical outgrowth.

While their methodologies differ, the Proposed Regulation and the Regulation both serve the same logical function of preventing taxpayers from benefiting from deductions attributable to disqualified basis. The Regulation allocates and apportions deductions attributable to disqualified basis to gross income in the residual CFC gross income grouping, rather than denying (for purposes of determining tested income and loss) deductions that would have otherwise been allocated against gross tested income. As Keysight agrees, the substantive impact for GILTI purposes is therefore similar to the Proposed Regulation: such deductions cannot be used to reduce gross tested income. *See Veterans Justice Grp.*, 818 F.3d at 1345 (finding a final rule to be a logical outgrowth because it did "not constitute a change in the basic approach" of the proposed rule).

Because that outcome is similar and either version would have blocked the tax benefits

of Keysight's related-party transaction Keysight would have objected with equal vehemence to both. *See United Steelworkers of Am. AFL-CIO v. Marshall*, 647 F.2d 1189, 1225 (D.C. Cir. 1980) ("LIA contended that the proposed standard was infeasible, and would have done the same for the final standard."). It is difficult to imagine any comment that could have been levied against the final regulation (but not the proposed regulation) would have led to a different result. *See BASF Wyandotte Corp. v. Costle*, 598 F.3d 637, 644 (1st Cir. 1979) ("[W]e cannot think how their comments would have differed fundamentally if they had known what EPA would do. Though they would have had a different proposition against which to argue, their proposed solutions would, presumably, have been the same for the same reasons."). Keysight does not suggest any.

Moreover, in a section labeled "Anti-Abuse Provisions," the preamble to the proposed regulations referenced the Conference Report's statement regarding the intent "that non-economic transactions intended to affect tax attributes of CFCs and their U.S. shareholders . . . to minimize tax under this provision be disregarded." 83 Fed. Reg. at 51077 (internal quotations omitted). The preamble noted that the Secretary was aware of taxpayers engaging in transactions like the ones described in the Conference Report and noted that "it would be inappropriate for a taxpayer to reduce its GILTI inclusion amount for any taxable year by reason of a stepped-up basis in CFC assets attributable to transactions between related CFCs" in the gap period. *Id.*

As such, taxpayers were undeniably on notice that the Regulation would prevent deductions related to disqualified basis. The final regulation did not change that "basic approach." *Veterans Justice Grp.*, 818 F.3d at 1345. Keysight's "real complaint" here is ultimately not based on the methodology of the Regulation; it's that the Secretary did not allow

43

Keysight to enjoy a windfall by avoiding taxes through a non-taxed, related-party transaction designed to increase basis. *See BASF Wyandotte*, 598 F.2d at 644 (rejecting a logical outgrowth challenge, noting that petitioners' "real complaint" was that the EPA rejected the solution they wanted).

### 2. The Regulation's broadening to prevent deductions against other income was also a logical outgrowth.

Keysight also argues that the change in methodology has a broader effect because taxpayers "also cannot use the deductions to reduce Subpart F income or other types of income." (Dkt. No. 34 at 49). However, this argument fails for the same reason discussed above. The final regulation's preamble clearly explained the anti-abuse purpose of the proposed rule—that is, to prevent taxpayers from obtaining tax-free benefits from non-economic, gap-period transactions. The preamble also warned that "[t]he U.S. tax results claimed with respect to transactions that fall outside the scope of the anti-abuse rules in the proposed regulations may, nonetheless, be challenged under other statutory provisions or judicial doctrines." 83 Fed. Reg. at 51077. These explanations put interested parties on notice that the final regulation might expand the anti-abuse provisions to other benefits that taxpayers might otherwise claim, such as deductions against Subpart F income and other income.

With this basic purpose in mind, the Secretary explained that the final rule was "intended to ensure that taxpayers cannot simply circumvent the rule by converting their gross tested income into either subpart F income or effectively connected income, and thus be permitted to use the deduction or loss attributable to the disqualified basis against such income." 84 Fed. Reg. at 29300. The Regulation thereby effectuated the Proposed Regulation's intent "that taxpayers not be permitted to claim tax benefits with respect to cost-free disqualified basis," and "close[d] an obvious loophole." *Id.*

44

Further, it is not clear that Keysight has standing to challenge the Regulation's application to Subpart F income. In this action, Keysight seeks a refund of taxes based on amortization deductions to be applied to its gross tested income under GILTI. Keysight has not demonstrated that the amortization deductions at issue could also be taken against its Subpart F income. If they could not be, Keysight is not harmed by that hypothetical application of the Regulation. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (holding that a plaintiff must demonstrate standing for each claim and for form of relief).

## CONCLUSION

In enacting sweeping changes to the international tax regime as part of the TCJA, Congress was aware that taxpayers might try to take advantage of gaps in the transition to create artificially inflated basis by way of abusive, related-party transactions—as Keysight did. But to prevent taxpayers from obtaining improper benefits from such transactions, Congress granted the Secretary authority to define which deductions are "properly allocable" to income, along with the Secretary's long-standing delegation of authority to fill gaps and make rules as necessary when laws change. The Secretary acted appropriately within the bounds of that authority to promulgate Treas. Reg. § 1.951A-2(c)(5), which effectively disallows the benefits of Keysight's abusive transaction. As such, the Regulation is a valid exercise of authority delegated by Congress, and the United States is entitled to judgment as a matter of law.

45

Dated: January 6, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General,
Tax Litigation Branch

*/s/ Jason Bergmann*
JASON BERGMANN
Assistant Director

*/s/ Kari Madrene Larson*
KARI MADRENE LARSON
Senior Litigation Counsel
Tax Litigation Branch
Civil Division, Department of Justice
Post Office Box 26
Washington, DC 20044
202-532-3728 (v)
202-514-9440 (f)
Kari.M.Larson@usdoj.gov

ERIC J. SMITH
Trial Attorney
ELISABETH K. KRYSKA
Trial Attorney
JEREMY A. RILL
Trial Attorney