**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

KEYSIGHT TECHNOLOGIES, INC. &
SUBSIDIARIES

      *Plaintiff*,

   v.

THE UNITED STATES,

      *Defendant*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 25-137

The Honorable David A. Tapp

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to RCFC 5.4(a)(5) and 56(a) and this Court's Scheduling Order, *see* ECF No. 15, Plaintiff Keysight Technologies, Inc. & Subsidiaries (Keysight) submits the following reply in support of its motion for partial summary judgment and response in opposition to Defendant's cross-motion for summary judgment on the validity of Treasury Regulation § 1.951A-2(c)(5), 26 C.F.R. § 1.951A-2(c)(5). For the reasons set forth below, Keysight respectfully requests that the Court enter judgment as a matter of law that Treasury Regulation § 1.951A-2(c)(5) is invalid.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

TREASURY REGULATION § 1.951A-2(c)(5) IS INVALID AS A MATTER OF LAW ............. 3

    A.  The Regulation Is Contrary To The Statute ................................................................. 3

        1.  The Statute Requires Use Of The Factual Relationship Test ...................................... 3

        2.  "Similar To" Does Not Allow The Government To Discard The Factual Relationship Test ............................................................................................... 6

        3.  The Treasury Department Cannot Override The Statutory Text ................................11

    B.  The Treasury Department Does Not Have The Authority To Adopt A Regulation That Discards The Factual Relationship Test ........................................................... 14

        1.  Section 951A(c)(2)(A)(ii) Does Not Authorize The Treasury Department To Override The Factual Relationship Test .................................................................. 15

            a.  Section 951A(c)(2)(A)(ii) does not authorize new rulemaking ......................... 16

            b.  Section 951A(c)(2)(A)(ii) would not authorize this regulation ......................... 17

        2.  Section 7805(a) Also Does Not Authorize The Treasury Department To Override The Factual Relationship Test ................................................................. 20

    C.  The Regulation Is Procedurally Invalid ................................................................... 25

        1.  The Regulation Is Arbitrary And Capricious Because Gap-Period Transactions May Have Legitimate Business Purposes ................................................................ 25

        2.  The Final Rule Is Not A Logical Outgrowth Of The Proposed Rule ......................... 27

CONCLUSION................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Ala. Aircraft Indus., Inc.-Birmingham v. United States*,
    586 F.3d 1372 (Fed. Cir. 2009)..................................................................................26

*Allen v. United States*,
    173 F.3d 533 (4th Cir. 1999) .......................................................................................6

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983)....................................................................................................14

*DeCosta v. United States*,
    987 F.2d 1556 (Fed. Cir. 1993)...................................................................................13

*Jam v. Int'l Fin. Corp.*,
    586 U.S. 199 (2019)................................................................................................4, 18

*Lesko v. United States*,
    161 F.4th 1352 (Fed. Cir. 2025) ............................................................................19, 21

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)............................................................................................ *passim*

*Mem'l Hermann Accountable Care Org. v. Comm'r*,
    120 F.4th 215 (5th Cir. 2024) .....................................................................................23

*Michigan v. EPA*,
    576 U.S. 743 (2015)...............................................................................................15, 16

*Mid Continent Nail Corp. v. United States*,
    846 F.3d 1364 (Fed. Cir. 2017)........................................................................27, 28, 30

*Miller v. United States*,
    65 F.3d 687 (8th Cir. 1995) ..........................................................................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)......................................................................................................26

*Nat'l Council for Adoption v. Blinken*,
    4 F.4th 106 (D.C. Cir. 2021).......................................................................................30

*Nat'l Muffler Dealers Ass'n v. United States*,
    440 U.S. 472 (1979)....................................................................................................23

*OMJ Pharms., Inc. v. United States*,
    753 F.3d 333 (1st Cir. 2014).....................................................................................7, 16

*Princess Cruises, Inc. v. United States*,
  397 F.3d 1358 (Fed. Cir. 2005)........................................................................................6

*Redlark v. Comm'r*,
  141 F.3d 936 (9th Cir. 1998) ...........................................................................................6

*Robinson v. Comm'r*,
  119 T.C. 44 (2002)...........................................................................................................6

*Rowan Cos. v. United States*,
  452 U.S. 247 (1981).......................................................................................................23

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944).......................................................................................................20

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001).......................................................................................................14

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004).......................................................................................................16

*Strategic Hous. Fin. Corp. v. United States*,
  608 F.3d 1317 (Fed. Cir. 2010).....................................................................................12

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ........................................................................................29

*Union Bank v. Wolas*,
  502 U.S. 151 (1991).......................................................................................................12

*United States v. Ryals*,
  480 F.3d 1101 (11th Cir. 2007) .......................................................................................7

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014).......................................................................................................11

*Varian Med. Sys., Inc. v. Comm'r*,
  163 T.C. 76 (2024)............................................................................................12, 18, 23

*Veis v. United States*,
  1988 WL 149354 (D. Mont. Sept. 2, 1988)...............................................................16, 17

*Veteran's Justice Grp., LLC v. Sec'y of Veterans Affs.*,
  818 F.3d 1336 (Fed. Cir. 2016)...................................................................................27, 28

*Volvo Trucks of N. Am, Inc. v. United States*,
  367 F.3d 204 (4th Cir. 2004) ...........................................................................................7

*Watt v. Alaska*,
    451 U.S. 259 (1981)..............................................................................................................14

*Wayman v. Southard*,
    23 U.S. (10 Wheat.) 1 (1825)...................................................................................18, 19, 21

**Statutes**

5 U.S.C. § 553(b)(3) ....................................................................................................................27

5 U.S.C. § 5542(a) .......................................................................................................................19

7 U.S.C. § 956...............................................................................................................................23

12 U.S.C. § 1742...........................................................................................................................23

16 U.S.C. § 1463...........................................................................................................................23

16 U.S.C. § 1853(b).......................................................................................................................24

22 U.S.C. § 2581(i)........................................................................................................................23

25 U.S.C. § 1524............................................................................................................................23

26 U.S.C. § 59(*l*)(3).......................................................................................................................24

26 U.S.C. § 245A(g) ................................................................................................................16, 24

26 U.S.C. § 250(b)(3)(A)(ii) ..........................................................................................................5

26 U.S.C. § 338(b)(2) ...................................................................................................................16

26 U.S.C. § 861(b).........................................................................................................................25

26 U.S.C. § 864(e)(3)..................................................................................................................9, 10

26 U.S.C. § 951A(c)(2)(A)(ii) ................................................................................................ *passim*

26 U.S.C. § 951A(d)(4)........................................................................................................... *passim*

26 U.S.C. § 954(a) .......................................................................................................................17

26 U.S.C. § 954(b)(5) ............................................................................................................. *passim*

26 U.S.C. § 965.............................................................................................................................11

26 U.S.C. § 4052(d) ......................................................................................................................17

26 U.S.C. § 7805(a) ................................................................................................................ *passim*

26 U.S.C. § 7805(b)(3) ....................................................................................................21, 22

29 U.S.C. § 213(a)(15).........................................................................................................17

30 U.S.C. § 293.....................................................................................................................23

33 U.S.C. § 1312(a) ..............................................................................................................22

42 U.S.C. § 5846(a)(2)..........................................................................................................18

42 U.S.C. § 7412(n)(1)(A).....................................................................................................22

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2504:

    § 11011(e), 131 Stat. 2071................................................................................12, 13

    § 13302(e)(2), 131 Stat. 2123 ..................................................................................12

    § 14201(d), 131 Stat. 2208......................................................................................11

## Regulations

26 C.F.R. § 1.250(b)-1(d)(2)....................................................................................................5

26 C.F.R. § 1.861-8...................................................................................................5, 9, 24, 25

26 C.F.R. § 1.861-8(a)(2)......................................................................................................4, 8

26 C.F.R. § 1.861-8(a)(3)..........................................................................................................8

26 C.F.R. § 1.861-8(b)(2) ......................................................................................................4, 7

26 C.F.R. § 1.861-8(f) ...............................................................................................................5

26 C.F.R. § 1.861-8(g)(19) .....................................................................................................8, 9

26 C.F.R. § 1.951A-2(c)(3)........................................................................................................5

26 C.F.R. § 1.951A-2(c)(5)................................................................................................ passim

26 C.F.R. § 1.951A-2(c)(5)(i)..................................................................................................28

26 C.F.R. § 1.951A-3(h)(2)(ii)..................................................................................................26

26 C.F.R. § 1.954-1(c) ...............................................................................................................5

26 C.F.R. § 1.954-1(c)(1)(i)(B) (2017).................................................................................4, 5

v

**Other Authorities**

Gross Income; Allocation and Apportionment of Deductions,
    41 Fed. Reg. 49160 (proposed Nov. 4, 1976)...........................................................................24

Guidance Related to Section 951A, 83 Fed. Reg. 51072-01 (Oct 10, 2018).......................... *passim*

Guidance Related to Section 951A, 84 Fed. Reg. 29288-01 (June 21, 2019) ....................... *passim*

H.R. 5376, 117th Cong. (2021)......................................................................................................14

H.R. Rep. No. 115-466 (2017)..................................................................................................13, 26

*Webster's New World College Dictionary* (5th ed. 2016) .............................................................7

**INTRODUCTION**

The pending motions turn on a legal issue – whether Treasury Regulation § 1.951A-2(c)(5) is a valid interpretation of Section 951A(c)(2)(A)(ii).  As Keysight explained, it is not.  The statute allows taxpayers to take deductions to reduce their global intangible low taxed-income (GILTI) when the deductions are "properly allocable" to income "under rules similar to the rules of section 954(b)(5)."  26 U.S.C. § 951A(c)(2)(A)(ii).  A deduction is properly allocable to income under Section 954(b)(5) if it satisfies the factual relationship test. The government understands this; it uses the factual relationship test for *all* deductions in the regulation except for the category at issue.

Instead, for these deductions, the Treasury Department made up an entirely new rule, with the avowed purpose of denying the deductions.  Through made-up terminology, added at the eleventh hour, the regulation created a black hole and sent the deductions there to disappear.  The Treasury Department does not have the authority to do that.  Congress told Treasury which rules to use; Treasury is not allowed to cast those rules aside when it dislikes the result.

The government makes essentially two arguments for why the regulation does not need to use the factual relationship test.  First, it argues that the statutory language does not require the factual relationship test because the statute does not say "factual relationship," and because it requires a test "similar to" the Section 954(b)(5) test, which (in the government's view) could be a *different* test.  But as the government itself has recognized, the factual relationship test *is* the longstanding test under Section 954(b)(5). As for "similar to," that language simply reflects Congress's expectation that the Treasury Department would take the existing test and apply it to the context here.  A different test, which denies deductions that meet the factual relationship test, is not "similar to" the factual relationship test – it is the opposite of that test.

Second, and relatedly, the government argues that it has broad authority to decide when deductions are "properly allocable" to income, including the authority to disallow deductions that

it believes are abusive.  The government claims that Congress gave it that authority in Section 951A(c)(2)(A)(ii) itself (when Congress referred to "rules" for deductions) and in Section 7805(a) (when Congress gave the Treasury Department general rulemaking authority).  Neither provision gives the government that broad authority.  Section 951A(c)(2)(A)(ii) does not say anything about the agency issuing new rules, and it makes clear that any rules must be "similar to the rules of section 954(b)(5)" – not contrary to those rules.  Section 7805(a) is even further afield; it does not grant the Treasury Department any specific authority with respect to the statute here.  If the government were right about Section 7805(a), that would effectively undo *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), because it would make virtually every regulation presumptively valid.  When Congress wants the Treasury Department to have the authority to issue regulations to address potential abuse, it says so expressly, as it did elsewhere in this statute.  Section 951A(c)(2)(A)(ii) confers no such authority for deductions—which confirms that Congress did not want the agency to write regulations that disallow deductions expressly allowed by the statute.

At bottom, the government refuses to allow the deductions here because it believes doing so would create an unwarranted tax benefit for fiscal-year subsidiaries.  But that is not the Treasury Department's call to make.  Congress set clear rules when it enacted the Tax Cuts and Jobs Act (TCJA); some rules benefit fiscal-year taxpayers, and others benefit calendar-year taxpayers.  The agency does not get to selectively override those choices just because it does not like some results.

Separately, the regulation is procedurally invalid.  The Treasury Department failed to engage in reasoned decision-making:  It said that the regulation addresses "non-economic transactions," yet the regulation applies to all transactions within a certain time period, without regard to the actual economics of the transactions.  The regulation also is not a logical outgrowth of the proposed rule.  The Treasury Department changed the statutory authority it relied upon, adopted a

different mechanism for disallowing deductions, and expanded the rule's scope – none of which interested parties could have anticipated from the proposed rule.

The Court should grant Keysight's motion and deny the government's cross-motion.

**ARGUMENT**

**TREASURY REGULATION § 1.951A-2(c)(5) IS INVALID AS A MATTER OF LAW**

### A.      The Regulation Is Contrary To The Statute

Section 951A(c)(2)(A)(ii) specifies that deductions are allowed if they are "properly allocable" to income "under rules similar to the rules of section 954(b)(5)."   26 U.S.C. § 951A(c)(2)(A)(ii).[1]  As Keysight has explained, at the time Congress enacted GILTI, "properly allocable . . . under rules similar to the rules of Section 954(b)(5)" had a settled meaning:  the factual relationship test.  *See* Keysight Br. 13-16.  That is the longstanding test used under Section 954(b)(5) – and indeed throughout the Internal Revenue Code – for allocating deductions to income, and there is ample case law interpreting it.  *See id.* at 20-23.  When Congress referred to "the rules of Section 954(b)(5)" in 2017, it incorporated that settled meaning.

The government nonetheless contends that the statute does not require the factual relationship.  Each of its arguments is incorrect.

#### 1.      The Statute Requires Use Of The Factual Relationship Test

First, the government argues that Section 951A does not require the factual relationship test because the statute "does not use the term 'factually related.'"  Gov't Br. 24-25.  The government's argument is a red herring; the government always has understood the Section 954(b)(5) rules to refer to the factual relationship test, including everywhere else in this very regulation.

Here is why:  Section 951A(c)(2)(A)(ii) allows taxpayers to use deductions to reduce their

---

[1]    Unless otherwise specified, all statutory and regulatory references are to the versions in effect in 2020-2022, the years at issue here.  Keysight Br. 3 n.1; *accord* Gov't Br. 5 n.1.

3

taxable income when the deductions are "properly allocable to [that] income under rules similar to the rules of section 954(b)(5)." 26 U.S.C. § 951A(c)(2)(A)(ii). As Keysight explained (Br. 14), because Congress referred "specific[ally]" to Section 954(b)(5), the "rules of section 954(b)(5)" means the rules under that section "as [they] existed" in 2017, "when [Section 951A] was enacted." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209-10 (2019). The government does not dispute that. *See* Gov't Br. 17, 26.[2]  In 2017, the rules under Section 954(b)(5) were well-established:  They were the factual relationship test. *See* Keysight Br. 14-15. In particular, a regulation in effect in 2017 specified the rules for deductions under Section 954(b)(5): It stated that a deduction is "properly allocable" to income when it bears a "factual relationship" to that income, 26 C.F.R. § 1.861-8(a)(2) – meaning "if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived," *id.* § 1.861-8(b)(2).

The government complains (Br. 25) that this analysis is "convoluted." But the government ultimately admits that this regulation provides the "rules of section 954(b)(5)," *see* Gov't Br. 26 – it just says that it can vary from those rules when it believes allowing a deduction would be "improper," *id.* at 29. Indeed, the Treasury Department itself promulgated the factual relationship test to provide the rules under Section 954(b)(5). As Keysight explained, Section 954(b)(5) requires the Treasury Department to issue regulations to explain when deductions are "properly allocable to" the income at issue. 26 U.S.C. § 954(b)(5). By 2017, the agency had adopted a regulation under Section 954(b)(5) that defined "properly allocable" by cross-referencing "the principles of sections 861, 864, and 904(d)." 26 C.F.R. § 1.954-1(c)(1)(i)(B) (2017). And the regulation under Section 861 sets out the factual relationship test. *Id.* § 1.861-8(a)(2). The government does not

---

[2]    Although the government later changed the rules under Section 954(b)(5), *see* Keysight Br. 15 n.3, it does not rely on those changes, *see* Gov't Br. 26 n.6.

4

take issue with any of these steps or explain how they could lead to anywhere *other* than Treasury Regulation § 1.861-8 and the factual relationship test.

Importantly, the Treasury Department always has understood that Section 951A(c)(2)(A)(ii) requires the factual relationship test. In the regulation at issue, the Treasury Department used the factual relationship test for all deductions under Section 951A except the type of deductions at issue here: It said that, "[e]xcept for" these deductions, "*any* deductions . . . are allocated . . . under the principles of section 954(b)(5) and [Treasury Regulation] § 1.954-1(c)," 26 C.F.R. § 1.951A-2(c)(3) (emphasis added) – and as explained, Treasury Regulation § 1.954-1(c) adopts the factual relationship test, *see* 26 C.F.R. § 1.954-1(c)(1)(i)(B) (2017). As the agency explained when it promulgated the regulation, the rules for allocating deductions under Section 954(b)(5) "generally depend on the factual relationship between the [deduction] and the associated gross income." Guidance Related to Section 951A, 84 Fed. Reg. 29288-01, 29299 (June 21, 2019).

Indeed, the factual relationship test is so well established that the Treasury Department uses it any time deductions need to be allocated to income for tax purposes. The agency uses the factual relationship test when a statute says "properly allocable" *without* a cross-reference to Section 954(b)(5). *E.g.*, 26 C.F.R. § 1.250(b)-1(d)(2) (implementing 26 U.S.C. § 250(b)(3)(A)(ii)); *see* Keysight Br. 21-22 & nn.5-6 (providing additional examples). And the agency even uses the factual relationship test when a statute does not say "properly allocable" at all, because that test is the commonsense way to allocate deductions to income. *See* 26 C.F.R. § 1.861-8(f) (2017). The Treasury Department's regulations thus refute the notion that "properly allocable under rules similar to the rules of section 954(b)(5)" could mean anything other than the factual relationship test.

The government nonetheless contends (Br. 24) that "properly allocable" is ambiguous, citing four *Chevron*-era decisions involving a different statute (Section 163(h)). But the statute here

5

does not say "properly allocable" on its own; it says "properly allocable . . . under rules similar to the rules of section 954(b)(5)," and everyone understands that the rules of Section 954(b)(5) mean the factual relationship test.  26 U.S.C. § 951A(c)(2)(A)(ii).  Anyway, after *Loper Bright*, a statutory ambiguity does not give the agency *carte blanche* to adopt any regulation it wishes to implement a statute; the agency's regulation is upheld only if it is the "best reading" of the statute, 603 U.S. at 394 – and the government's reading is not.[3]  If anything, ambiguity cuts against the government, as the Federal Circuit has held that courts should resolve ambiguities in tax statutes in favor of taxpayers.  *See Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1362 (Fed. Cir. 2005).  Further, none of the cited decisions construed "properly allocable" in the context of allocating deductions to income.  Instead, each decision construed Section 163(h), which involves a different factual context (allocating debt to the source of the debt).[4]  The decisions thus do not support the view that "properly allocable under rules similar to the rules of Section 954(b)(5)" in Section 951A(c)(2)(A)(ii) could mean anything other than the factual relationship test.  Keysight explained this in its brief (Br. 22-23 n.7), and the government has no response.

> **2.**  **"Similar To" Does Not Allow The Government To Discard The Factual Relationship Test**

The government next argues (Br. 25-26) that the words "similar to" allow the Treasury Department to adopt a test different from the factual relationship test.  That is wrong; "similar to" directs the agency to take the existing test under Section 954(b)(5) and fit it to the highly analogous

---

[3]    The government notes (Br. 24) that the decisions are still subject to "statutory *stare decisis*" following *Loper Bright*.  That is irrelevant.  The decisions are from outside this circuit and thus were never binding on this Court to begin with.  Further, none of the decisions involves Section 951A, and thus they are not binding on the question here even within their circuits.

[4]    *See Allen v. United States*, 173 F.3d 533, 535-36 (4th Cir. 1999); *Redlark v. Comm'r*, 141 F.3d 936, 939-40 (9th Cir. 1998); *Miller v. United States*, 65 F.3d 687, 690 (8th Cir. 1995); *Robinson v. Comm'r*, 119 T.C. 44, 49 (2002).

context of Section 951A.  It does not mean to discard the existing test altogether.

The plain meaning of rules "similar to" the rules of Section 954(b)(5) is that the new rules should follow the old rules as much as possible.  "Similar" means "nearly but not exactly the same or alike."  *Webster's New World College Dictionary* 1354 (5th ed. 2016).  The government essentially agrees on this point; it says "similar means having characteristics in common."  Gov't Br. 16.  Accordingly, courts interpreting a tax statute requiring rules "similar to" those of another section consistently have held that the new rules must "replicate, as much as is possible, the rules" of the old section.  *OMJ Pharms., Inc. v. United States*, 753 F.3d 333, 341 (1st Cir. 2014); *see, e.g.*, *Volvo Trucks of N. Am, Inc. v. United States*, 367 F.3d 204, 207-08 (4th Cir. 2004) (regulations "similar to the rules of" section 4222 required "registration and certification requirements" like those under Section 4222); *United States v. Ryals*, 480 F.3d 1101, 1109 (11th Cir. 2007) ("[r]ules similar to the rules of" Section 6331(i)(3) required that provision's exception for pre-existing levies to offers in compromise).  "Similar to" is not a license to depart entirely from the existing rules.

Thus, "similar to" in "rules similar to the rules of section 954(b)(5)" merely reflects that some changes may be needed due to the different contexts, but that otherwise the deduction rules for Section 951A should "replicate" those of Section 954(b)(5) "as much as possible."  *OMJ Pharms.*, 753 F.3d at 336.  The core characteristic of the rules of Section 954(b)(5) is that deductions reduce the income they helped produce or to which they are otherwise related.  26 C.F.R. § 1.861-8(b)(2).  So for a rule to be "similar to" the rules under Section 954(b)(5), it must share that essential feature:  The deductions must be allocated to the income to which they are related.  Here, Treasury Regulation § 1.951A-2(c)(5) is entirely different – it does not allocate deductions to a category of related income but instead prevents deductions from reducing any taxable income at all.  *See* Keysight Br. 16-19.  The regulation is not "similar to" the rules of Section 954(b)(5).

7

The government argues (Br. 26-27) that the regulation here is "similar to" the rules under Section 954(b)(5) because those rules also involve allocating deductions to a "residual" category. In particular, it observes (*id.*) that the regulation requires allocating deductions to "residual CFC gross income," 26 C.F.R. § 1.951A-2(c)(5), and the rules under Section 954(b)(5) can require allocating deductions to a "residual grouping of gross income," *id.* § 1.861-8(a)(2). Although "residual CFC gross income" and "residual grouping of gross income" sound similar, the two are completely different. The "residual grouping" is part of how the factual relationship test works – it does not override that test. Specifically, under Treasury Regulation § 1.861-8(a)(2), to determine to what extent a statute allows a particular deduction, the deduction is first allocated using the factual relationship test to "a class of gross income," such as income derived from business, interest income, or royalty income. 26 C.F.R. § 1.861-8(a)(2)-(3). Then, "if necessary" under the operative statute, "within [that] class of gross income," the deduction is apportioned between the "statutory grouping of gross income" and the "residual grouping of gross income," again using the factual relationship test. *Id.* The "statutory grouping" is the income that is relevant to the operative statute, and the "residual grouping" is the income that is not relevant to that statute. *Id.* § 1.861-8(a)(4). The deductions that are allowed under the statute are those that are allocated to the statutory grouping; those allocated to the residual grouping are simply not relevant to the statute.[5]

---

[5]    To illustrate:  Suppose a taxpayer has both foreign and domestic sales income, and wants to determine how much of its administrative expenses it can deduct for purposes of a foreign tax credit under Section 960. *See* 26 C.F.R. § 1.861-8(g)(19) (example 19). First, the taxpayer allocates the expense to the relevant "class" of gross income – in the example, "gross income derived from business." *Id.* § 1.861-8(a)(3)(ii). Then, within that class, the taxpayer apportions the expenses to the relevant "statutory grouping." Under Section 960, the amount of foreign tax credit depends on the amount of foreign sales, so the "statutory grouping" is the income from foreign sales; the "residual grouping" is the income from domestic sales. *Id.* § 1.861-8(g)(19)(a)(ii)(B). The taxpayer thus apportions the expenses based on whether they are factually related to its foreign or domestic sales, and deducts those allocated to the statutory grouping. *See id.*

"Residual CFC gross income" in the regulation here does something completely different. "Residual CFC gross income" is a made-up category. The regulation requires taxpayers to allocate the deductions at issue to that category, *even though* those deductions are factually related to the taxpayers' tested income for purposes of calculating GILTI. *See* Keysight Br. 16-17. "Residual CFC gross income" is not used in calculating GILTI, so deductions allocated to "residual CFC gross income" do not reduce GILTI. *Id.* "Residual CFC gross income" thus overrides the factual relationship test by creating a black hole to deny deductions altogether.[6] It is nothing like the "residual grouping" concept in Treasury Regulation § 1.861-8, or indeed anything else in that regulation or any other regulation applicable to Section 954(b)(4).

Next, the government contends (Br. 27-30) that Treasury Regulation § 1.951A-2(c)(5) is "similar to" the rules under Section 954(b)(5) because the rules under Section 954(b)(5) sometimes do not use the factual relationship test. The government points to two statutory provisions that supposedly deviate from the factual relationship test: a provision of Section 954(b)(5), which the government calls the "cream-skimming" rule, and Section 864(e)(3), which the government calls the "tax-exempt income" rule. Gov't Br. 27-30. But these are provisions *enacted by Congress itself*. These provisions show that when Congress wanted to modify the allocation principles under Section 954(b)(5), it said so expressly in the Internal Revenue Code, rather than leaving it to the Treasury Department to do so on its own.

In any event, the government is wrong about the provisions – they do not deviate from the factual relationship test. The cited provision of Section 954(b)(5) simply establishes priorities

---

[6] The government claims (Br. 26) that deductions allocated to residual CFC gross income do not "disappear" because they reduce the CFC's earnings and profits, which can in turn reduce Subpart F income. That is not correct: Treasury Regulation § 1.951A-2(c)(5), by its terms, prevents the deductions from being taken into account in determining the CFC's Subpart F income.

9

among competing factual relationships.  Section 954(b)(5) generally provides that certain catego-

ries of income "shall be reduced . . . so as to take into account deductions (including taxes) properly

allocable to such income," but then, in the provision the government cites, specifies that "any

interest which is paid or accrued by the controlled foreign corporation to any United States share-

holder" or related CFC "shall be allocated first to foreign personal holding company income which

is passive income."  26 U.S.C. § 954(b)(5).  Thus, all the cited provision does is establish a priority

for how to deduct related-party interest expense among possible categories of income.  The deduc-

tion ultimately still reduces a category of taxable income to which it is factually related.  The

statute does not effectively eliminate the deduction altogether.

Similarly, Section 864(e) still uses the factual relationship test to ensure that deductions

reduce taxable income.  That provision provides that, in allocating interest expenses, tax-exempt

assets and income are not taken into account.  *See* 26 U.S.C. § 864(e)(3).  This means that deduc-

tions that are factually related to both tax-exempt income and taxable income must be allocated

only to taxable income.  The provision thus preserves the factual relationship test, and the deduc-

tions still reduce factually related taxable income – just not factually related tax-exempt income.

The regulation at issue here, Treasury Regulation § 1.951A-2(c)(5), works in precisely the opposite

direction:  It takes deductions that are factually related to taxable tested income and allocates them

to "residual CFC gross income" – a made-up category that the Treasury Department created spe-

cifically to ensure those deductions do not reduce any taxable income at all.  84 Fed. Reg. at 29300.

The bottom line is that Treasury Regulation § 1.951A-2(c)(5) contradicts the factual rela-

tionship test and has no parallel in any of the rules under Section 954(b)(5) in 2017.  Indeed, the

whole point is to ensure that deductions are "not permitted to reduce tested income."  84 Fed. Reg.

at 29300.  The regulation thus is not "similar to the rules of section 954(b)(5)."

10

### 3.    The Treasury Department Cannot Override The Statutory Text

Unable to win on the text, the government argues (Br. 35-39) that Congress's purposes, the legislative history, and subsequent legislation show that Congress would not have wanted Keysight to take the deductions here.  But those types of arguments cannot override the plain text of the statute.  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

In any event, the government is wrong.  Starting with Congress' purposes:  Congress made deliberate choices about effective dates throughout the TCJA.  Those choices necessarily created different consequences for calendar-year and fiscal-year taxpayers – sometimes favoring one group, sometimes the other.  In Section 951A, Congress chose to apply GILTI to income earned in taxable years beginning after December 31, 2017.  *See* Pub. L. No. 115-97, § 14201(d), 131 Stat. 2208.  For the transition tax, Congress chose to tax unrepatriated income earned through December 31, 2017.  *See* 26 U.S.C. § 965.  For calendar-year taxpayers, these provisions aligned:  GILTI picked up where the transition tax left off.  But for fiscal-year taxpayers, these effective dates created a short gap period – income earned after December 31, 2017, but before the start of the next fiscal year, was subject to neither provision.  *See* Keysight Br. 7-8.

The regulation targets deductions arising from transactions during that gap period.  *See* Guidance Related to Section 951A, 83 Fed. Reg. 51072-01, 51077 (Oct 10, 2018).  But the gap period was the result of Congress's decision to adopt uniform effective dates rather than craft bespoke transition rules for each taxpayer.  Congress understood that some taxpayers would benefit and others would not.  The agency cannot override Congress's choice because it knows better about what is supposedly abusive.

The government contends (Br. 34–35) that there is "no indication Congress intended a massive tax holiday" for fiscal-year taxpayers.  But the same could be said of any differential treatment created by Congress's effective-date choices.  The government does not dispute that

11

Congress's uniform effective dates throughout the TCJA sometimes favored fiscal-year taxpayers and sometimes burdened them. "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991). After all, "the best evidence of congressional intent is the plain meaning of the statutory language at the time Congress enacted the statute." *Strategic Hous. Fin. Corp. v. United States*, 608 F.3d 1317, 1324 (Fed. Cir. 2010).

The Treasury Department may not override the plain meaning of the statute simply because it dislikes the consequences. "Congress spoke clearly" when it selected "mismatched effective dates" in the TCJA, and "[a]ppeals to policy and Congress's overarching purpose cannot overcome these choices, no matter how much the Commissioner may dislike them." *Varian Med. Sys., Inc. v. Comm'r*, 163 T.C. 76, 102 (2024).[7]

Indeed, Congress's other effective-date choices in the TCJA confirm that it knowingly adopted uniform dates despite predictable asymmetries. The TCJA's amendments to the net operating loss provisions favored calendar-year taxpayers over fiscal-year taxpayers: the new, more restrictive carryback rules applied to "losses arising in taxable years ending after December 31, 2017," meaning fiscal-year taxpayers could not apply the old rules to losses incurred in the last months of 2017 while calendar-year taxpayers could apply them to all of 2017. Pub. L. No. 115-97, § 13302(e)(2), 131 Stat. 2123; *see* Keysight Br. 27-28. Similarly, Section 199A created a new 20 percent deduction for qualified business income, effective for "taxable years beginning after

---

[7]    The government contends (Br. 36-37) that *Varian* is distinguishable because the regulation there effectively changed the effective date for one of the TCJA's provisions, whereas the regulation here does not purport to change the effective date for the GILTI provisions. That is a distinction without a difference – the point is that in both situations, the Treasury Department refused to follow a result that was mandated by the effective dates that Congress chose. The Tax Court correctly rejected that approach in *Varian*, and this Court should do the same here.

December 31, 2017." Pub. L. No. 115-97, § 11011(e), 131 Stat. 2071. A calendar-year taxpayer could claim the deduction immediately for all qualified business income earned in 2018. In contrast, a fiscal-year taxpayer could not claim the deduction for all income earned in 2018, but instead had to wait until its next taxable year began to claim any Section 199A deduction. These asymmetries are baked into the TCJA's structure, and the agency may not override them.

The government's reliance (Br. 35-36) on the TCJA's legislative history fares no better. "Legislative history cannot override the plain meaning of a statute." *DeCosta v. United States*, 987 F.2d 1556, 1558 n.3 (Fed. Cir. 1993). And it does not help the government here in any event. The government points to a passage in the conference report expressing Congress's desire that "non-economic transactions intended to affect tax attributes of CFCs . . . to minimize tax under this provision be disregarded." H.R. Rep. No. 115-466, at 645 (2017). According to the government (Br. 35-36), this statement shows Congress's intent to grant the Treasury Department broad authority to disallow any transactions related to GILTI that it deems abusive. But that is not what Congress actually did in the statute. Although the report lists several tax attributes that might be affected by non-economic transactions, *see* H.R. Rep. No. 115-466, at 645, Congress ultimately granted the agency authority to promulgate anti-abuse rules only with respect to one of those attributes – qualified business asset investment (QBAI). *See* 26 U.S.C. § 951A(d)(4); Keysight Br. 34. The fact that Congress gave the Treasury Department only the very limited authority to adopt anti-abuse regulations *for QBAI* confirms that Treasury does not have the authority to adopt anti-abuse rules for other aspects of GILTI, including for deductions. The government cannot use legislative history to claim authority that Congress specifically withheld in the statute.

The government notes (Br. 38-39) that Congress did not override the regulation here when it enacted the One Big Beautiful Bill Act (OBBA) in 2025. But as the government itself admits

13

(Br. 21), "the silence of Congress is a treacherous guide to its intent." *Watt v. Alaska*, 451 U.S. 259, 271 n.13 (1981). The Supreme Court has made clear that a court may conclude that Congress "acquiesc[ed] to administrative interpretations of a statute" only when there is "overwhelming evidence of acquiescence." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001) (citing *Bob Jones Univ. v. United States*, 461 U.S. 574, 595 (1983)). In *Bob Jones*, for example, the Court concluded that Congress had acquiesced in an IRS rule after Congress "held hearings on this precise issue," and where "no fewer than 13 bills introduced to overturn the IRS's interpretation had failed." *Id.* (citing *Bob Jones*, 461 U.S. at 595). The government here identifies no evidence – much less "overwhelming evidence" – that Congress considered the issue here when it passed OBBA. Indeed, given the limited nature of the issue, affecting only fiscal-year taxpayers' transactions during a limited period in 2018, there is no reason to expect Congress would have sought to address it in a massive omnibus bill seven years later.

Notably, the year after the TCJA, Congress considered an amendment that would have expanded the Treasury Department's anti-abuse authority beyond QBAI, to cover all of Section 951A – exactly the authority the Treasury Department is claiming here. Yet Congress ultimately rejected that proposal. *See* H.R. 5376, 117th Cong. § 138126(b)(1) (2021) (as passed by the House Nov. 19, 2021). Thus, if there is any inference to be drawn from congressional silence, it is that Congress did *not* see deductions from gap-period transactions as a "problem" for the agency to "fix."

The bottom line is that Treasury Regulation § 1.951A-2(c)(5) does not reflect the best reading of Section 951A(c)(2)(A)(ii) and thus is invalid. *See Loper Bright*, 603 U.S. at 394.

### B.    The Treasury Department Does Not Have The Authority To Adopt A Regulation That Discards The Factual Relationship Test

The government acknowledges that its regulation deviates from the factual relationship

14

test, but argues that Congress gave it the authority to do that. The government relies on the Supreme Court's statement in *Loper Bright* that in some exceptional cases, a court may conclude that the best reading of a statute is that Congress "delegate[d] discretionary authority" to the agency to decide a particular issue. 603 U.S. at 395. In those circumstances, a court should defer to the agency's decision if the delegation is constitutional and the agency has engaged in reasoned decision-making within the scope of the delegation. *Id.* The Supreme Court identified three types of statutes that delegate such authority: (1) statutes that "expressly delegate to an agency the authority to give meaning to a particular statutory term"; (2) statutes that "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme"; and (3) statutes that authorize an agency "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Id.* According to the government, Section 951A(c)(2)(A)(ii) and Section 7805(a) fall within these exceptions.[8] The government is mistaken. Indeed, its view of Section 7805(a) would completely undo *Loper Bright*, because it would make any regulation issued pursuant to a general grant of rulemaking authority presumptively valid, even though such grants are commonplace.

### 1. Section 951A(c)(2)(A)(ii) Does Not Authorize The Treasury Department To Override The Factual Relationship Test

The government first argues (Br. 15-16) that Section 951A(c)(2)(A)(ii) itself gives the Treasury Department authority to define "properly allocable" differently from the factual relationship test. This argument is made for litigation – the Treasury Department did not rely on Section 951A(c)(2)(A)(ii) in promulgating the regulation. *See* 83 Fed. Reg. at 51077 (proposed rule citing Section 951A(d)(4)); 84 Fed. Reg. at 29298-99 (final rule citing Section 7805(a)). An agency can defend its action "only on the grounds that the agency invoked when it took the action," *Michigan*

---

[8] Notably, although the government previously relied on its anti-abuse authority relating to QBAI in Section 951A(d)(4), *see* 83 Fed. Reg. at 51077, the government now has abandoned any arguments about that provision, *see* Gov't Br. 14-23.

*v. EPA*, 576 U.S. 743, 758 (2015), so the Court should disregard the government's newly invented arguments about Section 951A(c)(2)(A)(ii).

Anyway, the government is wrong: Section 951A(c)(2)(A)(ii) does not authorize new rule-making at all, and even if it did, it would not authorize the regulation here.

### a.    *Section 951A(c)(2)(A)(ii) does not authorize new rulemaking*

Section 951A(c)(2)(A)(ii) does not confer rulemaking authority on the Treasury Department. When Congress wants to give the agency the authority to promulgate a Treasury regulation, it says so expressly, often using the phrase "under regulations prescribed by the Secretary." *E.g.*, 26 U.S.C. § 338(b)(2); *id.* § 835(a); *id.* § 961(a); *id.* § 1276(c). Indeed, that exact phrase appears over 250 times in the Internal Revenue Code. And hundreds of other provisions use similar language expressly authorizing the agency to "prescribe" or "issue" "regulations" – including within Section 951A itself. *Id.* § 951A(d)(4) (authorizing the Secretary to "issue such regulations or other guidance as the Secretary determines appropriate"); *see, e.g.*, *id.* § 170(a)(2); *id.* § 245A(g); *id.* § 404A(g)(2). Given that Congress plainly knows how to expressly authorize rulemaking, its decision not to use that express language in Section 951A(c)(2)(A)(ii) shows that Congress did not intend for additional rulemaking here – much less for additional rulemaking that deviates from the settled factual relationship test. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).

The government argues (Br. 15, 21) that "under rules" presumes that the Treasury Department will issue new rules for Section 951A. That is incorrect. "Under rules similar to the rules of Section 954(b)(5)" is self executing, in that it does not require new regulations to be given effect. By its plain terms, the statute directs taxpayers, in preparing their tax returns, to use the existing rules of Section 954(b)(5) with the necessary adaptations for GILTI. *See, e.g.*, *OMJ Pharms.*, 753 F.3d at 336-37 (noting that "neither Congress nor the IRS wrote any rules" to implement the statutory phrase "[r]ules similar to the rules of . . . section 41(f)(3)"); *Veis v. United States*, 1988 WL

149354 (D. Mont. Sept. 2, 1988), *aff'd* 891 F.2d 297 (9th Cir. 1989) ("under rules similar to the rules of . . . section 6654" did not require the Treasury Department to promulgate regulations). When Congress wants the agency to issue regulations that adopt new rules that are similar to existing rules, it says so expressly. *E.g.*, 26 U.S.C. § 4052(d) ("*Under regulations prescribed by the Secretary*, rules similar to the rules of . . . section 4216 . . . shall apply for purposes of this subchapter." (emphasis added)). Section 951A(c)(2)(A)(ii) does not authorize new rulemaking at all.

The government suggests (Br. 15-16) that, because Section 951A(c)(2)(A)(ii) refers to the "rules of section 954(b)(5)," it can borrow its rulemaking authority under Section 954(b)(5) to issue regulations for Section 951A(c)(2). This argument also is new, and it also is wrong. The express terms of Section 954(b)(5) grant the agency the authority only to promulgate regulations "[f]or purposes of subsection (a)" – *i.e.*, for purposes of calculating certain types of income under 26 U.S.C. § 954(a). 26 U.S.C. § 954(b)(5). Section 954(b)(5) does not grant freewheeling authority to promulgate regulations for a different statute involving a different type of income (GILTI).

### b.      *Section 951A(c)(2)(A)(ii) would not authorize this regulation*

Even if Section 951A(c)(2)(A)(ii) authorized some rulemaking, it would not authorize the regulation here because it does not give the agency discretion under a *Loper Bright* exception.

First, the government argues (Br. 15-16) that Section 951A(c)(2)(A)(ii) comes within the *Loper Bright* exception for statutes that "expressly delegate to an agency the authority to give meaning to a particular statutory term" – here, "properly allocable . . . under rules similar to rules of section 954(b)(5)." That is incorrect. The Supreme Court gave two examples of statutes of this type of delegation, *see* 603 U.S. at 395 n.5: a statute that authorizes the Secretary of Labor to "defin[e] and delimit[]" by "regulation" the term "traveling salesman" for purposes of determining when a person qualifies as a particular kind of employee, 29 U.S.C. § 213(a)(15); and a statute that authorizes the Nuclear Regulatory Commission to "defin[e] by regulation" when "a facility

17

regulated pursuant to the Atomic Energy Act" contains "a defect which could create a substantial safety hazard," 42 U.S.C. § 5846(a)(2).

Section 951A(c)(2)(A)(ii) is not like those examples. It does not say that the Treasury Department may "define" or "delimit" what "properly allocable . . . under rules similar to the rules of section 954(b)(5)" means; indeed, it does not even mention the Secretary. It is a directive to use existing allocation rules – the rules of Section 954(b)(5) – not a delegation of authority to define the statutory term however the agency sees fit. Section 951A(c)(2)(A)(ii) thus does not come within this type of *Loper Bright* exception.

Further, even if Section 951A(c)(2)(A)(ii) could be read as authorizing the Treasury Department to write rules, any such authority is sharply circumscribed by the statute itself. The statute says that any new rule must be "similar to the rules of section 954(b)(5)," which means the rules as they existed when Congress enacted the TCJA. *See Jam*, 586 U.S. at 209-10. That means the factual relationship test. Nothing in Section 951A(c)(2)(A)(ii) allows the Treasury Department to go beyond that test, much less to adopt a rule that prevents deductions from reducing the income to which the deductions are factually related. *See Varian*, 163 T.C. at 107.

Next, the government argues (Br. 16-18) that Section 951A(c)(2)(A)(ii) comes within the *Loper Bright* exception for statutes that "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme." That also is wrong – this exception is for when Congress set out the substantive framework and left it to the agency to implement the procedural rules.

The Supreme Court cited *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825), as an example of this type of delegation. *Loper Bright*, 603 U.S. at 395. *Wayman* involved Section 17 of the Judiciary Act of 1789, which delegated to the federal courts the "power" to "make and establish all necessary rules for the orderly conducting business in the said Courts, provided such rules are

18

not repugnant to the laws of the United States." 23 U.S. at 42. This example makes clear that the "fill up the details" exception involves situations where Congress has set out substantive rules in a statute and then empowered an agency to establish procedural rules to carry out Congress's substantive policy. This type of delegation does not involve substantive interpretive authority.

The government cites (Br. 17) *Lesko v. United States*, 161 F.4th 1352 (Fed. Cir. 2025) (en banc), but *Lesko* actually supports Keysight, not the government. There, the Federal Circuit upheld a regulation by the Office of Personnel Management (OPM) requiring that overtime authorization be in writing, holding that this was a permissible "fill up the details" regulation. 161 F.4th at 1359-60. But *Lesko* involved a statute that was genuinely silent on the relevant issue: The overtime statute required that overtime be "officially ordered or approved" but said nothing about the formalities – written or oral – required for approval. *Id.* at 1359 (quoting 5 U.S.C. § 5542(a)). The court accordingly held OPM could fill in that procedural gap. Here, by contrast, the statute is not silent. Section 951A(c)(2)(A)(ii) directs deductions to be allocated "under rules similar to the rules of section 954(b)(5)" – which means the factual relationship test. There is no gap to fill.

Further, *Lesko* involved a purely procedural requirement governing the *form* of approval – whether overtime requests had to be submitted in writing rather than orally. 161 F.4th at 1359. That kind of procedural rule does not alter the underlying substantive entitlement to overtime; it simply establishes the mechanics by which employees document their claims. The regulation here, in contrast, plainly is substantive. It determines *which* deductions taxpayers may claim in the first place, rather than prescribing how taxpayers must document or substantiate their deductions. A rule that eliminates otherwise valid deductions is not a procedural formality; it is a substantive allocation standard. So even if Section 951A(c)(5)(A)(ii) were a "fill-in-the-details" delegation, this regulation would exceed the scope of the delegation.

19

As a backstop, the government argues (Br. 32-35) that the Court should give weight to the Treasury Department's interpretation of Section 951A(c)(2)(A)(ii) under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). But the regulation lacks the "power to persuade" under *Skidmore*. Under *Skidmore*, a court considers "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." 323 U.S. at 140. Here, the regulation's interpretation of "properly allocable" deviates from the Treasury Department's longstanding interpretation of that phrase, undermines the settled factual relationship test that has governed allocation of deductions for decades, and rests on the untenable theory that the agency may override Congress's choice of effective dates whenever it dislikes the consequences. Keysight Br. 13-30. That interpretation has no power to persuade.

The government ultimately just seeks a return to *Chevron*. Its argument that the words "properly allocable . . . under rules similar to rules of section 954(b)(5)" constitute a delegation of rulemaking authority is just a rebadged argument that ambiguity about statutory terms amounts to an implied delegation of interpretive authority to the agency. That is precisely the argument the Supreme Court rejected in *Loper Bright*. 603 U.S. at 399-400.

### 2. Section 7805(a) Also Does Not Authorize The Treasury Department To Override The Factual Relationship Test

The government also argues (Br. 18-20) that Treasury Regulation § 1.951A-2(c)(5) is a valid exercise of the Treasury Department's authority under Section 7805(a), which authorizes the agency to "prescribe all needful rules and regulations for the enforcement of this title." 26 U.S.C. § 7805(a). Specifically, relying largely on decisions about Section 7805(a) from before *Loper-Bright*, the government asserts (Br. 19-20) that Section 7805(a) comes within the "fill up the details" exception to *Loper Bright*. That is incorrect. Section 7805(a) is one of many general grants of rulemaking authority throughout the U.S. Code – indeed, *Loper Bright* itself involved a similar

20

provision.  So if Section 7805(a) comes within a *Loper Bright* exception, then virtually every agency regulation would be presumptively valid and *Loper Bright* would be meaningless.

To start, unlike the provision cited in *Wayman*, Section 7805(a) does not identify a specific statutory scheme for the Treasury Department to "fill up the details."  Instead, Section 7805(a) refers to the Internal Revenue Code generally, authorizing "needful rules and regulations for the enforcement of *this title*."  26 U.S.C. § 7805(a) (emphasis added).  The provision is not limited to any particular statute or any particular subject matter.  Further, even if Section 7805(a) could be compared to the provision cited in *Wayman*, that type of delegation grants authority only to establish procedural rules, not substantive authority to disallow deductions.  As explained, the *Wayman* delegation involved empowering courts to establish procedural rules for the "orderly conducting [of] business," not to make substantive legal determinations.  23 U.S. at 42.  The regulation here is substantive, so it would not come within a "fill up the details"-type delegation.

The government contends (Br. 18) that the Federal Circuit in *Lesko* held that Section 7805(a) is a "fill-up-the-details" delegation.  That is incorrect – the Federal Circuit merely noted that general grants of rulemaking authority are commonplace, and cited Section 7805(a) as an example of such a grant.  161 F.4th at 1362 n.11.  Anyway, as explained the regulation at issue in *Lesko* was a purely procedural regulation, so even if Section 7805(a) were similar to the statutory provision at issue in *Lesko*, it would not support the substantive regulation at issue here.

The government also suggests (Br. 9) that Section 7805(b)(3) permits the Treasury Department to promulgate retroactive anti-abuse regulations.  But Section 7805(b)(3) is not an independent grant of rulemaking authority.  It provides only that "the Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse."  26 U.S.C. § 7805(b)(3).  By its terms, the provision addresses only the effective date of "any regulation" the agency may validly

promulgate – it says nothing about whether the agency has authority to promulgate the regulation in the first place. *Id.* Thus, Section 7805(b)(3) does not expand the Treasury Department's authority to issue anti-abuse regulations. And as explained, Congress authorized the agency to issue anti-abuse regulations only for QBAI, and not for deductions. *See* Keysight Br. 31-33.

The government next argues (Br. 20) that Section 7805(a) comes within the exception for statutes that "empower an agency to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" 603 U.S. at 395. The government misunderstands this exception.

The Supreme Court gave two examples of this type of delegation. *See* 603 U.S. at 395. First, the Clean Water Act delegates authority to the EPA Administrator to set effluent limits whenever, "in the judgment of the Administrator," "discharges of pollutants from a point source . . . would interfere with the attainment or maintenance of [the] water quality" needed to protect "public health" and "public water supplies." 33 U.S.C. § 1312(a). Second, the Clean Air Act directs the EPA to "perform a study of the hazards to public health" potentially posed by power plants and to regulate those plants "if the Administrator finds such regulation is appropriate and necessary after considering the results of the study." 42 U.S.C. § 7412(n)(1)(A). These examples both involve Congress expressly conferring discretion on a specific agency official to exercise his or her judgment on a specific issue (whether certain discharges interfere with water quality, or whether power plants should be regulated based on a public health study). The statutes identify the decision to be made, the official authorized to make it, and the standards or factors to guide the decision.

Section 7805(a) is not like those examples. Although it uses a word indicating some flexibility ("needful"), it does not refer to any particular issue, does not identify any particular objective for the Treasury Department to further, and does not set out any conditions or limits on the

22

agency's supposed discretion.  If this language constituted the type of discretionary authority contemplated by *Loper Bright*, then virtually every agency would have the authority to issue binding regulations on any subject, because similar general grants of rulemaking authority appear throughout the U.S. Code.[9]  Keysight is aware of no decision that holds that Section 7805(a) – or another similar general grant of rulemaking – is a delegation of discretionary authority to regulate under *Loper Bright*, and that cannot be what the Supreme Court intended when it described this narrow exception.  On the contrary, the courts that have considered regulations issued pursuant to Section 7805(a) after *Loper Bright* have concluded that *no* deference is due.  *See Mem'l Hermann Accountable Care Org. v. Comm'r*, 120 F.4th 215, 219 (5th Cir. 2024); *Varian*, 163 T.C. at 107.[10]

Notably, *Loper Bright* itself involved a general grant of rulemaking authority similar to Section 7805(a).  The Magnuson-Stevens Act authorizes the Secretary of Commerce to promulgate

---

[9]    *See, e.g*., 25 U.S.C. § 1524 ("The Secretary of the Interior is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this chapter."); 30 U.S.C. § 293 ("The Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying this chapter into full force and effect."); *id.* § 541g ("The Secretary of the Interior is authorized to issue such rules and regulations as may be necessary or appropriate to effectuate the purposes of this chapter."); *id*. § 1211(c)(2) ("The Secretary [of the Interior] shall . . . publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of this chapter."); 7 U.S.C. § 956 ("The Secretary [of Agriculture] may make rules and regulations as may be necessary in the administration of this chapter."); 12 U.S.C. § 1742 ("The Secretary [of Housing and Urban Development] is authorized and directed to make such rules and regulations as may be necessary to carry out the provisions of this subchapter."); *id*. § 2707(a) ("The Secretary [of Housing and Urban Development] is authorized to make such rules and regulations as may be necessary to carry out the provisions of this chapter."); 16 U.S.C. § 1463 ("The Secretary [of Commerce] shall develop and promulgate . . . such rules and regulations as may be necessary to carry out the provisions of this chapter."); 22 U.S.C. § 2581(i) ("[T]he Secretary of State . . . is authorized to . . . make, promulgate, issue, rescind, and amend such rules and regulations as may be necessary or desirable to the exercise of any authority conferred upon the Secretary of State by the provisions of this chapter.").

[10]    That is consistent with courts' approach to tax regulations before *Chevron*.  Under *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979), courts recognized that regulations issued under Section 7805(a) were owed "less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision." *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981).

"necessary and appropriate" regulations for fisheries management. *Loper Bright*, 603 U.S. at 383 (citing 16 U.S.C. § 1853(b)). The Supreme Court held that this language did not authorize the agency to impose a requirement not found in the statute, and did not suggest that this language was one of the special type of delegations the Court had identified. *Id*. at 400-04. Section 7805(a)'s authorization to issue "needful" regulations is just like the fisheries provision at issue in *Loper Bright*. If that type of language gives the agency authority to override the statutory text whenever it deems necessary, *Loper Bright* itself would have come out the other way.

The government's view of Section 7805(a) also cannot be correct because it has no limiting principle. If Section 7805(a) broadly delegates authority to promulgate binding substantive tax regulations whenever the Treasury Department deems them "needful," then there would be no reason for Congress to expressly authorize substantive rulemaking elsewhere in the Code. Yet Congress has done so hundreds of times. *See, e.g.*, 26 U.S.C. §§ 245A(g), 951A(d)(4). The government's interpretation would render these specific grants superfluous. The government's response (Br. 22) is that *some* specific grants of rulemaking contain direction as to what regulations to promulgate, so they would not be superfluous under its view of Section 7805(a). But as the government implicitly acknowledges, many of the specific grants of rulemaking authority do not contain that direction, so they would be superfluous if the government were right about Section 7805(a). *See, e.g.*, 26 U.S.C. § 59(*l*)(3) ("The Secretary shall provide for such regulations or other guidance as is necessary to carry out the purposes of this subsection.").

Finally, the government suggests (Br. 31) that Section 7805(a) authorizes the regulation here because it was the authority the Treasury Department cited in enacting Treasury Regulation § 1.861-8 (which sets out the factual relationship test). *See* Gross Income; Allocation and Apportionment of Deductions, 41 Fed. Reg. 49160, 49160 (proposed Nov. 4, 1976). But having the

24

authority to write regulations does not mean that the regulations are valid. Treasury Regulation § 1.861-8 is valid because the factual relationship test is the best interpretation of Section 861 – that section states that deductions should be "properly apportioned or allocated" to income, 26 U.S.C. § 861(b), and the commonsense way to allocate deductions is to the income that it generates. *See* Keysight Br. 6. If the agency had attempted to promulgate a regulation under Section 861 that disallowed a deduction in the circumstances here, that regulation also would be invalid.

The government plainly does not have the best reading of Section 951A. So it is attempting to claim discretionary authority to supplant the statute's plain meaning. This approach would not have worked even under *Chevron*, because an agency cannot interpret a statute in a way that contradicts the statute. And it certainly does not work under *Loper Bright*, because there are only very limited and specific circumstances in which Congress authorizes an agency to interpret a statute instead of the courts, and the government identifies no such authority here.

### C. The Regulation Is Procedurally Invalid

Separately, the regulation is procedurally invalid, on two grounds. First, it is arbitrary and capricious because the Treasury Department identified a concern about non-economic transactions but adopted a blanket rule covering all gap-period transactions regardless of whether they are non-economic. Second, the regulation is not a logical outgrowth of the proposed rule because the agency changed the statutory authority, adopted a completely different mechanism for disallowing deductions, and expanded the rule's scope in ways interested parties could not have anticipated.

#### 1. The Regulation Is Arbitrary And Capricious Because Gap-Period Transactions May Have Legitimate Business Purposes

The government contends (Br. 39-41) that the Treasury Department engaged in reasoned decision-making under the Administrative Procedure Act (APA). It is wrong. The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action

25

including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

The regulation here flunks that test because the problem the Treasury Department identified does not justify the rule it adopted. The preamble to the final rule explains that the rule is meant to address "non-economic transactions" that would "improperly reduce or eliminate" taxable income. 84 Fed. Reg. at 29299. The preamble cites the conference report, which similarly expresses concern about "non-economic transactions intended to affect tax attributes of CFCs . . . to minimize tax under this provision." H.R. Rep. No. 115-466, at 645. Thus, both the preamble and the conference report make clear that the concern is with transactions that lack economic substance.

Yet the regulation sweeps far more broadly. It treats every transaction between related CFCs during the gap period as a "disqualified transfer" generating "disqualified basis" – regardless of whether the transaction served a genuine business purpose. *See* 26 C.F.R. § 1.951A-3(h)(2)(ii); 84 Fed. Reg. at 29300. The Treasury Department pointed to no evidence that *all* gap-period transactions are non-economic, and it failed to consider the possibility that many such transactions might serve entirely legitimate commercial objectives. It simply assumed that all gap-period transactions are problematic without examining the evidence or articulating any basis for that sweeping conclusion. That renders the rule invalid. *See Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

Notably, the parties in this case dispute whether the transaction at issue has economic substance and have taken extensive discovery on that topic. That factual dispute confirms that the government's assertion that *all* gap-period transactions necessarily are non-economic cannot be correct. Further, to the extent the validity of Treasury Regulation § 1.951A-2(c)(5) depends on whether a particular transaction had a legitimate business purpose, then there is a genuine dispute

26

of material fact here that precludes summary judgment for the government.

### 2.    The Final Rule Is Not A Logical Outgrowth Of The Proposed Rule

The regulation is also procedurally invalid because it is not a logical outgrowth of the proposed rule. The APA requires that a final rule be a "logical outgrowth" of the proposed rule so that interested parties have a meaningful opportunity to comment on the substance of the rule the agency ultimately adopts. *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017) (citing 5 U.S.C. § 553(b)(3)). A final rule satisfies this requirement "only if interested parties should have anticipated that the change was possible." *Id.* (quoting *Veteran's Justice Grp., LLC v. Sec'y of Veterans Affs.*, 818 F.3d 1336, 1344 (Fed. Cir. 2016)). Where a final rule is "surprisingly distant from the proposed rule," such that interested parties "would have had to divine the agency's unspoken thoughts," the rule fails the logical-outgrowth test. *Id.* at 1374. The final rule here differs from the proposed rule in three fundamental respects: it relies on different statutory authority, it uses a completely different mechanism, and it is substantially broader in scope. Interested parties could not have anticipated any of these changes.

First, the Treasury Department abandoned the statutory basis it originally cited for the rule. The proposed rule cited Section 951A(d)(4) as its principal source of authority. *See* 83 Fed. Reg. at 51077. After commenters pointed out that Section 951A(d)(4) authorizes anti-abuse rules only with respect to QBAI – not deductions – the agency abandoned that basis entirely. The final rule instead invokes Section 7805(a). *See* 84 Fed. Reg. at 29298-99. This shift deprived interested parties of the opportunity to comment on the actual basis for the regulation. Had the Treasury Department disclosed in the proposed rule that it was relying on Section 7805(a) to override the factual relationship test, commenters would have explained – as Keysight has in this litigation – why that general grant of authority cannot override Congress's specific direction in Section 951A(c)(2)(A)(ii) to use "rules similar to the rules of section 954(b)(5)."

27

But according to the government (Br. 14-18) in this litigation, even those comments would not have deterred the Treasury Department, because the agency actually was secretly relying on its inherent authority under Section 951A(c)(2)(A)(ii) itself.  That argument appears nowhere in either the proposed rule or the final rule.  *See* 83 Fed. Reg. at 51077; 84 Fed. Reg. at 29298-99.  The government's serial changes in position confirm that interested parties had no way to anticipate the actual legal theory underlying the regulation.

Second, the Treasury Department also changed the mechanism by which the rule operates.  *See* Keysight Br. 37-39.  The proposed rule would have directly disallowed deductions attributable to disqualified basis – it simply "disregard[ed]" those deductions for purposes of calculating tested income.  83 Fed. Reg. at 51077.  The final rule takes a fundamentally different approach.  It creates an entirely new category of income called "residual CFC gross income" – a term that appears nowhere in the statute – and requires taxpayers to allocate deductions attributable to disqualified basis "solely" to that category.  26 C.F.R. § 1.951A-2(c)(5)(i).

The government admits (Br. 42) that the final rule "change[s] [the] methodology" of the proposed rule.  It dismisses this change as merely technical, because "the substantive impact for GILTI purposes . . . is the same."  *Id*.  But "same result" is not the legal standard.  The logical-outgrowth requirement exists to give affected parties notice of how the agency intends to regulate, so they can comment meaningfully on the agency's approach.  *See Mid Continent Nail*, 846 F.3d at 1373.  Thus, interested parties must have been able to "anticipate" the government's final rule.  That is, the final rule's "basic approach" (not basic *result*) must be the same as the proposed rule.  *Veteran's Justice Grp*, 818 F.3d at 1344.  Here, the approach is completely different:  the proposed rule said nothing about creating new income categories, nothing about "residual CFC gross income," and nothing about redefining what deductions are "properly allocable" to tested income.

28

The new approach also matters substantively, because it has consequences beyond GILTI, such as for Subpart F income. *See* Keysight Br. 39; pp. 29-30, *infra.* Interested parties had no notice that the Treasury Department was considering this approach.

The government suggests (Br. 42-44) that notice is irrelevant because the Treasury Department would have ignored any objections to its new approach. That is the opposite of reasoned decision-making – the APA requires agencies to consider and respond to comments. *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002). An agency's admission that it would not have done so is effectively an admission that the agency acted contrary to the law.

Third, the final rule expanded the regulation's scope. *See* Keysight Br. 38-40. The proposed rule was limited to GILTI. 83 Fed. Reg. at 51077. The final rule goes much further: by allocating deductions to "residual CFC gross income," it ensures that those deductions cannot reduce any category of taxable income, including Subpart F income. *See* 84 Fed. Reg. at 29300 (acknowledging that Treasury "broaden[ed]" the rule to extend to "subpart F income"). Yet nothing in the proposed rule suggested that Treasury was considering this expansion. The notice of proposed rulemaking discussed GILTI exclusively. The only mention of Subpart F was a cross-reference to separate proposed regulations addressing different issues. *See* 83 Fed. Reg. at 51075. No interested party reading the proposed rule would have anticipated that the final rule would reach beyond GILTI to affect Subpart F deductions.

The government's responses lack merit. It points (Br. 44) to a sentence in the preamble stating that transactions that are allowed under the proposed rules "may, nonetheless, be challenged under other statutory provisions or judicial doctrines." 83 Fed. Reg. at 51077. But what the government might do under *other* provisions or doctrines does not give notice that the agency intended to broaden *this* regulation.

29

Finally, the government suggests (Br. 45) that Keysight may lack standing to challenge the expanded scope of the final rule because Keysight is not claiming Subpart F deductions. But Keysight is not bringing a freestanding challenge to hypothetical Subpart F applications. Keysight is arguing that the final rule's broadened scope – which the government admits was not disclosed in the proposed rule – renders the rule procedurally invalid. The appropriate remedy for a rule that is not a logical outgrowth of the proposed rule is vacatur. *See Mid Continent Nail*, 846 F.3d at 1386. That would redress Keysight's injury by removing the rule that currently forecloses the GILTI deductions Keysight seeks. That is sufficient for standing. *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021).

## CONCLUSION

The Court should grant partial summary judgment to Keysight on the ground that Treasury Regulation § 1.951A-2(c)(5) is invalid and deny the government's cross-motion.

DATED:  February 3, 2026

Respectfully submitted,

 /s/ Jenny A. Austin
JENNY A. AUSTIN
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 701-7140
jaustin@mayerbrown.com

*Of counsel:*
GARY B. WILCOX
NICOLE A. SAHARSKY
ANTHONY D. PASTORE
MARIA C. CRITELLI
MINH NGUYEN-DANG
GRAHAM WHITE
ZACHARY C. WEIT
MADISON T. ZEEMAN

*Attorneys for Plaintiff*

30